No. 24-20485

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

DARAIUS DUBASH; FARAZ HARSINI,

*Plaintiffs-Appellants,*

v.

CITY OF HOUSTON; HOUSTON DOWNTOWN PARK CORPORATION; ROBERT DOUGLAS; VERN WHITWORTH; DISCOVERY GREEN CONSERVANCY, FORMERLY KNOWN AS HOUSTON DOWNTOWN PARK CONSERVANCY; MARRY MANDEL,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Southern District of Texas 4:23-cv-03556 (Hanen, J.)

## BRIEF OF *AMICUS CURIAE* AMERICAN HINDU COALITION IN SUPPORT OF PLAINTIFFS-APPELLANTS AND REVERSAL

Nicholas Reaves
   *Counsel of Record*
YALE LAW SCHOOL
FREE EXERCISE CLINIC
1919 Penn. Ave. N.W., Ste. 400
Washington, D.C. 20006
Tel. (202) 955-0095
*nicholas.reaves@yale.edu*

*Counsel for* Amicus Curiae

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), the American Hindu Coalition certifies that it does not have a parent corporation and that no publicly held company has 10 percent or greater ownership in the American Hindu Coalition.

**SUPPLEMENTAL STATEMENT OF INTERESTED PERSONS**

Pursuant to Fifth Circuit Rules 26.1.1, 28.2.1, and 29.2, the undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

Dated:  February 28, 2025

*/s/ Nicholas Reaves*
Nicholas Reaves
*Counsel of Record for Amicus Curiae*

<u>*Amicus Curiae*</u>:

American Hindu Coalition

<u>Counsel for *Amicus Curiae*</u>:

Nicholas Reaves of the Yale Law School Free Exercise Clinic

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

SUPPLEMENTAL STATEMENT OF INTERESTED PERSONS ........................ ii

TABLE OF AUTHORITIES .............................................................................. v

INTEREST OF THE *AMICUS CURIAE* .................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................... 1

ARGUMENT ................................................................................................... 3

I.      America's Public Parks and Streets Play a Critical Role in Its Historical Tradition of Free Discourse, Especially for Religious Minorities ................. 3

    A.      Public Parks and Streets Have Long Served as Centers of Speech and Religious Activity in the United States ........................................... 4

    B.      Minority Religions Rely on Public Parks and Streets to Exercise Their Faith ........................................................................................ 8

II.     Many Faith Traditions—Including Hinduism—Teach and Practice Nonviolence ................................................................................................ 11

    A.      Beliefs About Nonviolence Are Important to Many Faith Traditions ........................................................................................ 11

    B.      Practicing and Advocating for Nonviolence Is Central to the Hindu Belief of *Ahimsa* ................................................................. 14

III.    Appellees' Discretionary Decision to Remove Mr. Dubash Fails First Amendment Scrutiny .................................................................................. 17

    A.      Appellees' Ban Is Subject to Strict Scrutiny ....................................... 17

        1.      Appellees' Ban Is Subject to Strict Scrutiny Under TRFRA Because It Substantially Burdens Mr. Dubash's Religious Conduct ................................................................................. 17

        2.      Appellees' Ban Is Subject to Strict Scrutiny Under the Free Exercise Clause Because It Is Not Neutral and Generally Applicable ................................................................................. 18

B.    Appellees' Removal of Dr. Harsini Does Not Help Them Avoid Strict Scrutiny.......................................................................20

C.    Appellees' Exclusion of Mr. Dubash Fails Strict Scrutiny.................23

CONCLUSION.........................................................................................24

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. City of Wellington,*
  19 P. 719 (Kan. 1888) ...........................................................................6

*Barr v. City of Sinton,*
  295 S.W.3d 287 (Tex. 2009) ...............................................................21

*State ex rel. Bigelow v. Spiegel,*
  43 Ohio C.C. 595 (Ohio Ct. App. 1915)...............................................9

*Cantwell v. Connecticut,*
  310 U.S. 296 (1940)..............................................................................10

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
  508 U.S. 520 (1993)..............................................................18, 20, 23

*City of Boerne v. Flores,*
  521 U.S. 507 (1997)..............................................................................23

*City of Chicago v. Trotter,*
  26 N.E. 359 (Ill. 1891) ..........................................................................6

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,*
  473 U.S. 788 (1985)................................................................................7

*In re Frazee,*
  30 N.W. 72 (Mich. 1886)........................................................................6

*Fulton v. City of Philadelphia,*
  593 U.S. 522 (2021)........................................................................19, 21

*Hague v. Comm. for Indus. Org.,*
  307 U.S. 496 (1939)............................................................................3, 7

*Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.,*
  452 U.S. 640 (1981)..............................................................................10

*Int'l Soc'y for Krishna Consciousness, Inc. v. Lang,*
  398 N.Y.S.2d 20 (N.Y. Sup. Ct. 1977)................................................11

*Kennedy v. Bremerton Sch. Dist.*,
　597 U.S. 507 (2022)..............................................................................3, 19

*Kunz v. New York*,
　340 U.S. 290 (1951)...................................................................................10

*Marsh v. Chambers*,
　463 U.S. 783 (1983).....................................................................................3

*McAllen Grace Brethren Church v. Salazar*,
　764 F.3d 465 (5th Cir. 2014) ....................................................................17

*Merced v. Kasson*,
　577 F.3d 578 (5th Cir. 2009) ...............................................................17, 18

*Rich v. City of Naperville*,
　42 Ill. App. 222 (1891) ................................................................................6

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
　592 U.S. 14 (2020).................................................................19, 21, 22, 23

*Tandon v. Newsom*,
　593 U.S. 61 (2021)..........................................................................19, 21, 23

*Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*,
　450 U.S. 707 (1981).............................................................................13, 14

*United States v. Seeger*,
　380 U.S. 163 (1965)...................................................................................14

**Statutes**

Tex. Civ. Prac. & Rem. Code § 110.001(a)(1) ...........................................20

Tex. Civ. Prac. & Rem. Code § 110.003 ....................................................17

Va. Code of 1833, § 31 ..................................................................................8

**Other Authorities**

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction*
　(1998)............................................................................................................8

Akhil Reed Amar, *The Words that Made Us: America's Constitutional Conversation, 1760–1840* (2021) ...................................................4

Matthew Berkowitz, *Greetings of Peace*, Jewish Theological Seminary (Dec. 16, 2006), https://perma.cc/U5QV-W442 ...............................13

R. B. Bernstein, *Rediscovering Thomas Paine*, 39 N.Y.L. Sch. L. Rev. 873 (1994) ...................................................................................................4

*Bhagavad Gita* 16.1–3, https://perma.cc/5JV9-VY54 (last visited Feb. 27, 2025) ..............................................................................................15

Bhuvan Chandel, *Gandhi on Non-Violence (*Ahimsa*)*, 6 Diogenes 135 (2017) .....................................................................................................16

Sonia Chaudhary, *Gandhi's Concept of Non-Violence*, Nat'l J. Com. & Mgmt. 37 (2022) ........................................................................16

Hope K. Fitz, *Ahimsa: A Way of Life; A Path to Peace*, Univ. of Mass., Dartmouth Center for Indic Stud. 1 (2007) .................................14

Benjamin Franklin, *The Autobiography of Benjamin Franklin* (Houghton, Mifflin & Co. 1888) ........................................................5, 8

*Hebrews* 12:14 (English Standard Version) ...........................................12

Jehovah's Witnesses, *Preaching Publicly and from House to House*, https://perma.cc/FH8G-P5EL (last visited Feb. 27, 2025) ................10

Thomas S. Kidd, *George Whitefield: America's Spiritual Founding Father* (2014) .................................................................................5, 8

Jeffrey D. Long & Michael G. Long, *Nonviolence in the World's Religions: A Concise Introduction* (1st ed. 2021) ...........................12, 13, 15, 16

*Mahabharata* 18:116.37–14 ...................................................................15

*Matthew* 5:38–39 (English Standard Version).......................................12

Stephen Mansfield, *Forgotten Founding Father: The Heroic Legacy of George Whitefield* (2001) .................................................................5

Kerry O'Halloran, *Conscientious Objection: Dissent and Democracy in a Common Law Context* (2022).....................................................14

Pope Francis, *Fratelli Tutti*, The Holy See (Oct. 3, 2020),
    https://bit.ly/3Qy5EsM ......................................................................12

Acharya Prashant, *Is It Possible to Be Spiritual and Eat Animals?*, AP
    Articles (2017), https://perma.cc/WT28-U2GY .................................16

*Qur'an* 5:32 (M. A. S. Abdel Haleem trans. 2004) ...................................13

Geoffrey R. Stone, *Fora Americana: Speech in Public Places*, 1974
    Sup. Ct. Rev. 233 (1974) .....................................................................7

Jacobus tenBroek, *Equal Under Law* (1951)............................................9

## INTEREST OF THE *AMICUS CURIAE*

The American Hindu Coalition ("AHC") is a nonpartisan advocacy organization based in Washington, D.C., with significant membership in several states. AHC represents Hindus, Buddhists, Jains, Sikhs, and related members of minority religions. Because its members' religious practices may be unfamiliar to mainstream America, AHC files this brief to clarify the sincere, religious nature of its members' beliefs and the burdens government regulation places on those beliefs. Religious freedom—including the right to live, speak, and act according to one's religious beliefs, peacefully and publicly—is an essential component of AHC's platform. AHC supports Appellant Daraius Dubash in ensuring that the free exercise of religion remains protected in public spaces.[1]

## INTRODUCTION AND SUMMARY OF ARGUMENT

The City of Houston and its associated defendants prevented Appellant Daraius Dubash from engaging in peaceful expression in a public park.[2] That

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *Amicus* affirms that no counsel for a party authored this brief in whole or in part and that no person other than *Amicus*, its members, and its counsel made a monetary contribution to its preparation or submission. The parties have consented to the filing of this brief. *See* Fed. R. App. P. 29(a)(2). This brief is prepared by a clinic operated by Yale Law School but does not purport to present the School's institutional views, if any.

[2] *Amicus* does not address the question of state action and instead focuses on the constitutional free exercise questions presented by this case. Because *Amicus* understands that Appellant Dr. Faraz Harsini has not asserted a free exercise claim, the arguments in this brief primarily concern Mr. Dubash.

decision runs afoul of American tradition, burdens Mr. Dubash's religious exercise, and violates both the U.S. Constitution and Texas law.

In the United States, public spaces have always been open to peaceful expression. Even before the Founding, American colonists voiced their political discontent in the streets. And both public streets and public fields (predecessors of public parks) played host to the most popular religious evangelists of the time: itinerant preachers. Drawing on that tradition, nineteenth- and twentieth-century courts routinely protected the freedom to engage in religious expression in public spaces. These protections were—and still are—most critical for religious minorities, the very groups which are most likely to resort to public religious exercise out of necessity or religious compulsion. Over time, these protections for public religious expression became enshrined in our constitutional order.

Here, Mr. Dubash's religious expression takes the form of advocacy for non-violence. This advocacy is a central tenet of many faith traditions, including Hinduism. Mr. Dubash's actions were motivated by his Hindu faith and his belief in "*ahimsa*." *Ahimsa* is a foundational aspect of Vedantic Hinduism and, according to the Veda, obligates followers to protect animals from violence. Indeed, the vast majority of Hinduism's leading *sampradaya* (religious traditions) regard the ethical treatment of non-human animals as a fundamental application of the Hindu understanding that the Divine exists in all living beings.

2

By preventing Mr. Dubash from engaging in the non-violent advocacy required by his religious beliefs, Appellees burdened Mr. Dubash's religious free exercise. Consequently, both the Texas Religious Freedom Restoration Act and the Free Exercise Clause of the U.S. Constitution require that Appellees satisfy strict scrutiny. Because Appellees' actions are not narrowly tailored to advance a compelling governmental interest, Appellees cannot meet this high bar.

## ARGUMENT

### I.     America's Public Parks and Streets Play a Critical Role in Its Historical Tradition of Free Discourse, Especially for Religious Minorities.

The First Amendment demands "[a]n analysis focused on original meaning and history." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 536 (2022). Under that analysis, practices that are "deeply embedded in the history and tradition of this country" demand special respect. *Marsh v. Chambers*, 463 U.S. 783, 786 (1983). Because Americans have "immemorially" used "streets and parks" for expression, *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939) (plurality), the government must tread carefully when regulating expression in these spaces. And minority religions especially depend on protecting free access to public parks and streets.

3

**A.     Public Parks and Streets Have Long Served as Centers of Speech and Religious Activity in the United States.**

American history is marked with a tradition of protecting the freedom of speech in public places. This tradition—encompassing both political and religious messages—has its roots in the nation's Founding, proceeds through Reconstruction, and continues to this day.

Decades before the Constitution was ratified, colonists began developing a tradition of street protests. In Boston, for instance, protests in the streets led to the high-profile "[i]ntercolonial conversation" that helped speed the colonies towards the American Revolution. Akhil Reed Amar, *The Words that Made Us: America's Constitutional Conversation, 1760–1840*, at 54 (2021). Indeed, British actions—from the Stamp Act of 1765 to the Townshend Duties of 1767 and the Boston Massacre in 1770—were reliably met with a distinctively American response: political expression in town squares. *Id.* at 54, 68, 73.

As the American colonies lurched towards revolution, the public streets remained a locus for public debate. One of this debate's most important participants was Thomas Paine, whose pamphlet *Common Sense* "redirected the course of American history" by shifting discourse towards independence. R. B. Bernstein, *Rediscovering Thomas Paine*, 39 N.Y.L. Sch. L. Rev. 873, 874 (1994). Paine's pamphlet "hit[] the streets of America" in 1776, just as Americans brought their

discontent with Britain out of their homes and into public square. Amar, *supra*, at 96.

Like political speech, Founding-era religious speech was often outdoors. In fact, the "most influential Anglo-American evangelical leader of the eighteenth century" was an itinerant preacher: George Whitefield. Thomas S. Kidd, *George Whitefield: America's Spiritual Founding Father* 260–63 (2014). Like other itinerant preachers of his time, Whitefield commonly preached in public spaces. As Benjamin Franklin recounted, Whitefield filled multiple nearby streets as he preached "from the top of the Court-house steps," drawing a crowd numbering around "thirty thousand." Benjamin Franklin, *The Autobiography of Benjamin Franklin* 107–08 (Houghton, Mifflin & Co. 1888).

On other occasions, Whitefield spoke in common fields. *Id.* at 131. And again, the "multitudes of all sects and denominations that attended his sermons were enormous." *Id.* Preaching in the "open air" up and down the colonies, Whitefield had little concern for offense or disruption. *Id.* at 131. America's religious "Founding Father" spread his message regardless of its reception. *See generally* Stephen Mansfield, *Forgotten Founding Father: The Heroic Legacy of George Whitefield* (2001).

Recognizing that the Founding generation's civic and spiritual life played out in public parks and streets, nineteenth-century courts likewise protected later forms

5

of similar public expression. One state supreme court, for instance, held that an ordinance preventing political parties from parading in the streets "contravene[d] common right." *Anderson v. City of Wellington*, 19 P. 719, 721 (Kan. 1888). The ordinance was "an abridgment of the rights of the people" because it "represse[d] associated effort" to produce "expression on great public questions, economic, religious, and political." *Id.* at 722. In "the public streets," the right to publicly demonstrate was "too firmly established, and has been too often exercised, to be now questioned." *Id.*

Nor was this anomalous. Michigan's Supreme Court, for example, reached the same result and invalidated a similar ordinance in *In re Frazee*, 30 N.W. 72 (Mich. 1886). The court explained that the ordinance violated the consensus of "all free countries" that "people who are assembled for common purposes" may "parade together, by day or reasonable hours at night" in public streets. *Id.* at 75; *accord Rich v. City of Naperville*, 42 Ill. App. 222, 224 (1891) (endorsing *Frazee*). This principle was also extended to attempts by government officials to use their discretion to curtail public expression. The Illinois Supreme Court invalidated a Chicago ordinance banning "parades or processions" without a permit, the issuance of which was subject to "the discretion or caprice of the superintendent of police to imperatively prescribe who shall be permitted to gather together in such processions, and who shall not." *City of Chicago v. Trotter*, 26 N.E. 359, 360 (Ill. 1891).

America's legal tradition thus makes clear that freedom of expression—religious or otherwise—in public spaces has long been held dear. *See also* Geoffrey R. Stone, *Fora Americana: Speech in Public Places*, 1974 Sup. Ct. Rev. 233, 238, 239–45 (1974) (collecting evidence of how "parks and streets ha[ve] historically been used for speech and assembly").

This American consensus on freedom of expression in public places still endures. In *Hague v. Committee for Industrial Organization*, the Supreme Court bridged common-law tradition with the modern era. As the Court explained, "[w]herever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague*, 307 U.S. at 515 (plurality). Indeed, the Court went on to note that "from ancient times," such "use of the streets and public places has . . . been a part of the privileges, immunities, rights, and liberties of citizens." *Id.*; *see also Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985) (identifying "[p]ublic streets and parks" as "places which by long tradition or by government fiat have been devoted to assembly and debate" (internal quotation marks omitted)).

7

**B.    Minority Religions Rely on Public Parks and Streets to Exercise Their Faith.**

For religious minorities, America's ongoing tradition of open public expression constitutes a spiritual necessity. That tradition has benefited and still benefits a wide range of groups: Founding-era Methodists, Reconstruction-era black churches, twentieth-century populist churches, atheists, Jehovah's Witnesses, outdoor Gospel workers, and Hindus.

Return, for instance, to George Whitefield, the "first internationally famous itinerant preacher." Kidd, *supra*, at 260–63. Whitefield did not willingly choose open-air public fields and streets as his venues. In fact, he began preaching in churches. Franklin, *supra*, at 131. But there was a problem. Whitefield's ideas were new and unorthodox; "the clergy" soon took "a dislike to him" and "refused him their pulpits." *Id.* So Whitefield had no choice: "he was obliged to preach in the fields." *Id.* Having that option allowed him to continue his ministry.

Other marginalized religious groups historically faced similar obstacles to private assembly. In Virginia, for instance, the state government enacted a law prohibiting "[e]very *assemblage* of negroes for the purpose of religious worship"— no exceptions. Va. Code of 1833, § 31 (emphasis added). After the Civil War, the Reconstruction Congress "took direct aim at laws like the one Virginia had passed" when framing the Fourteenth Amendment. Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* 245 (1998). In Congress's eyes, the right of black

8

Americans "to assemble peaceably on the Sabbath for the worship of [the] Creator" was essential. Jacobus tenBroek, *Equal Under Law* 124–25 (1951). Congress therefore ensured that the suppression of black religious groups would not endure. Instead, that shameful practice was a temporary exception to the historical rule: In America, public religious assembly is for everyone.

That rule protected religious minorities in the twentieth century too. Take, for example, the People's Church, a local Cincinnati denomination that blended Christianity with labor advocacy. *State ex rel. Bigelow v. Spiegel*, 43 Ohio C.C. 595, 596 (Ohio Ct. App. 1915). This small religious society did not have a building in which it could hold services. Instead, it sought to hold "open air," "street corner" meetings. *Id.* at 595–96. These meetings, however, upset Cincinnati's mayor, who denied the group a permit and claimed that the city's streets were meant for "traffic," "vehicles," and "pedestrians"—not for a "church or religious denomination." *Id.* at 597. To make matters worse, the mayor nevertheless allowed "other organizations" to use public streets "for various purposes, religious, political, commemorative and otherwise." *Id.* at 598. The People's Church sued—and won. The court ruled that "public parades and demonstrations, whether religious or political," are "fundamental and constitutional rights." *Id.* at 604.

Some religious minorities, like the Jehovah's Witnesses, understand public preaching as a divine commandment. For example, Newton Cantwell and his two

sons walked through the streets of a heavily Catholic town while launching a vocal "attack on the Catholic religion." *Cantwell v. Connecticut*, 310 U.S. 296, 301 (1940). No doubt their listeners—perhaps like some of Mr. Dubash's—were "offended." *Id.* at 309. But for Jehovah's Witnesses, proclaiming their faith "in public places" is an article of faith. Jehovah's Witnesses, *Preaching Publicly and from House to House*, https://perma.cc/FH8G-P5EL (last visited Feb. 27, 2025). So when Connecticut prosecuted and convicted these street preachers, the Supreme Court reversed the convictions. Importantly, it noted that each of the Cantwells "was upon a public street, where he had a right to be, and where he had a right peacefully to impart his views to others." *Cantwell*, 310 U.S. at 308.

Other religious minorities have similar beliefs. A Baptist minister who subscribed to "Outdoor Gospel Work," for instance, had a sincere religious conviction that his "duty [was] to 'go out on the highways and byways and preach the word of God.'" *Kunz v. New York*, 340 U.S. 290, 292 (1951). Citing *Hague* and *Cantwell*, the Supreme Court held that New York could not deny him the "use of public streets for the expression of religious views" by vesting discretion in an official with "no appropriate standards to guide his action." *Id.* at 293–95.

Many practitioners of Hindu-affiliated religions also rely on public parks and streets to exercise their faith. As the Supreme Court has recognized, members of the Krishna religious society practice "Sankirtan" as a "religious ritual." *Heffron v. Int'l*

*Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 645 (1981). This ritual requires "members to go into public places to distribute or sell religious literature and to solicit donations." *Id.* Accordingly, practitioners of the Krishna religion are spiritually obligated to engage passersby in places like parks and streets. And when the government seeks to prevent that religious exercise, courts rightly intervene. The New York Supreme Court, for instance, required the state to grant Krishna adherents a permit to use a public park, criticizing the government for acting on "the unpopularity of the [Krishna] society and the community's dislike and fear of its religious beliefs and practices." *Int'l Soc'y for Krishna Consciousness, Inc. v. Lang*, 398 N.Y.S.2d 20, 22 (N.Y. Sup. Ct. 1977).

History, tradition, and precedent leave no doubt: When Mr. Dubash took his religious exercise to a public park, he did not give up his First Amendment rights. American courts have long safeguarded expressive and religious rights in public parks and streets—rights that are especially important for religious minorities.

## II.    Many Faith Traditions—Including Hinduism—Teach and Practice Nonviolence.

### A.    Beliefs About Nonviolence Are Important to Many Faith Traditions.

Nonviolence is a core belief and virtue that spans many religious traditions. "The admonition that individuals should not kill is a basic principle in the Abrahamic faiths. It is even more prominent in the Indic faiths, such as Hinduism, Buddhism,

Jainism, and to some extent, Sikhism." Jeffrey D. Long, & Michael G. Long, *Nonviolence in the World's Religions: A Concise Introduction* 5 (1st ed. 2021). For Christians, the gospel includes many teachings on nonviolence. In the well-known "Sermon on the Mount," Jesus instructed a crowd to choose humility and restraint over violence: "You have heard that it was said, 'An eye for an eye and a tooth for a tooth.' But I say to you, Do not resist the one who is evil." *Matthew* 5:38–39 (English Standard Version, "ESV"); *Hebrews* 12:14 (ESV) ("Strive for peace with everyone, and for the holiness without which no one will see the Lord."); *see also* Pope Francis, *Fratelli Tutti*, The Holy See (Oct. 3, 2020), https://bit.ly/3Qy5EsM (teaching against war and violence and in favor of peace).

Indeed, two of the twentieth century's most prominent Christian leaders—Martin Luther King, Jr. and Pope Saint John Paul II—were deeply committed to nonviolence. "King not only brought Gandhian techniques and philosophy into the civil rights struggle of the 1950s and 60s, he inspired a succession of antiwar movements and reshaped the political discourse of mainstream Protestant churches." Long, et al., *supra*, at 97. And "John Paul [II]'s leadership was critical in what seemed unimaginable until the cascading events of 1989, which dismantled the Soviet empire and ended the Cold War." *Id.*

Nonviolence is also a shared belief of the other Abrahamic faiths. Peace is deeply engrained in the Jewish tradition and lifestyle, as seen in common greetings

such as "*shalom*" (peace) and "*shalom aleichem*" (peace be upon you). Matthew Berkowitz, *Greetings of Peace*, Jewish Theological Seminary (Dec. 16, 2006), https://perma.cc/U5QV-W442. In addition, "[n]onviolence has been an integral aspect of Islamic tradition since the time of the Prophet Mohammed." Long, et al., *supra*, at 102. The Qur'an states, "On account of [his deed], We decreed to the Children of Israel that if anyone kills a person—unless in retribution for murder or spreading corruption in the land—it is as if he kills all mankind, while if any saves a life it is as if he saves the lives of all mankind." *Qur'an* 5:32 (M. A. S. Abdel Haleem trans. 2004).

Courts have historically recognized the importance of a belief in nonviolence in a variety of faiths. In a seminal case pitting religious beliefs about nonviolence against the government's need for citizens to support the war effort, the Supreme Court evaluated whether a state could deny an individual unemployment benefits if she resigned on account of religious objections to her work. *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 709 (1981). The petitioner in *Thomas* was a practicing Jehovah's Witness who quit his manufacturing job because his religious beliefs precluded him from participating in the production of military equipment. *Id.* While the lower court denied Thomas unemployment benefits because—it claimed—resignation resulted from a personal, philosophical choice rather than a religious tenet, the Supreme Court disagreed and safeguarded his pacifist beliefs.

*See id.* at 715, 717. The fact that Thomas's faith informed and motivated his view on nonviolence and, consequently, compelled him to reject participation in war manufacturing was enough to substantiate his free exercise claim. *Id.*

Draft-exemption cases similarly demonstrate how pacifist viewpoints are widely respected by the courts. *See, e.g.*, *United States v. Seeger*, 380 U.S. 163, 185 (1965) (ruling in favor of conscientious objectors under the Free Exercise Clause); Kerry O'Halloran, *Conscientious Objection: Dissent and Democracy in a Common Law Context* 241 (2022) ("Conscientious objection to bearing arms has a history that stretches back to the war of independence from Great Britain when the established presence of substantial Quaker communities—especially in Pennsylvania— guaranteed peaceful resistance to conscription in the armed forces.").

## B. Practicing and Advocating for Nonviolence Is Central to the Hindu Belief of *Ahimsa.*

Nonviolence figures prominently in Hinduism. *Ahimsa*, otherwise known as nonviolence or non-injury for all living things, is a foundational virtue for Hinduism, as well as other Indic faiths such as Buddhism and Jainism. *See* Hope K. Fitz, *Ahimsa: A Way of Life; A Path to Peace*, Univ. of Mass., Dartmouth Center for Indic Stud. 1, 7 (2007). This belief, for many practitioners, encompasses a spirit of nonviolence towards animals. *See id.* at 3. *Ahimsa* is religiously linked to concepts such as "*dharma*" (duty) and impacts personal capacity to achieve "*moksha*" (liberation of the soul and rebirth). *See id.* at 4. The duty to refrain from harming

others has existed in Indian religions for hundreds of years and underpins widely known Hindu practices such as adopting a vegetarian diet. Consequently, for Hindu believers, faithfully adhering to *ahimsa* involves significant religious commitment and implicates many lifestyle choices. *See also* Long, et al., *supra*, at 7 (Ahimsa "is not simply a matter of not killing, but nonviolence in 'thought, word and deed.' The word comes from the Sanskrit term, *himsa*, which is not just violence but the desire to harm. The letter 'a' in front of the word negates it, so *ahimsa* can be properly translated as 'the absence of the desire to harm.'").

Hindu scripture explains the importance of *ahimsa* as both an individualized belief and a shared obligation. According to the Mahabharata, one of the primary religious texts in Hinduism, *ahimsa* is the "highest *dharma*," "greatest gift," "highest self-control," "highest truth," and "highest teaching." *Mahabharata* 18:116.37–41; *see also* Long, et al., *supra*, at 12 ("Nonviolence specifically—*ahimsa*, or nonviolence in thought, word, and deed—is . . . an ancient Hindu value."). Thus, adherence to the principles of nonviolence is critical to achieving self-fulfillment. The Bhagavad Gita, another important Hindu text, also underscores the close relationship between *ahimsa* and actively working toward the protection of animals. As the text explains, "*Ahimsa* means not arresting the progressive life of any living entity. . . . There is no necessity for animal killing. This injunction is for everyone." *Bhagavad Gita* 16.1–3, https://perma.cc/5JV9-VY54 (last visited Feb. 27, 2025).

While there is no singular definition of *ahimsa*, one common form of Hinduism—Vedantic Hinduism—teaches that nonviolence should be practiced through activism. In the twentieth century, Mahatma Gandhi, who drew from Vedantic Hindu philosophy, influenced the modern practice of *ahimsa* through his activism. *See* Bhuvan Chandel, *Gandhi on Non-Violence (*Ahimsa*)*, 6 Diogenes 135, 138–39 (2017). Gandhi popularized the belief that *ahimsa* has an active component and embodies positive values, such as resistance to injustice and courage in the face of violence. *See* Sonia Chaudhary, *Gandhi's Concept of Non-Violence*, Nat'l J. Com. & Mgmt. 37, 40 (2022).

Mr. Dubash practices the Vedantic stream of Hinduism, and, accordingly, believes that *ahimsa* requires him to advocate for the humane and ethical treatment of animals. Appellants' Br. 8. He follows the teachings of Acharya Prashant, who has written that "veganism in its essence is religion" and encouraged others to forgo eating meat to attain greater spirituality. Acharya Prashant, *Is It Possible to Be Spiritual and Eat Animals?*, AP Articles (2017), https://perma.cc/WT28-U2GY; *see also* Long, et al., *supra*, at 21 ("If God dwells within the heart of all beings, then it follows that if we do harm, or even wish harm, to another being, we are actually, in a very real sense, wishing harm to God."). It is thus unsurprising that Mr. Dubash's religious beliefs led him to seek to advocate for them in a public park.

III.   **Appellees' Discretionary Decision to Remove Mr. Dubash Fails First Amendment Scrutiny.**

By prohibiting Mr. Dubash from advocating for the humane and ethical treatment of animals, Appellees precluded Mr. Dubash from practicing *ahimsa* and thereby burdened his religious exercise. Under both the Texas Religious Freedom Restoration Act and the Free Exercise Clause of the U.S. Constitution, Appellees must justify that burden by satisfying strict scrutiny. Because Appellees' policy cannot meet this exacting standard, Mr. Dubash's religious exercise claims should succeed.

A.     **Appellees' Ban Is Subject to Strict Scrutiny.**

Appellees' actions are subject to strict scrutiny under the Texas Religious Freedom Restoration Act ("TRFRA") because they substantially burden Mr. Dubash's religious conduct. And they are subject to strict scrutiny under the Free Exercise Clause because they are not neutral and generally applicable.

1.     **Appellees' Ban Is Subject to Strict Scrutiny Under TRFRA Because It Substantially Burdens Mr. Dubash's Religious Conduct.**

TRFRA subjects government action to strict scrutiny whenever it substantially burdens a person's free exercise of religion. Tex. Civ. Prac. & Rem. Code § 110.003. This Court has held that "the government's *ban* of conduct sincerely motivated by religious belief substantially burdens an adherent's free exercise of that religion." *Merced v. Kasson*, 577 F.3d 578, 590 (5th Cir. 2009); *see also McAllen Grace*

*Brethren Church v. Salazar*, 764 F.3d 465, 472 (5th Cir. 2014) ("[C]omplete bans on religious conduct 'substantially burden an adherent's free exercise of that religion.'" (quoting *A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.*, 611 F.3d 248, 264 (5th Cir. 2010)) (alteration adopted)).

According to the complaint, Mr. Dubash's display of videos depicting the conditions inside factory farms is conduct sincerely motivated by religious belief. *See* Appellants' Br. 8; *see also supra* § II.B. Appellees had Mr. Dubash arrested and removed for showing these videos, and they continue to prohibit him from doing so. Appellants' Br. 9–12. That is a substantial—*i.e.*, a "real" and "significant," *Merced*, 577 F.3d at 588—burden on his free exercise. Appellants' Br. 37.[3]

### 2.    Appellees' Ban Is Subject to Strict Scrutiny Under the Free Exercise Clause Because It Is Not Neutral and Generally Applicable.

Government action that burdens religious exercise is subject to strict scrutiny under the Free Exercise Clause unless it is neutral and generally applicable. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993); *see*

---

[3] The fact that Mr. Dubash has been able to practice his religion elsewhere does not make the burden less than substantial. In *Merced*, this Court considered a ban on animal sacrifice in the City of Euless, Texas, which precluded the plaintiff-appellant, a Santeria priest, from performing religiously required rituals. 577 F.3d at 581. The Court found that the ban imposed a substantial burden because it "forced [the plaintiff] to choose between living in Euless and practicing his religion." *Id.* at 591. The fact that a ban is geographically limited is not enough to avoid strict scrutiny.

*also Kennedy*, 597 U.S. at 525 ("[A] plaintiff may carry the burden of proving a free exercise violation . . . by showing that a government entity has burdened his sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'"). This is a separate and independent path to strict scrutiny.

Laws are not generally applicable when they provide "a mechanism for individualized exemptions." *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021) (quoting *Emp. Div. v. Smith*, 494 U.S. 872, 884 (1990)); *accord Kennedy*, 597 U.S. at 526. Here, the complaint sufficiently alleges that Appellees have numerous discretionary mechanisms for granting exemptions. Appellees did not identify any rule or policy they were enforcing, and their agents even stated that what speech is permitted is determined on a "case by case" basis. Appellants' Br. 10. Appellees' decisions on what conduct and content to permit are therefore all "individualized," and exemptions can be made when Appellees deem them appropriate. *Fulton*, 593 U.S. at 533.

Laws also fail to be neutral and generally applicable when they treat "*any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam) (citing *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 16–18 (2020)). Appellees here treated Mr. Dubash's religious conduct less favorably than comparable secular conduct. For example, when Appellees hosted an LGBTQ celebration, "Rainbow on the Rink,"

that "featured music, performances by local drag queens, and a roller-skating dance party," some guests complained. *See* Compl. ¶ 78, *Dubash v. City of Houston*, No. 4:23-cv-3556 (S.D. Tex. Sept. 20, 2023), ECF No. 1. Parents believed that the celebration was not "family appropriate." *Id.* ¶ 79. Despite the complaints, Appellees did not disrupt that event. *Id.* ¶ 81.

Because Appellees' ban fails both of these tests for neutrality and general applicability, it is subject to strict scrutiny under the Free Exercise Clause.

### B.    Appellees' Removal of Dr. Harsini Does Not Help Them Avoid Strict Scrutiny.

Appellees removed Dr. Harsini for conduct similar to Mr. Dubash's. Appellants' Br. 8–9. In briefing below, Appellees suggested that this weakens Mr. Dubash's free exercise claim. *See* Defs.' Resp. to Pls.' Mot. for Prelim. Inj. at 24, *Dubash v. City of Houston*, No. 4:23-cv-3556 (S.D. Tex. Dec. 27, 2023), ECF No. 41. But this argument misunderstands the Free Exercise Clause.

Religious conduct is protected because of its *motivation*, not its form. TRFRA defines the "[f]ree exercise of religion" as "an act . . . that is substantially motivated by sincere religious belief." Tex. Civ. Prac. & Rem. Code § 110.001(a)(1). The Free Exercise Clause protects "conduct motivated by religious belief." *Lukumi*, 508 U.S. at 543. Because these protections turn on a person's underlying motivations, the very same actions might be protected when motivated by religious belief but unprotected

when lacking religious motivation.[4] *See Barr v. City of Sinton*, 295 S.W.3d 287, 300 (Tex. 2009) ("Just as a Bible study group and a book club are not treated the same, neither are a halfway house operated for religious purposes and one that is not.").

To be sure, the protections of the Free Exercise Clause depend on whether the government imposes burdens on religious and secular conduct alike. But government action is not entitled to *Smith*'s deferential level of scrutiny merely because it treats *some* secular conduct as unfavorably as it treats religious conduct: "[G]overnment regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon*, 593 U.S. at 62; *see also Roman Cath. Diocese*, 592 U.S. at 29 (Kavanaugh, J., concurring) ("[I]t does not suffice for a State to point out that, as compared to houses of worship, *some* secular businesses are subject to similarly severe or even more severe restrictions.").

And *Fulton* explains that the presence of "a mechanism for individualized exemptions" is itself sufficient to render a law not generally applicable. 593 U.S. at 533. The government cannot make a law generally applicable simply by withholding

---

[4] As noted above, *Amicus* understands that Dr. Harsini has not asserted a free exercise claim in this action. *See supra* n.2. Nothing in this brief is intended to comment on the viability of Dr. Harsini's other First Amendment claims.

exemptions from some secular conduct in addition to the religious conduct it burdens.

Here, the government treated Dr. Harsini as unfavorably as it treated Mr. Dubash. But the Free Exercise Clause is not satisfied merely because *some* secular conduct is leveled down to the same unfavorable treatment as religious conduct. *See Roman Cath. Diocese*, 592 U.S. at 29 (Kavanaugh, J., concurring) ("[O]nce a State creates a favored class of [conduct] . . . the State must justify why [religious conduct is] excluded from that favored class."). The purpose of the right of free exercise is to allow people to practice their religion, not just to ensure that whenever people cannot practice their religion, at least some secular conduct is similarly burdened.

Nor would it help Appellees if they did not know, at the time that they had Mr. Dubash arrested and removed, that his conduct was religiously motivated. *See* Defs.' Resp. to Pls.' Mot. for a Prelim. Inj., *supra*, at 24. The government cannot be free to burden religious conduct so long as it remains ignorant of the religious motivation. Indeed, such a rule would disproportionately impact adherents of less well-known religious practices, such as Mr. Dubash, and would incentivize government actors to avoid taking proactive steps to accommodate them. Such a result would be perverse.

## C.    Appellees' Exclusion of Mr. Dubash Fails Strict Scrutiny.

By triggering strict scrutiny, the burden shifts to Appellees to prove that their actions are narrowly tailored to advance a compelling governmental interest. *See Lukumi*, 508 U.S. at 546. Strict scrutiny is "the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). Appellees come nowhere close to satisfying this demanding standard.

Appellees have described their interest as "protecting children from being subjected to the videos" being shown by Mr. Dubash. Defs.' Reply to Pls.' Opp'n to Mot. to Dismiss at 22, *Dubash v. City of Houston*, No. 4:23-cv-3556 (S.D. Tex. Feb. 19, 2024), ECF No. 58; *see also* Defs.' Resp. to Pls.' Mot. for a Prelim. Inj., *supra*, at 23. But, among other things, Appellees fail to explain why less restrictive alternatives would not advance this interest equally well. *See Roman Cath. Diocese*, 592 U.S. at 18 (COVID-19 regulations failed strict scrutiny because "less restrictive rules" would achieve the government's objective); *see also Tandon*, 593 U.S. at 63 ("narrow tailoring requires the government to show that measures less restrictive of the First Amendment could not address its interest"). For example, Mr. Dubash has already alleged that he does not attempt to talk to or show videos to children. Compl., *supra*, ¶ 42. Were this not sufficient, Appellees could even put up their own signs alerting patrons that Mr. Dubash's speech might not be suitable for children. Having

failed to explain why any of a number of less restrictive means would not also satisfy Appellees' alleged interest, Appellees fail strict scrutiny.

## CONCLUSION

For the foregoing reasons, the District Court's decision should be reversed and the case remanded for further proceedings.

February 28, 2025                    Respectfully submitted,

                                     */s/ Nicholas Reaves*

                                     Nicholas Reaves
                                     YALE LAW SCHOOL
                                     FREE EXERCISE CLINIC
                                     1919 Penn. Ave. N.W., Ste. 400
                                     Washington, D.C. 20006

                                     *Counsel for* Amicus Curiae

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th Day of February 2025, an electronic copy of the foregoing was filed with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system, and that service will be accomplished by the appellate CM/ECF system.

*/s/ Nicholas Reaves*
Nicholas Reaves

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) and Fifth Circuit Rule 32.2, this document contains 5,446 words.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman font.

Dated: February 28, 2025                    */s/ Nicholas Reaves*
                                            Nicholas Reaves