No. 24-20485

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

_____

DARAIUS DUBASH; FARAZ HARSINI,

*Plaintiffs–Appellants,*

v.

CITY OF HOUSTON; HOUSTON DOWNTOWN PARK CORPORATION; ROBERT DOUGLAS; VERN WHITWORTH; DISCOVERY GREEN CONSERVANCY, FORMERLY KNOWN AS HOUSTON DOWNTOWN PARK CONSERVANCY; BARRY MANDEL,

*Defendants–Appellees.*

_____

On Appeal from a Final Judgment of the United States District Court
for the Southern District of Texas, Houston Division
Case No. 4:23-cv-03556, Hon. Andrew S. Hanen

_____

## THE BRIEF OF THE LAW ENFORCEMENT ACTION PARTNERSHIP AND THE NATIONAL POLICE ACCOUNTABILITY PROJECT AS AMICI CURIAE SUPPORTING APPELLANT AND REVERSAL

_____

Lauren Bonds
NATIONAL POLICE ACCOUNTABILITY PROJECT
1403 Southwest Blvd
Kansas City, KS 66103

February 28, 2025

# CERTIFICATE OF INTERESTED PERSONS

(1)  Case No. 24-20485, *Dubash, et al. v. City of Houston*

(2)  The undersigned counsel of record certifies that the following

listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an

interest in the outcome of this case. These representations are made in order that the

judges of this court may evaluate possible disqualification or recusal.

1.  Daraius Dubash
    *Plaintiff*

2.  Dr. Faraz Harsini
    *Plaintiff*

3.  John Greil
    Steven T. Collis
    Law and Religion Clinic
    University of Texas School of Law
    727 E. Dean Keaton St.
    Austin, TX 78705
    *Attorneys for Plaintiffs*

4.  JT Morris
    Gabe Walters
    Zach Silver
    Foundation for Individual Rights and Expression
    700 Pennsylvania Ave. SE, Ste. 340
    Washington, D.C. 20003
    *Attorneys for Plaintiffs*

5.  Sara Berinhout
    Daniel Ortner
    Foundation for Individual Rights and Expression
    510 Walnut St., Ste. 900
    Philadelphia, PA 19106
    *Attorneys for Plaintiffs*

6.  City of Houston, Texas
    City of Houston Legal Department
    900 Bagby, Fourth Floor
    Houston, TX 77002

*Defendant*

7.  Houston Downtown Park Corporation
    City of Houston Legal Department
    900 Bagby, Fourth Floor
    Houston, TX 77002
    *Defendant*

8.  Officer Robert Douglas
    Houston Police Department Headquarters
    1200 Travis St.
    Houston, TX 77002
    *Defendant*

9.  Officer Vern Whitworth
    Houston Police Department Headquarters
    1200 Travis St.
    Houston, TX 77002
    *Defendant*

10. Discovery Green Conservancy
    f/k/a Houston Downtown Park Conservancy
    900 Bagby, Fourth Floor
    Houston, TX 77002
    *Defendant*

11. Barry Mandel
    927 W. 19th St., Unit A
    Houston, TX 77008-3301
    *Defendant*

12. Andrew S. Holland
    Wilson, Elser, Moskowitz, Edelman & Dicker, LLP
    909 Fannin St., Ste. 3300
    Houston, TX 77010
    *Attorney for Defendants City of Houston, Texas, Officer Robert Douglas, Officer Vern Whitworth, Discovery Green Conservancy, and Barry Mandel*

13. Laura Flores Macom
    Michael H. Wallis
    Langley & Banack, Inc.
    745 E. Mulberry Ave, Ste. 700
    San Antonio, TX 78212

*Attorneys for Defendant Houston Downtown Park Corporation*

14. Amicus National Police Accountability Project
    Lauren Bonds
    National Police Accountability Project
    1403 Southwest Blvd
    Kansas City, KS 66103
    *Attorney for Amicus National Police Accountability Project*

        /s/ Lauren Bonds_____
        Attorney for Amicus Curiae

## CORPORATE DISCLOSURE STATEMENT

*Amici* are nonprofit organizations. The National Police Accountability Project and Law Enforcement Action Partnership have no parent corporations, and no publicly held corporation owns any portion of any of it. *Amici* do not have a financial interest in the outcome of this litigation.

# TABLE OF CONTENTS

**Page(s)**

Corporate Disclosure Statement ................................................................. iv

Table of Authorities.................................................................................... vi

Interest of the Amicus Curiae .................................................................... 9

Introduction .............................................................................................. 10

Argument .................................................................................................. 11

I.    Accountability for Law Enforcement Officers and Their Employers Is Crucial to Public Confidence in the Police and the Government................... 11

II.   Officers Cannot Claim Arguable Probable Cause and Shield Themselves with Qualified Immunity by Refusing to Investigate Facts........................... 13

     A. Courts have consistently found that officers are not shielded from liability when they are willfully ignorant to easily discoverable facts. ................................................................................................ 14

     B. The cases about private and public property distinctions cited by the District Court are distinguishable from the current case............. 16

     C. Plaintiff should be able to develop the record to determine the officers' reasonableness as a fact-specific inquiry................................. 17

III.  Municipalities Know Their Officers Will Encounter First Amendment Activity and Failure to Provide Clear Policies and Training Is Sufficient to Establish a Monell Claim. ................................................................... 21

     A. Municipalities Are Liable for the Failure to Train and Provide Guidance, Absent Allegations of Past Incidents. ................................... 22

     B. Police Know They Are Going to Encounter Protesters in Public and Quasi-Public Spaces. .......................................................................... 24

Conclusion................................................................................................. 28

Certificate of Compliance........................................................................... 1a

Certificate of Service ................................................................................. 2a

# TABLE OF AUTHORITIES

## Cases

*Bailey v. Iles*, 87 F.4th 275 (5th Cir. 2023) .................................................. 14

*Baptiste v. J.C. Penney Co.*, 147 F.3d 1252 (10th Cir. 1998) ..................................... 14

*Berg v. Cnty. of Allegheny*, 219 F.3d 261 (3d Cir. 2000) ........................................... 22

*Bevier v. Hucal*, 806 F.2d 123 (7th Cir. 1986) ................................................... 14

*Bigford v. Taylor*, 834 F.2d 1213 (5th Cir. 1988) ................................................... 13

*Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890 (6th Cir. 2004) .................................... 22

*Bodzin v. City of Dall.*, 768 F.2d 722 (5th Cir. 1985) ............................................. 15

*Brown v. Bryan Cnty.*, 219 F.3d 450 (5th  Cir. 2000) ............................................. 23

*Buesing v. Honeycutt*, No. A-16-CA-286-SS, 2016 U.S. Dist. LEXIS 54630 (W.D. Tex. Apr. 22, 2016) .................................................................................... 17

*Canton v. Harris*, 489 U.S. 378 (1989) ........................................................... 22

*Connick v. Thompson,* 563 U.S. 51 (2011) ......................................................... 22

*Darden v. City of Fort Worth*, 880 F.3d 722 (5th Cir. 2018) ..................................... 19

*Davenport v. Rodriguez*, 147 F. Supp. 2d 630 (S.D. Tex. 2001) ................................. 19

*Degenhardt v. Bintliff*, 117 F.4th 747 (5th Cir. 2024) ............................................ 18

*Evett v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 330 F.3d 681 (5th Cir. 2003) .............................................................................................. 13

*Flores v. City of Palacios*, 381 F.3d 391 (5th Cir. 2004) .......................................... 17

*Ford v. Anderson Cnty.*, 102 F.4th 292, 320 (5th Cir. 2024) ..................................... 23

*Freeman v. Gore*, 483 F.3d 404 (5th Cir. 2007) .................................................. 17

*Gibson v. Cnty. of Washoe*, 290 F.3d 1175 (9th Cir. 2002) ....................................... 22

*Goodman v. Harris Cnty.,* 571 F.3d 388 (5th Cir. 2009) .......................................... 22

*Horvath v. City of Leander*, 946 F.3d 787 (5th Cir. 2020) ........................................ 10

*Kingsland v. City of Miami*, 382 F.3d 1220 (11th Cir. 2004) ..................................... 14

*Leatherman v. Tarrant Cnty. Narcotics Intelligence and Coordination Unit,* 507 U.S. 163 (1993) .................................................................................... 23

*Maryland v. Pringle*, 540 U.S. 366 (2003) ........................................................ 19

*Mote v. Walthall*, 902 F.3d 500 (5th Cir. 2018) .................................................. 16

*Ratlieff v. City of Fort Lauderdale*, No. 22-CV-61029-RAR, 2024 U.S. Dist. LEXIS 158610 (S.D. Fla. Sep. 4, 2024) .................................................................... 24

*Saldana v. Garza*, 684 F.2d 1159 (5th Cir. 1982) ........................................................ 14

*Salinas v. Breier*, 695 F.2d 1073 (7th Cir. 1982) ........................................................ 22

*Schaefer v. Whitted*, 121 F. Supp. 3d 701 (W.D. Tex. 2015) ..................................... 23

*Scott v. Santos*, No. 22-cv-01088, 2023 WL 8167059 (W.D. Tex. Oct. 31, 2023), *appeal dismissed*, No. 23-cv-50853, 2024 WL 2272413 (5th Cir. Feb. 26, 2024)... 16

*Soto v. Monge*, 735 F. Supp. 3d 792 (W.D. Tex. 2024) ............................................. 19

*United States v. Cooper*, 949 F.2d 737 (5th Cir. 1991) .............................................. 18

*United States v. Nunez-Sanchez*, 478 F.3d 663 (5th Cir. 2007) ................................. 18

*United States v. Rodriguez*, 835 F.2d 1090 (5th Cir. 1988) ....................................... 18

*United States v. Taffaro*, 919 F.3d 947 (5th Cir. 2019) ............................................. 10

*Williams v. City of Columbus*, No. 2:22-cv-01831, 2024 U.S. Dist. LEXIS 5238 (S.D. Ohio Jan. 10, 2024) ............................................................................................ 23

## Other Authorities

Megan Brenan, *U.S. Confidence in Institutions Mostly Flat, but Police Up*, Gallup (July 15, 2024) ................................................................................................. 11

William Y. Chin, *Weaponized Anonymity: The Continuing Marginalization of Communities of Color through Racially-Biased Anonymous Processes in U.S. Society*, 22 CONN. PUB. INT. L.J. 1, 4 (2022)................................................................ 13

*Community-Police Engagement: Agency Considerations Checklist for Civil Demonstrations Response*, IACP .............................................................................. 26

DOJ Office of Justice Programs, *Factors That Influence Public Opinion of the Police* 10 (June 2003) ................................................................................................ 11

Bob Harrison, *The Evolution of Protest Policing*, RAND (May 1, 2024), ................. 24

*Law Enforcement Guidance*, Institute for Constitutional Advocacy and Protection .................................................................................................................... 25

Edward R. Maguire, *The Role of the U.S. Government in the Law Enforcement Response to Protests*, Niskanen Center (April 2022)................................................. 25

*Police and Private Security Partnerships: Collaborating to Meet Growing Challenges*, DOJ COPS, 152 (Feb. 2022) .................................................................. 26

*Recommendations for First Amendment-Protected Events for State and Local Law Enforcement Agencies*, DOJ, Dec. 2011 ........................................................... 25

*Report of the National Advisory Commission on Civil Disorders ("Kerner Report")* at 174, Feb. 29, 1968 ................................................................................................ 25

*Rethinking the Police Response to Mass Demonstrations: 9 Recommendations*, PERF, Feb. 2022 ........................................................................................................ 25

David Risely, *Private Police Coming to a Neighborhood Near You! Why Private Police May Be An Important Element of Future Law Enforcement*, The Police Chief at 82 (July 2015) ............................................................................................... 26

Jay Schweikert, *Qualified Immunity: A Legal, Practical, and Moral Failure*, Cato Institute (Sept. 14, 2020) ................................................................................. 12

Carl Takei, *How Police Can Stop Being Weaponized by Bias-Motivated 911 Calls*, ACLU (June 18, 2018) ............................................................................................... 13

Tom. R. Tyler and Jeffrey Fagan, *Legitimacy and Cooperation: Why Do People Help the Police Fight Crime in Their Communities*, 6 OHIO STATE J. CRIM. LAW 231, 250 (2008) ......................................................................................................... 11

## INTEREST OF THE AMICI CURIAE[1]

**The Law Enforcement Action Partnership (LEAP**) is a non-profit organization whose members include police, prosecutors, judges, corrections officials, and other law enforcement officials advocating for criminal justice and drug policy reforms that will make our communities safer and more just. Founded by five police officers in 2002 with a sole focus on drug policy, today LEAP's speakers bureau numbers more than 200 criminal justice professionals advising on police community relations, incarceration, harm reduction, drug policy, and global issues. Through speaking engagements, media appearances, testimony, and support of allied efforts, LEAP reaches audiences across a wide spectrum of affiliations and beliefs, calling for more practical and ethical policies from a public safety perspective.

**The National Police Accountability Project (NPAP)** was founded in 1999 by members of the National Lawyers Guild to address misconduct by law enforcement officers through coordinating and assisting civil rights lawyers. NPAP has approximately 500 attorney members practicing in every region of the United States, including more than fifteen in Texas and thirty in states within the Fifth Circuit. Every year, NPAP members litigate thousands of egregious cases of law enforcement abuse that do not make news headlines as well as high-profile cases that capture national attention. NPAP provides training and support for these attorneys and

---

[1] *Amici* file this brief with the consent of all parties. No Party has contributed to the preparation of this brief; it has been entirely prepared by *Amici* or its counsel.

resources for non-profit organizations and community groups working on police and corrections officer accountability issues. NPAP also advocates for legislation to increase police accountability and appears regularly as amicus curiae in cases, such as this one, presenting issues of particular importance for its members and their clients.

## INTRODUCTION

Public trust in law enforcement is essential to a functioning democracy, yet it is eroded when officers are shielded from accountability for clear constitutional violations. This case presents a troubling example: the district court granted qualified immunity to officers who arrested Mr. Dubash for exercising his First Amendment rights in a public park, despite being presented with clear evidence that the location was public property. By allowing officers to evade responsibility simply by refusing to investigate basic facts, the decision below undermines well-established legal principles and further weakens public confidence in law enforcement.

This brief is submitted to emphasize that qualified immunity should not be used as a blanket defense when officers ignore readily available exculpatory evidence. Courts have repeatedly held law enforcement officers cannot rely on willful ignorance to establish arguable probable cause. Moreover, municipalities must provide clear policies and training to ensure that officers properly navigate interactions involving First Amendment activities. By reversing the district court's decision, this Court can reaffirm that accountability for law enforcement is necessary to uphold constitutional rights and maintain public trust in the legal system.

## ARGUMENT

I.  **Accountability for Law Enforcement Officers and Their Employers Is Crucial to Public Confidence in the Police and the Government.**

"Law enforcement officials and other public officials who engage in misconduct should be held accountable. Nothing is more corrosive to public confidence in our criminal justice system than the perception that there are two different legal standards. Public officials who violate the law without consequence only further fuel public cynicism and distrust of our institutions of government." *Horvath v. City of Leander*, 946 F.3d 787, 801 (5th Cir. 2020) (citing *United States v. Taffaro*, 919 F.3d 947, 949 (5th Cir. 2019) (internal quotation marks omitted).

There is a demonstrated link between public trust and confidence in police and whether communities cooperate with the police. *See* Tom. R. Tyler and Jeffrey Fagan, *Legitimacy and Cooperation: Why Do People Help the Police Fight Crime in Their Communities*, 6 OHIO STATE J. CRIM. LAW 231, 250 (2008) (finding that individual perception of police legitimacy influenced survey respondents' willingness to cooperate with the police, including reporting crimes and suspicious activity and helping find people accused of criminal activity); *see also* DOJ Office of Justice Programs, *Factors That Influence Public Opinion of the Police* 10 (June 2003)[2] ("Public acceptance of police authority is essential to maintain public order. Public confidence in police can lead to cooperation that is needed for effective policing."). Yet, only about half of the country currently feels confidence in the police. Megan Brenan,

---

[2] Available at https://www.ojp.gov/pdffiles1/nij/197925.pdf.

*U.S. Confidence in Institutions Mostly Flat, but Police Up*, Gallup (July 15, 2024)[3] (Americans' confidence in the police in 2024 is 51% overall). Maintaining appropriate avenues of police accountability to combat the perception of "two different legal standards" and to maintain public trust in police is, therefore, necessary to the effective functioning of police and public safety. Of course, courts that pursue accountability and find constitutional violations where they do not exist may induce a chilling effect among officers, so a thorough analysis of the reasonableness of an officer's or agency's actions is required to best serve the interests of public trust in police and public safety. Shielding officers and law enforcement agencies from blatantly obvious misconduct through qualified immunity only decreases public confidence in the police, ultimately undermining public safety. *See* Jay Schweikert, *Qualified Immunity: A Legal, Practical, and Moral Failure*, Cato Institute (Sept. 14, 2020)[4] (discussing how "qualified immunity also hurts police officers themselves— most notably by depriving officers of the public trust and confidence that is necessary for them to do their jobs safely and effectively").

The below decision granted qualified immunity to officers despite blatantly obvious constitutional violations—arresting Plaintiff for speech content in a public park. As discussed further below, this type of violation is an area of law in which officers are expected to be trained; there is no risk of chilling officers' conduct toward peaceful First Amendment speakers in public parks by pursuing accountability in this case. However, the potential detriment to trust in police in Texas's largest city,

---

[3] Available at https://news.gallup.com/poll/647303/confidence-institutions-mostly-flat-police.aspx.
[4] Available at https://www.cato.org/policy-analysis/qualified-immunity-legal-practical-moral-failure.

relating to an incident in one of its major downtown parks, is great. Leaving in place the lower court's decision will further erode the fragile confidence in police and ultimately make it more difficult for them to perform their jobs effectively.

## II. Officers Cannot Claim Arguable Probable Cause and Shield Themselves with Qualified Immunity by Refusing to Investigate Facts.

Allowing officers to claim arguable probable cause and gain the benefit of qualified immunity without investigating even basic facts of the alleged criminal violation would give a loophole to any officer to escape valid false arrest claims by simply refusing to investigate prior to an arrest. Arresting individuals on claims of criminal trespass without further investigation puts at risk innocent individuals' civil liberties and undermines public trust in law enforcement when arrests are made wrongfully.

The potential dangers of people weaponizing the police by making 911 calls and alleging criminal trespass are well known. *See* Carl Takei, *How Police Can Stop Being Weaponized by Bias-Motivated 911 Calls*, ACLU (June 18, 2018)[5] This is especially true for people of color; the anonymous nature of 911 calls allows individuals to "weaponize the 911 system by engaging in 'racialized police communications' to harm people of color." William Y. Chin, *Weaponized Anonymity: The Continuing Marginalization of Communities of Color through Racially-Biased Anonymous Processes in U.S. Society*, 22 CONN. PUB. INT. L.J. 1, 4 (2022).

---

[5] Available at https://www.aclu.org/news/racial-justice/how-police-can-stop-being-weaponized-bias-motivated.

Accordingly, courts expect officers to investigate allegations reported to them and not just accept them wholesale. The lower court deviated from ample precedent in granting qualified immunity to the officers in this case when they chose not to investigate the allegations of criminal trespass and accepted them unquestioningly.

A. Courts have consistently found that officers are not shielded from liability when they are willfully ignorant to easily discoverable facts.

This court has held that "while law enforcement personnel 'may rely on the totality of facts available to them in establishing probable cause, they also may not disregard facts tending to dissipate probable cause.'" *Evett v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 330 F.3d 681, 688 (5th Cir. 2003) (quoting *Bigford v. Taylor*, 834 F.2d 1213, 1218 (5th Cir. 1988)) (finding an officer lacked probable cause for arrest based only on information from an "unsubstantiated source"— another officer—because reasonable and prudent officers "would not have arrested [the plaintiff] without further investigation"). This principle was reiterated by this court more recently in 2023. "Officers may not disregard facts tending to dissipate probable cause . . . and no decision by *any* court contradicts this principle." *Bailey v. Iles*, 87 F.4th 275, 288 (5th Cir. 2023) (cleaned up) (reversing district court's finding of probable cause and holding the officer was not entitled to qualified immunity).

Indeed, other circuits agree that "police officers may not ignore easily accessible evidence and thereby delegate their duty to investigate and make an independent probable cause determination based on that investigation." *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1259 (10th Cir. 1998); *see Kingsland v. City of Miami*, 382 F.3d 1220, 1228-1233 (11th Cir. 2004) ("an officer may lose qualified immunity

by willfully failing to perform an adequate investigation"), *Bevier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986) ("[a] police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest"). Qualified immunity is meant to protect officers who have fulfilled their duties to the best of their abilities, not those who willfully disregard their duty to investigate.

The court below did not see the need for any level of investigation of facts prior to Mr. Dubash's arrest, finding the officers' belief sufficient despite Mr. Dubash having provided exculpatory facts in the form of property records showing that the park was public. *See* ROA.1196-97. The court quoted *Saldana v. Garza*, 684 F.2d 1159, 1165 (5th Cir. 1982): "Certainly we cannot expect our police officers to carry surveying equipment and a Decennial Digest on patrol; they cannot be held to a title-searcher's knowledge of metes and bounds or a legal scholar's expertise in constitutional law." Yet, there were easily discoverable facts about the ownership and management of the park that informed them it was a public area entitled to speech protections with little or no additional effort, and certainly without surveying equipment. While the officers argue that park security and a park manager asked Mr. Dubash to leave and that officers were told "*Private park* security has determined that this is now criminal trespass," the officers themselves made no evaluation to determine if there was a criminal trespass. ROA.1196. Relying only on the park security for that evaluation while disregarding the obvious facts indicating that it was a public space in which First Amendment protections applied is insufficient for a finding of probable cause to apply qualified immunity. Holding so will make willful

15

blindness to exculpatory facts a path to qualified immunity in contradiction with this Circuit and other circuits' precedents.

B. The cases about private and public property distinctions cited by the District Court are distinguishable from the current case.

The probable cause leading to the officers' qualified immunity is predicated on their lack of understanding of the park as a public forum. However, the cases cited by the district court for this proposition are easily distinguishable.

For instance, the court cites to *Bodzin v. City of Dall.*, 768 F.2d 722, 725-26 (5th Cir. 1985), a case involving "a sidewalk and grassy area adjoining the parking lot of a shopping center" that had to be surveyed to determine the boundary lines. A small area adjoining private property is much more likely to be part of private property than a park held open to the public as in the case here. Further, there was no surveying error creating confusion about the boundary of private property in the current case; rather, it was public knowledge that the park was public property at the time of the arrest as shown to the officers with the park's property records. ROA.1196. Officers need not know the exact metes and bounds of property, but should be expected to know when a public park is public property, particularly after being shown public records to that effect.

Similarly, *Scott v. Santos*, No. 22-cv-01088, 2023 WL 8167059, at *4 (W.D. Tex. Oct. 31, 2023), *appeal dismissed*, No. 23-cv-50853, 2024 WL 2272413 (5th Cir. Feb. 26, 2024), cited by the court is inapposite to the probable cause analysis. In *Scott*, Kohl's, a major department store, was clearly objectively private property and no reasonable officer would need to determine if it was public property with First

Amendment protections. Here, the objectively reasonable assumption regarding a park open to the public and used for prior First Amendment activities would be that it is public property for which management has limited rights to eject alleged trespassers. Holding that it was unreasonable to ignore these facts indicating a public park would not overrule any precedential cases.

C. <u>Plaintiff should be able to develop the record to determine the officers' reasonableness as a fact-specific inquiry.</u>

As the court below noted, "[t]o overcome qualified immunity, a plaintiff must show '(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct.'" ROA.1194 (quoting *Mote v. Walthall*, 902 F.3d 500, 505 (5th Cir. 2018)). The court began the qualified immunity analysis with the first prong, "whether Dubash has established Douglas and Whitworth violated the Fourth Amendment." ROA.1194. "[P]robable cause exists where the facts and circumstances within the officer's knowledge at the time of the arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." ROA.1195 (quoting *Freeman v. Gore*, 483 F.3d 404, 413 (5th Cir. 2007) and *Flores v. City of Palacios*, 381 F.3d 391, 402 (5th Cir. 2004), internal quotation marks omitted). The operative question is if it was reasonable for the officers, having been shown information that the park was publicly owned, to still "conclude that [Mr. Dubash] had committed or was committing an offense." ROA.1195 (quoting *Freeman*, 483 F.3d at 413).

Reasonableness for probable cause is inherently a fact-specific inquiry that should be analyzed on an evidentiary basis after a motion to dismiss because the

involved factual assessments are inappropriate for resolution at the pleading stage. *See Buesing v. Honeycutt*, No. A-16-CA-286-SS, 2016 U.S. Dist. LEXIS 54630, at *11 (W.D. Tex. Apr. 22, 2016) (when there is clearly established law, "the court cannot conclude [the defendant's] conduct was reasonable as a matter of law based on the pleadings. The issue of qualified immunity must be decided on an evidentiary basis on summary judgment or at trial."). Courts are required to accept well-pleaded factual allegations as true and should not weigh evidence or make factual determinations when considering reasonableness for probable cause when considering a motion to dismiss. In *Degenhardt v. Bintliff*, this court recently emphasized:

> [T]he facts forming the basis for reasonable suspicion 'must be viewed in their totality as seen and interpreted by the officer or agent's experience.' That principle does nothing to change the fact that, in the context of a motion to dismiss, the court must credit all well-pleaded factual allegations, absent some exception to that rule.

117 F.4th 747, 754 (5th Cir. 2024) (quoting *United States v. Rodriguez*, 835 F.2d 1090, 1092 (5th Cir. 1988)) (holding that when "looking at the facts as the [plaintiffs] present them, and drawing reasonable inferences in *their* favor rather than [defendant's], the only possible basis for reasonable suspicion sufficient to justify the traffic stop" was a loud muffler that did not alone indicate a traffic violation, and reversing the granting of officers' motion to dismiss).

Rather, reasonableness or unreasonableness for probable cause is likely to become apparent during discovery. To determine if an officer was reasonable in determining probable cause for a warrantless arrest, courts should consider the

totality of the facts and circumstances surrounding the officer's decision. *See United States v. Nunez-Sanchez,* 478 F.3d 663, 666 (5th Cir. 2007). "When considering what a 'reasonable person' would have concluded, we take into account the expertise and experience of the law enforcement officials." *Id.* at 667. Rather than a subjective standard based on what the officer actually knew or believed, the fact finder should look at what an officer should have known based on the training and experience in the case's specific context. *See United States v. Cooper*, 949 F.2d 737, 744 (5th Cir. 1991) ("Probable cause is determined by an objective test: it cannot be established simply by showing that the police subjectively believed that probable cause existed . . . ."). The full scope of the expertise and experience of the arresting officers is not readily available to plaintiffs without discovery. Deviations from policy and training, past incidents at the park involving the officers, and other factors discoverable after the motion to dismiss stage all will inform the reasonableness inquiry. *See Darden v. City of Fort Worth*, 880 F.3d 722, 732 n.8 (5th Cir. 2018) (noting the existence and violation of police department policies is relevant in analyzing the reasonableness of an officer's actions under the totality of the circumstances). As long as it is at all possible to infer at the motion to dismiss based on the plaintiff's allegations that the officer's determination of probable cause was unreasonable, the issue is best decided at summary judgment or trial.

Especially when an officer has not directly witnessed all elements of the crime and relies on information from another to form an opinion about whether a crime has occurred, the reasonableness of that opinion is "highly dependent on the particular

facts and circumstances" and warrants discovery. *See Davenport v. Rodriguez*, 147 F. Supp. 2d 630, 636 (S.D. Tex. 2001) (where plaintiff alleged lack of probable cause for arrest and the officer "did not witness the alleged criminal behavior and thus presumably made his decision to arrest based on the accusation of" another individual, whether the officer "had knowledge that would warrant a prudent person's belief that [the plaintiff] had already committed the alleged crime is highly dependent on the particular facts and circumstances. What he was told by [the reporting individual] and his own observations would be highly relevant. Thus, 12(b)(6) dismissal for failure to state a claim would be inappropriate."); *see also Soto v. Monge*, 735 F. Supp. 3d 792, 801-02 (W.D. Tex. 2024) (quoting *Maryland v. Pringle*, 540 U.S. 366 (2003) for the view that probable cause is "a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules," and finding that plaintiff's concrete factual allegations, including that the officers did not further investigate with field sobriety tests after not witnessing directly any criminal activity, when compared to officers' reliance on statements of another in their police report in support of probable cause, were sufficient to adequately allege lack of probable cause).

Here, Mr. Dubash has adequately pled that there were not facts and circumstances, when construed in the light most favorable to the plaintiff, that were within the officers' knowledge at the time sufficient for a reasonable person to conclude that Mr. Dubash had committed a crime. Because Mr. Dubash had shown Douglas and Whitworth the park's property records prior to the arrest that showed it

was public property, and yet they still arrested him for refusing to leave, he alleged that they "understood detaining and arresting him was based on the content of his speech and no probable cause existed to be detained and arrested for trespassing." ROA.1194, 1196.

However, the court below found that "the police report and Plaintiff's recitation of the events supports the notion that he was arrested for criminal trespass." ROA.1195. First, the lower court misconstrued these facts from the pleading in the light most favorable to the defendants, not the plaintiff, to determine that the arrest was for criminal trespass rather than based on the content of his speech. Second, even if, for the sake of argument, the facts are construed against Mr. Dubash to determine that he was arrested for criminal trespass, there is enough alleged in the pleadings to permit the inference that there was no probable cause based on the unreasonableness of the officers' actions, indicating a violation of the Fourth Amendment and satisfying the first prong of qualified immunity analysis contrary to the decision of the court below. The facts indicated to the officers at the time that the park was publicly owned and the management lacked authority to revoke permission to Mr. Dubash to be present on the basis of the content of his speech. With these sufficient allegations, Mr. Dubash should have the opportunity to build on the record to determine the reasonableness of the officers on an evidentiary basis.

## III. Municipalities Know Their Officers Will Encounter First Amendment Activity and Failure to Provide Clear Policies and Training Is Sufficient to Establish a Monell Claim.

Municipalities and private actors deputized to carry out state duties are liable when their policies and training, or lack thereof, cause a plaintiff's constitutional

injury. The district court denied Mr. Dubash's claims *Monell* claims finding, in part, that he had failed to plead sufficient facts to show either institution was on notice of policy or training deficiencies. However, Mr. Dubash's protest activity is the kind of situation that police officers are expected to encounter in the course of their work and their employer should know that they need training and guidance to appropriately respond. Accordingly, Mr. Dubash's allegations of lack of training and policies on responding to protesters in the park were sufficient to survive a motion to dismiss.

A. <u>Municipalities Are Liable for the Failure to Train and Provide Guidance, Absent Allegations of Past Incidents.</u>

As the District Court and this Court have acknowledged, municipalities can be liable for failing to implement training and policies notwithstanding a lack of prior constitutional violations. *See* ROA.1212; *see also Goodman v. Harris Cnty.,* 571 F.3d 388, 395 (5th Cir. 2009). A single incident of unconstitutional activity can establish a policy for the purposes of *Monell* liability where "the unconstitutional consequences of failing to train could be so patently obvious" that the violation of constitutional rights is a "highly predictable consequence" of the failure to train. *Connick v. Thompson,* 563 U.S. 51, 63-64 (2011). In other words, a single incident *Monell* liability can be invoked where 1) the department knows that its officers are going to have to engage in certain duties with sufficient frequency; (2) there is an obvious risk of harm attendant to carrying out those duties; and (3) the department provides no training. *See Canton v. Harris*, 489 U.S. 378, 390 (1989).

The absence of clear written guidance can similarly establish single incident liability. *See*, *e.g.*, *Gibson v. Cnty. of Washoe,* 290 F.3d 1175, 1185-86 (9th Cir. 2002)

(showing the county's deliberate indifference through omission of guidance in written policies); *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 900 (6th Cir. 2004) (lack of a written policy on dealing with prisoner illnesses could support municipal liability); *Berg v. Cnty. of Allegheny*, 219 F.3d 261, 275-76 (3d Cir. 2000) (lack of written safeguards against data entry errors in procedure for issuing warrants could constitute a policy of deliberate indifference); *Salinas v. Breier*, 695 F.2d 1073, 1077, 1084 (7th Cir. 1982) (lack of rules and regulations around strip and body cavity searches allowed an unconstitutional custom or practice). The central question in determining municipal liability for lack of guidance is foreseeability—whether it is foreseeable that that an officer would need to engage in certain conduct and whether it is foreseeable that constitutional violations would result from a city's failure to prepare them to engage in said conduct. *Brown v. Bryan Cnty.*, 219 F.3d 450, 458 (5th Cir. 2000) (discussing foreseeability of harm in light of lack of other guidance mechanisms short of training).

At the pleading stage, a plaintiff does not have to provide detailed evidence of how a training or policy is lacking to proceed under a single incident theory of liability. *Leatherman v. Tarrant Cnty. Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 164 (1993) (holding that a federal court may not apply a standard "more stringent than the usual pleading requirements of Rule 8(a)" in "civil rights cases alleging municipal liability"); *see, e.g., Ford v. Anderson Cnty.*, 102 F.4th 292, 320 (5th Cir. 2024) (finding a properly pleaded municipal liability claim despite lack of pleading a pattern of prior constitutional violations because a constitutional violation

was a highly predictable consequence of the policy alleged). Courts have consistently found that at the 12(b)(6) stage, allegations of a total lack of training on a particular topic is sufficient to survive a motion to dismiss. *See, e.g., Schaefer v. Whitted*, 121 F. Supp. 3d 701, 719 (W.D. Tex. 2015) ("it is highly predictable failing to train officers regarding how to act with individuals legally entitled to carry firearms would result in the constitutional violation alleged here and this failure to train was a moving force behind [plaintiff's] death"). Moreover, the failure to train officers on how to respond to protest activity has been sufficient to establish single-incident liability. *See Williams v. City of Columbus*, No. 2:22-cv-01831, 2024 U.S. Dist. LEXIS 5238, at *61 n.21 (S.D. Ohio Jan. 10, 2024) (finding a reasonable jury could find city defendant responsible for "constitutional injuries under failure to train and/or supervise through a pattern of similar constitutional violations or a theory of single-incident liability"); *see also Ratlieff v. City of Fort Lauderdale*, No. 22-CV-61029-RAR, 2024 U.S. Dist. LEXIS 158610, at *128-29 (S.D. Fla. Sep. 4, 2024) (finding that a failure to train on crowd control in a police department in a major metropolitan area was the kind of highly predictable scenario contemplated in *Connick*).

Mr. Dubash's allegations that the municipal entities' utter and complete failure to train its officers on the First Amendment fits squarely within the single incident exception. When a city fails to train or guide its officers, there is little more to say in a pleading other than "the City failed to train." ROA.1213. Mr. Dubash did not need to say more to proceed on his claims.

    B.  <u>Police Know They Are Going to Encounter Protesters in Public and Quasi-Public Spaces.</u>

Law enforcement have historically been tasked with the responsibility of responding to protests and demonstrations. Bob Harrison, *The Evolution of Protest Policing*, RAND (May 1, 2024), (noting the role police responses to demonstrations and protests in the early 1900s);[6] Edward R. Maguire, *The Role of the U.S. Government in the Law Enforcement Response to Protests*, Niskanen Center (April 2022), at 1 (explaining shifts in training and policies on protester response in the 1980s and again in the late '90s).[7] Accordingly, there have been generally accepted national standards on how to respond to protest activity for decades. *See, e.g., Report of the National Advisory Commission on Civil Disorders ("Kerner Report")* at 174, Feb. 29, 1968 (explaining national practices on training related to protest response prior to wide civil unrest in the spring and summer of 1968).[8] An integral part of that guidance has been instructing officers on the differences between protests on private and public property. *Recommendations for First Amendment-Protected Events for State and Local Law Enforcement Agencies*, DOJ, Dec. 2011;[9] *Law Enforcement Guidance*, Institute for Constitutional Advocacy and Protection (explaining the importance of "time, place, and manner" analysis in police response).[10] In 2022, when Mr. Dubash was arrested, demonstrations and protests had reached an all-time high

---

[6]  Available at https://www.rand.org/pubs/commentary/2024/05/the-evolution-of-protest-policing.html.

[7]  Available at https://www.niskanencenter.org/wp-content/uploads/2022/04/The-Role-of-U.S.-Law-Enforcement-in-Response-to-Protests.pdf.

[8]  Available at https://www.hud.gov/sites/dfiles/FHEO/documents/kerner_commission_full_report.pdf.

[9]  Available at https://bja.ojp.gov/sites/g/files/xyckuh186/files/media/document/Recommendations%20for%20First%20Amendment-Protected%20Events%20for%20state%20and%20local%20Law%20Enforcement.pdf.

[10]     Available at https://www.law.georgetown.edu/icap/wp-content/uploads/sites/32/2021/04/ICAP-Law-Enforcement-Demonstrations-Guidance-4-19.21.pdf.

in the United States and law enforcement agencies were well aware that their officers were going to encounter protests large and small in the course of their work. *See Rethinking the Police Response to Mass Demonstrations: 9 Recommendations* at 17, PERF, Feb. 2022 (advising coordinating with private actors impacted by protests).[11]

Independent from training on how to respond to protests, the policing profession has recognized the importance of clear guidance on private security-policing partnerships long before Mr. Dubash's arrest. *See, e.g., Police and Private Security Partnerships: Collaborating to Meet Growing Challenges*, DOJ COPS, 152 (Feb. 2022); *Community-Police Engagement: Agency Considerations Checklist for Civil Demonstrations Response*, IACP.[12] In the mid-2010s policing experts were projecting the growth of private security as well as the likelihood that the private security personnel would encroach on core law enforcement functions. David Risely, *Private Police Coming to a Neighborhood Near You! Why Private Police May Be An Important Element of Future Law Enforcement*, The Police Chief at 82 (July 2015).[13] The City of Houston is an outlier in its failure to train and instruct officers on First Amendment issues and private security-police partnerships and a finder of fact could determine that this deviation is sufficient to establish single-incident liability.

As explained in Section III.A, *supra,* whether a law enforcement agency knows that officers will encounter protesters and work with private security is central to the question of whether the alleged complete failure to train officers on these topics would

---

[11] Available at https://www.policeforum.org/assets/ResponseMassDemonstrations.pdf.
[12] Available at https://www.theiacp.org/sites/default/files/2018-07/Final_CPE%20Considerations%20Checklist.pdf.
[13] Available at https://www.policechiefmagazine.org/private-police-coming-to-a-neighborhood.

establish *Monell* liability. Accordingly, Mr. Dubash should have the opportunity to develop theories as to how Houston deviated from industry-standard practices on training on these topics.

## CONCLUSION

For the foregoing reasons, in addition to the reasons in Appellants' Brief, the judgment of the district court should be reversed.

Respectfully submitted,

<u>/s/ Lauren Bonds</u>

Lauren Bonds
NATIONAL POLICE ACCOUNTABILITY PROJECT
1403 Southwest Blvd
Kansas City, KS 66103

Counsel for Amici Curiae

Feb. 28, 2025

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(a)(7)(C), I certify that this brief:

(i) complies with the type-volume limitation of Rule 32(a)(7)(B) because it contains 5,630 words, including footnotes and excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii); and

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word 16.66.1, set in Century Schoolbook 12-point type.

/s/ Lauren Bonds

Lauren Bonds

**CERTIFICATE OF SERVICE**

I certify that on Feb. 28, 2025 this brief was filed using the Court's CM/ECF system. All participants in the case are registered CM/ECF users and will be served electronically via that system.

/s/ Lauren Bonds

Lauren Bonds