No. 24-20485

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

DARAIUS DUBASH; FARAZ HARSINI

*Plaintiffs-Appellants*,

v.

CITY OF HOUSTON; HOUSTON DOWNTOWN PARK CORPORATION;
ROBERT DOUGLAS; VERN WHITWORTH; DISCOVERY GREEN
CONSERVANCY, FORMERLY KNOWN AS HOUSTON DOWNTOWN PARK
CONSERVANCY; BARRY MANDEL

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Southern District of Texas, Houston Division
Civil Action No. 4:23-cv-3556, Judge Andrew S. Hanen

**BRIEF OF *AMICUS CURIAE* NATIONAL PRESS PHOTOGRAPHERS
ASSOCIATION IN SUPPORT OF APPELLANTS AND REVERSAL**

Thomas S. Leatherbury
Thomas S. Leatherbury Law, PLLC
Cumberland Hill School Building
1901 North Akard Street
Dallas, TX 75201-2305
(214) 213-5004
tom@tsleatherburylaw.com

Peter B. Steffensen
SMU Dedman School of Law
First Amendment Clinic
P.O. Box 750116
Dallas, TX 75275-0116
(214) 768-4077
psteffensen@smu.edu

**(additional counsel listed on inside cover)**

*Attorneys for Amicus Curiae National Press Photographers Association*

Mickey H. Osterreicher
General Counsel
National Press Photographers
Association
70 Niagara Street
Buffalo, NY 14202
(716) 983-7800
lawyer@nppa.org

Alicia Calzada
Deputy General Counsel
National Press Photographers
Association
Alicia Wagner Calzada, PLLC
926 Chulie Drive, suite 16
San Antonio, Texas 78216
(210) 825-1449
Advocacy@nppa.org

## SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

1. No. 24-20485, *Dubash v. City of Houston, et al*

2. The undersigned counsel of record certifies that—in addition to the persons and entities listed in Appellants' Certificate of Interested Persons and in the Certificates of Interested Persons of the other *Amici Curiae*—the following listed persons or entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

### *Amicus Curiae*

National Press Photographers Association

### *Attorneys for Amicus Curiae*

Peter B. Steffensen
SMU Dedman School of Law[1]
First Amendment Clinic
P.O. Box 750116
Dallas, TX 75275-0116

Thomas S. Leatherbury
Thomas S. Leatherbury Law, PLLC
Cumberland Hill School Building
1901 North Akard Street
Dallas, TX 75201-2305

---

[1] The views expressed do not speak for Southern Methodist University or the SMU Dedman School of Law.

Mickey H. Osterreicher
General Counsel
National Press Photographers Association
70 Niagara Street
Buffalo, NY 14202

Alicia Calzada
Deputy General Counsel
National Press Photographers Association
Alicia Wagner Calzada, PLLC
926 Chulie Drive, suite 16
San Antonio, Texas 78216


Pursuant to Fed. R. App. P. 26.1(a), the undersigned counsel certifies that

National Press Photographers Association is not a publicly held corporation, does

not have a parent corporation, and no publicly held corporation owns 10 percent or

more of any corporation's stock.

*/s/ Peter B. Steffensen*
*Counsel of Record for Amicus Curiae*
*National Press Photographers*
*Association*

# **TABLE OF CONTENTS**

SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS .......................3

TABLE OF CONTENTS ..........................................................................5

TABLE OF AUTHORITIES ........................................................................6

STATEMENT OF AMICUS CURIAE.......................................................9

SUMMARY OF ARGUMENT ...........................................................11

ARGUMENT .....................................................................................12

    I.   The Operation and Management of Public Parks Are Traditional and
Exclusive Government Functions. .......................................................12

    II.   The Lower Court Misapplied Bedrock Probable Cause and Qualified
Immunity Standards to Appellants' Well-Pleaded Factual Allegations. ............22

CONCLUSION ...................................................................................31

CERTIFICATE OF SERVICE.............................................................32

CERTIFICATION UNDER ECF FILING STANDARDS ...................................33

CERTIFICATE OF COMPLIANCE ...................................................34

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Adelman v. Branch*,
784 F. App'x 261 (5th Cir. 2019).........................................................24, 26

*Anthony v. State*,
209 S.W.3d 296 (Tex. App.—Texarkana 2006, no pet.) ...........................25

*Berge v. Sch. Comm. of Gloucester*,
107 F.4th 33 (1st Cir. 2024) ......................................................................29

*Bigford v. Taylor*,
834 F.2d 1213 (5th Cir. 1988)...............................................................23, 24

*Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*,
531 U.S. 288 (2001) ...................................................................................14

*Brindley v. City of Memphis, Tenn.*,
934 F.3d 461 (6th Cir. 2019) .....................................................................18

*Burton v. Wilmington Parking Auth.*,
365 U.S. 715 (1961) ...................................................................................14

*Carey v. Brown*,
447 U.S. 455 (1980) ...................................................................................15

*Club Retro, L.L.C. v. Hilton*,
568 F.3d 181 (5th Cir. 2009)......................................................................23

*Devenpeck v. Alford*,
543 U.S. 146 (2004) ...................................................................................22

*Evans v. Newton*,
382 U.S. 296 (1966) ...................................................................13, 16, 18, 20

*Evett v. DETNTFF*,
330 F.3d 681 (5th Cir. 2003).......................................................................23

*Glik v. Cunniffe*,
655 F.3d 78 (1st Cir. 2011) ........................................................................28

*Hague v. Comm. for Indus. Org.*,
307 U.S. 496 (1939) .................................................................14, 15, 19

*Iacobucci v. Boulter*,
193 F.3d 14 (1st Cir. 1999) ....................................................................30

*In re N.Y.C. Policing During Summer 2020 Demonstrations*,
548 F. Supp. 3d 383 (S.D.N.Y. 2021) ...................................................29

*Index Newspapers LLC v. City of Portland*,
480 F. Supp. 3d 1120 (D. Or. 2020)......................................................29

*Irizarry v. Yehia*,
38 F.4th 1282 (10th Cir. 2022)..............................................................29

*Jackson v. Metro. Edison Co.*,
419 U.S. 345 (1974) ..............................................................................17

*Lee v. Katz*,
276 F.3d 550 (9th Cir. 2002)..................................................................17

*Lugar v. Edmondson Oil Co.*,
457 U.S. 922 (1982) ..............................................................................14

*Manhattan Cmty. Access Corp. v. Halleck*,
587 U.S. 802 (2019) ...................................................................17, 19, 20

*Marbury v. Madison*,
1 Cranch 137 (1803)...............................................................................11

*Marsh v. Alabama*,
326 U.S. 501 (1946) .........................................................................12, 16

*Perry Educ. Assoc. v. Perry Local Educators' Ass'n*,
460 U.S. 37 (1983) ..........................................................................13, 15

*Piazza v. Mayne*,
217 F.3d 239 (5th Cir. 2000)..................................................................23

*Pro-Life Cougars v. Univ. of Hous.*,
259 F. Supp. 2d 575 (S.D. Tex. 2003) ...................................................21

*Pulliam v. Fort Bend Cty., Tex.*,
No. 4:22-cv-04210, 2024 WL 4068767 (S.D. Tex. Sept. 5, 2024), *report and recommendation adopted*, 2024 WL 4282088 (Sept. 24, 2024)..........................29

*Se. Promotions, Ltd. v. Conrad*,
420 U.S. 546 (1975) ...............................................................................21

*Turner v. Lt. Driver*,
848 F.3d 678 (5th Cir. 2017)......................................................21, 22, 23

*United Church of Christ v. Gateway Econ. Dev. Corp. of Greater Cleveland, Inc.*,
383 F.3d 449 (6th Cir. 2004) ..................................................................17

*Villarreal v. City of Laredo*,
94 F.4th 374, 407 (5th Cir. 2024) (en banc), *rev'd sub nom. Villarreal v. Alaniz*,
145 S. Ct. 368 (per curiam)....................................................27, 29, 30

*West v. Atkins*,
487 U.S. 42 (1988) ...............................................................................19

*Winzer v. Kaufman Cty.*,
916 F.3d 464 (5th Cir. 2019) ..................................................................24

## <u>Other Authorities</u>

"State Patrol Troopers Undergo Media Training Following $825K Settlement," WCCO News (Apr. 21, 2022), https://www.cbsnews.com/minnesota/news/state-patrol-troopers-undergo-media-training-following-825k-settlement/ ................29

Freedom of the Press Foundation, U.S. Press Freedom Tracker, "Broadcast reporter charged following investigation of protest arrest," https://pressfreedomtracker.us/all-incidents/broadcast-reporter-charged-following-investigation-of-protest-arrest/ (last accessed Feb. 27, 2025)............29

## STATEMENT OF AMICUS CURIAE[2]

The National Press Photographers Association ("NPPA") represents thousands of visual journalists across the United States whose profession depends on their ability to gather and share information and images of public concern safely and without fear of interference or arrest by government authorities. The NPPA vigorously promotes freedom of the press in all its forms and tirelessly advocates to protect the First Amendment, as well as visual journalists' rights to earn a living from their work. Professional members turn to the NPPA for support and advice when problems arise. The City of Houston and its associates' actions in this case affect more than just protestors—it directly impacts all who use public parks, including the press.

This case implicates a fundamental constitutional right—the right of the press and the public to use a public park that the government itself has chosen to make available as a public forum. That right is supported by decades' worth of Supreme Court and Fifth Circuit precedent. The lower court's decision restricts the rights of NPPA members to gather information and images in quintessential public forums such as public parks by allowing government to authorize private actors to effectively remove any parkgoer, for any reason, at any time—and evade

---

[2] Pursuant to Fed. R. App. P. 29(a)(2), all parties consent to the filing of this brief. Pursuant to Fed. R. App. P 29(a)(4)(E), no party or party's counsel authored this amicus brief in whole or in part or contributed money toward the preparation of this brief.

accountability for doing so. NPPA offers this brief in the hope that the Court will limit the adverse spillover effects of a ruling that condones a municipality's evasion of its constitutional obligations through the delegation of a traditional and exclusive public duty—the maintenance and operation of public parks—to private actors.

## SUMMARY OF ARGUMENT

This case raises a timeless and vexatious question: what happens "if the laws furnish no remedy for the violation of a vested legal right"? *Marbury v. Madison*, 1 Cranch 137, 163 (1803). Despite Appellants being singled out and removed from a public park for exercising the fundamental right to peacefully protest, the court below held that they are simply out of luck: they have no remedy against the officials who operate the park, nor can they sue the law enforcement officers who unreasonably believed the park—a quintessential public forum—was private land.

This result opens the door to a deeply troubling possibility. On the lower court's reasoning, traditional public forums could be rendered a nullity, and emboldened government actors could commit constitutional torts in broad daylight against peaceful protestors, members of the press, or other members of the public who rely on community spaces like public parks and sidewalks to speak freely. To escape scot-free, all the government must do is delegate the operation of its public spaces to private parties, then claim ignorance of bedrock constitutional principles as it forcibly prevents its citizenry from exercising their fundamental rights.

As explained further below, that logic misapplied longstanding precedent, and tested Appellants' well-pleaded allegations against the wrong standards. And if left in place, it threatens the sanctity of the spaces where speech is deserving of the

highest protection, and chills the people who ordinarily would use those spaces to express themselves without fear of government retaliation or reprisal.

## ARGUMENT

**I.    The Operation and Management of Public Parks Are Traditional and Exclusive Government Functions.**

There was no dispute below that Discovery Green is a public park, and, therefore, a traditional public forum. Nor is there any doubt that Appellants were arrested while engaging in core speech and expressive activity. Had the Appellants been arrested by City employees, there would have been no reasonable basis to dispute that public actors wielded state power to effectuate the unlawful arrest of the Appellants. And applying long-settled First Amendment principles, there would have been no question that the City of Houston created and enforced a policy that discriminated against speakers based on the content and viewpoint of their speech.

These principles are in fact *so* settled, that, had the City of Houston directly operated Discovery Green, Appellants' arrest would ordinarily be an easy case. *Cf. Marsh v. Alabama*, 326 U.S. 501, 504 (1946) (reversal of petitioner's conviction would have been "clear" if direct state action had been at issue). Indeed, it is hornbook law that the government may not target a speaker for exclusion from a public forum based on their viewpoint; nor may it single out particular content for exclusion, absent a compelling government interest that is narrowly tailored to serve

that interest. *Perry Educ. Assoc. v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983).

The decision below does not question these fundamental principles. But by holding *sua sponte* that Park officials—who enforced an unconstitutional viewpoint- and content-based policy against Appellants to move ahead with their unlawful arrest—were not state actors, the court below creates a troubling paradox of Constitutional magnitude: a person exercising the fundamental right to speak in a traditional public forum can nonetheless be forcibly removed from that forum, even on patently unconstitutional terms, because ostensibly private actors were the ones in charge of overseeing it.

That cannot be, because the delegation of a public park's operational responsibilities to a private entity does not alter the fundamentally public character of the land itself or its status as a traditional public forum. *Evans v. Newton*, 382 U.S. 296, 301-02 (1966). Nor should that kind of delegation permit the government to perform an end run around liability for the constitutional torts of their delegees.

The court below thus erred when it concluded that the operation and management of a public park is not a "traditional and exclusive public function," ROA.1218-1227, and consequently held that neither the Conservancy nor its former president were state actors. That holding defies both commonsense and the weight of caselaw that have defined public parks and other public spaces as being

"immemorially … held in trust for the use of the public[.]" *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939).

To constitute state action, the violation of a federal right must be "fairly attributable to the State." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982). "What is fairly attributable is a matter of normative judgment, and the criteria lack rigid simplicity." *Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288, 295 (2001); *see also Lugar*, 457 U.S. at 938-39 (requiring "something more" than mere action taken pursuant to a statute or some other law to find state action). But several factors may "bear on the fairness of such an attribution." *Brentwood*, 531 U.S. at 296. These include:

- When the state uses "coercive power," provides "significant encouragement," or acts jointly with a willful private actor to cause the challenged activity
- When a private actor is controlled by an "agency of the state"
- When a private actor has been "delegated a public function by the State"; or
- When the private actor is pervasively "entwined" with a governmental body, or its policies.

*Id.* (collecting cases). These factors are not exclusive, and the ultimate determination of state action rests heavily on the particular facts of the case. *See Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 722 (1961) ("Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance."). Here, the facts alleged by Appellants

14

overwhelmingly supported a finding that the private operators of Discovery Green were performing a "traditional and exclusive public function," and the court's findings to the contrary requires reversal. *See* Br. of Appellants at 5-8 (22-24 of 87).

Public parks are *the* quintessential traditional public forums—they are spaces "which by long tradition or by government fiat have been devoted to assembly and debate[.]" *Perry*, 460 U.S. at 45. As the Supreme Court recognized when it established the public forum doctrine, the use of spaces like public parks has, "from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens." *Hague*, 307 U.S. at 515. Consequently, the power of the state to limit speech and expression in public parks is "sharply circumscribed." *Perry*, 460 U.S. at 45; *see Carey v. Brown*, 447 U.S. 455, 460 (1980) ("[S]treets, sidewalks, parks, and other similar public places are so historically associated with the exercise of First Amendment rights that access to them for the purpose of exercising such rights cannot constitutionally be denied broadly and absolutely.") (internal citations omitted).

Starting from that premise, courts have long held that the ostensibly private ownership or control of public parks and streets—which are community goods—does not insulate those spaces from the constraints of the Constitution. In *Marsh v. Alabama*, the Supreme Court held that a company town—a town whose title was owned by a single corporation—could not ban the distribution of religious literature

15

on its public streets consistent with the Constitution. 326 U.S. at 509. The Court explained that "the more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it." *Id.* at 506. Regardless of whether the ownership of a town was private or municipal, the Court viewed their interests as coextensive: each "has an identical interest in the functioning of the community in such manner that the channels of communication remain free." *Id.* at 507.

Nor can the state work in concert with a private entity to insulate public property from the requirements of the Constitution. *Evans*, 382 U.S. at 301–02. In *Evans*, the Court determined that operation of a public park was fundamentally "municipal in nature[,]" likening the public good served by a park to "a fire department or police department that traditionally serves the community." *Id.* The Court thus held that, even though the *operation* of the park had been transferred to private trustees—who desired to utilize their private authority to ensure the park could be used by white people only—the park itself must "be treated as a public institution subject to the command of the Fourteenth Amendment, regardless of who now has title under state law." *Id*. This is because "[m]ass recreation through the use of parks is plainly in the public domain," regardless of whether private entities "perform that public function." *Id.* at 302.

16

Importantly, and directly contrary to the findings of the court below, the Supreme Court itself characterized the holding in *Evans* as establishing the operation of a municipal park to be a "power[] traditionally exclusively reserved to the State." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 352 (1974) (citing *Evans*). Thus, while the court below correctly noted that "[v]ery few functions" can be considered traditional and exclusive government functions, it was reversible error to conclude that the operation and maintenance of a public park does not fall within that narrow class. ROA.1221 (quoting *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 809 (2019)).

So, too, have courts in other circuits reached the same conclusion. In *Lee v. Katz*, the Ninth Circuit held that "street preachers" could not be excluded from an outdoor area leased by the city of Portland, Oregon to a private corporation which then imposed a policy, like here, regulating the speech of visitors. 276 F.3d 550, 554–56 (9th Cir. 2002). And in *United Church of Christ v. Gateway Econ. Dev. Corp. of Greater Cleveland, Inc.*, the Sixth Circuit found the private owner of a sports complex engaged in state action by maintaining sidewalks along the exterior of its private facility that were "in the heart of the City, [were] connected and indistinguishable from a publicly-owned sidewalk, and [were] open to the public as a through route[.]" 383 F.3d 449, 455 (6th Cir. 2004); *see also Brindley v. City of*

17

*Memphis, Tenn.*, 934 F.3d 461, 468 (6th Cir. 2019) ("[A] street does not lose its status as a traditional public forum simply because it is privately owned.").

The Appellants' factual allegations only reinforce these conclusions. As in *Evans*, "the predominant character and purpose" of Discovery Green "are municipal." *See Evans*, 382 U.S. at 302. Here, the City created Discovery Green for public use. Notwithstanding its ostensibly private, non-profit operator—the Conservancy—the City retains responsibility for Discovery Green as the public entity that holds title to the land and that designated Discovery Green for use as public park space. *See id.* The public character of Discovery Green is further highlighted by the free, public events Discovery Green offers and the public spaces it provides. Admission to the park is free, and the park offers more than 600 free events annually.[3] Since the park opened in 2008, over 20 million people have visited Discovery Green.[4] Because Discovery Green is a public park, it must be "treated as a public institution" regardless of who operates it. *See id.*

The close relationship between the City and the Conservancy likewise establishes that the Conservancy is a state actor. As was the case in *Evans*, the City maintains involvement with Discovery Green. *See* 382 U.S. at 301–302. The City, through a local government corporation, the Houston Downtown Park Corporation,

---

[3] https://www.discoverygreen.com/; https://www.discoverygreen.com/visit/
[4] https://www.discoverygreen.com/about/

maintains ownership of the park. The Park Corporation, acting on behalf of the City, delegated operation of the park to the Conservancy. This joint public-private partnership is directly analogous to *Evans*, where the city transferred title of a city park to private trustees. *See* 382 U.S. at 301–302.

Thus, as in *Evans*, the City's delegation of Discovery Green's operations to a private entity does not negate its continued involvement with the park; nor does it change the status of the park itself as a space "held in trust for the use of the public[.]" *Hague*, 307 U.S. at 515. And the fact that the Conservancy is a private non-profit contracted to operate Discovery Green, does not eliminate the City's ultimate ownership of the park; nor does it relieve the City, or the Conservancy, of its constitutional duty to respect the First Amendment rights of parkgoers "to assembl[e], communicat[e] thoughts between citizens, and discuss[] public questions." *Id.*

Indeed, if this delegation of public authority does in fact relieve the City and the Conservancy of its constitutional duties, no citizen could enforce their First Amendment rights. *West v. Atkins*, 487 U.S. 42, 55–57, n.14 (1988); *see Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. at 829 n.8 (Sotomayor, J., dissenting) ("When a government (1) makes a choice that triggers constitutional obligations, and then (2) delegates those constitutional responsibilities to a private entity, that entity—in agreeing to take on the job—becomes a state actor for purposes of

[section] 1983.").[5] In opening a public park, the City has chosen to provide its citizens with a traditional public forum that is subject to First Amendment protections. It "may not evade the Constitution by substituting a private administrator." *Id; see Evans*, 382 U.S. at 301–02.

Reversal is therefore appropriate, because the lower court's holding condones the City's evasion of the Constitution via private delegation of a quintessentially public function. By cloaking its actions in a complex public-private partnership, the City attempts to "contract around" its historical and traditional responsibility to maintain its public parks, and, more fundamentally, to respect the Constitutional rights of all parkgoers, including members of the press.

Moreover, there is no clear limiting principle to the lower court's holding, which permits an obvious attempt to circumvent the right against government interference in core political speech. The logical underpinnings of the lower court's holding could be extended to give private entities, performing a traditional government function on behalf of the government, vast and unchecked power to determine who may or may not be present in a public space. That concern is potent with respect to First Amendment rights, because when officials have "unbridled

---

[5] *See also Halleck*, 587 U.S. at 836–37 (Sotomayor, J., dissenting) ("[I]f the City's decision to outsource the channels to a private entity did render the First Amendment irrelevant, there would be substantial cause to worry about the potential abuses that could follow. Can a state university evade the First Amendment by hiring a nonprofit to apportion funding to student groups? Can a city do the same by appointing a corporation to run a municipal theater? *What about its parks?*") (emphasis added).

discretion over a forum's use" it emphasizes "the danger of censorship and of abridgment." *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975); *see also Pro-Life Cougars v. Univ. of Hous.*, 259 F. Supp. 2d 575, 583–84 (S.D. Tex. 2003).

The implications of this decision for *amicus* are especially salient. Public parks such as Discovery Green are frequently the site of newsworthy events that NPPA's members cover. Appellants highlighted specifically how Discovery Green hosted and "actively facilitate[d]" "NRA-related protests and LGBTQ+ pride events[.]" Br. of Appellants at 37 (54 of 87). Photojournalists rely on the broad entitlement to enter public spaces which all members of the public enjoy, in order to cover newsworthy events deserving of public attention. But if municipalities are allowed to partner with private entities as a means to cut off free speech rights in public spaces, including public parks, the right of the press to gather the news will be frustrated, and the ability of the public to be informed about matters of public concern in their community is stymied.

The holding of the court below also has possible downstream consequences for the clearly established rights of the press to photograph public officials in the exercise of their official duties. *See Turner v. Lt. Driver*, 848 F.3d 678, 687–90 (5th Cir. 2017). Indeed, if the park officials charged with revoking Appellants' permission to remain in Discovery Green are not state actors, then the right of members of the press to photograph these officials' involvement in Appellants'

arrest is likewise jeopardized by the lower court's reasoning. In effect, the holding of the court below raises the threat that any member of the public and the press could have their permission to be in a public park revoked at any time, for any reason—so long as the one carrying out the act is a private actor. That would turn the First Amendment on its head.

## II.    The Lower Court Misapplied Bedrock Probable Cause and Qualified Immunity Standards to Appellants' Well-Pleaded Factual Allegations.

The lower court's grant of qualified immunity to the arresting officers should likewise be reversed. In finding that the officers had probable cause to arrest Appellant Dubash, the lower court rested its conclusion entirely on the officers' unreasonable subjective belief that Discovery Green was a privately owned space—a belief which they purportedly developed based on the representations of park staff that Discovery Green was private land, and thus park staff had the authority to decide who had permission to be there. ROA.1197 (citing *Turner*, 848 F.3d at 691). But probable cause is rooted in more than a mere subjective belief of criminal wrongdoing. Indeed, longstanding Supreme Court precedent "make[s] clear that an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004).

Rather, "courts must look at the totality of the circumstances of each case to see whether the detaining officer has a *particularized and objective* basis for

suspecting legal wrongdoing." *Turner*, 848 F.3d at 691 (emphasis added) (cleaned up). The inquiry is not whether *these* officers believed Appellants were trespassing; it is whether the officers were aware of facts "sufficient to warrant a prudent person, or one of reasonable caution, in believing" that an offense was being committed. *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 204 (5th Cir. 2009) (quoting *Piazza v. Mayne*, 217 F.3d 239, 245–46 (5th Cir. 2000)).

Important to the lower court's analysis here, a person of "reasonable caution" would not ignore "facts tending to dissipate probable cause." *Bigford v. Taylor*, 834 F.2d 1213, 1218 (5th Cir. 1988) And where an officer is presented with those facts, there is at least some requirement for "[m]inimal further investigation" to determine whether those facts alter the probable cause calculus in any way. *Id.* at 1219. That is especially true in situations when officers are not in a position of having to make split-second judgments. Where, as here, the arresting officers were presented with information that should have at least caused them to question their subjective belief that Discovery Green was private property, a reasonably prudent officer would have taken the time to investigate further before making an arrest decision. *See Evett v. DETNTFF*, 330 F.3d 681, 688–89 (5th Cir. 2003) ("Officers acting reasonably and prudently, based on all of the available information at the time of the arrest, would not have arrested Evett without further investigation.").

But in finding the arresting officers had probable cause to arrest Dubash, the court below both (1) emphasized the officers' subjective belief of their entitlement to arrest Dubash; and (2) ignored Appellants' well-pleaded allegations that they presented the officers with exculpatory evidence which "tend[ed] to dissipate probable cause." *Bigford*, 834 F.2d at 1218. The lower court then compounded its factual errors when it failed to take the full set of facts known to the officers and to apply those facts through the lens of a reasonably prudent or cautious officer. At the pleading stage, the improper application of those standards to Appellants' well-pleaded facts was reversible error. *Cf. Winzer v. Kaufman Cty.*, 916 F.3d 464, 474 (5th Cir. 2019) (lower court's "failure to credit [plaintiff's] testimony, instead [of] adopting the officers' characterization of the events preceding the shooting" was reversible error).

Applying the proper "reasonably prudent officer" standard to Appellants' claims is especially important when the arrest involves an oxymoronic allegation of criminal trespass on public property. That is because, if the officers were aware of any facts indicating that they lacked the authority to remove the arrestee from the property, then they lacked probable cause entirely. Thus, in *Adelman v. Branch*, this Court held that an officer who arrested photojournalist and NPPA member Avi Adelman for criminal trespass at the Rosa Parks Plaza DART station in downtown Dallas, was not entitled to qualified immunity because a reasonable officer would

24

have known that Adelman's presence complied with DART policy, and the officer

therefore lacked the authority to remove him. 784 F. App'x 261, 267 (5th Cir. 2019).

The Court explained that "no reasonable officer would conclude that she has

probable cause to arrest someone for a criminal trespass after that person refuses to

follow her instructions to leave when she lacks the authority to exclude the person

from the property." *Id.*

The holding in *Adelman* relied on *Anthony v. State*, in which the Texas Sixth

Court of Appeals held that officers applying an unconstitutional, unwritten policy

allowing them the discretion to issue criminal trespass warnings to visitors of a

public park lacked probable cause to arrest the defendant for criminal trespass. 209

S.W.3d 296, 310 (Tex. App.—Texarkana 2006, no pet.). The court there reasoned

that when the sole basis for ejecting the defendant was the unconstitutional policy,

the officers lacked the authority to remove the defendant from the park, and

consequently lacked probable cause to arrest him for criminal trespass because he

had effective consent to be there. *Id.*

Both *Adelman* and *Anthony* are instructive here. At the pleading stage where

the Court must accept the Appellants' well-pleaded factual allegations, the facts

showed that the Appellants provided the officers with clear documentation

establishing that Discovery Green was public property, and the officers nonetheless

sought to remove them on the basis of their unreasonable subjective belief that

Discovery Green could revoke Appellants' permission to be there. But just as the officers in *Anthony* could not enforce an obviously unconstitutional policy allowing them to pick and choose who had permission to be in a public park, so, too, the officers here were foreclosed from removing Appellants from Discovery Green when park staff had no ability to revoke Appellants' permission to be there— certainly not when the sole reason for doing so was Appellants' speech. *See* Br. of Appellants at 46-48 (63-65 of 87), 61-65 (78-82 of 87); *Adelman*, 784 F. App'x at 267.

The lower court's qualified immunity analysis accentuates a troubling problem regarding the doctrine of qualified immunity writ large. Here, two intelligent and savvy citizens, desiring to engage in non-violent protest, took pains to ensure that they were complying with the law when they brought their protest to Discovery Green. They took the time to research the character of the park by reviewing its website and property records, to ensure that their chosen place of protest afforded them the highest protections the First Amendment provides. They then returned to the park equipped with this information, so that if law enforcement or park staff questioned their protest, they could do their best to educate these officials about the public character of the park and their right to be there.

But Appellants' best laid plans were not enough to prevent the officers, and park officials, from discarding this information, along with Appellants' fundamental

rights, and ejecting them—four times—from a traditional public forum solely on the basis of their speech. According to the district court, each of these officials is shielded from liability, despite the fact that their decisions obviously infringed on Appellants' First and Fourth Amendment rights.

Judge Willett, dissenting from the *en banc* majority in *Villarreal v. City of Laredo*, honed in on the irony of a doctrine that requires ordinary members of the public, like Appellants, to maintain "encyclopedic" knowledge of the law, while excusing public officials who "plead (or feign) ignorance of bedrock constitutional guarantees." 94 F.4th 374, 407 (5th Cir. 2024) (en banc) (Willett, J., dissenting), *rev'd sub nom. Villarreal v. Alaniz*, 145 S. Ct. 368 (per curiam). He explained:

> In the upside-down world of qualified immunity, everyday citizens are demanded to know the law's every jot and tittle, but those charged with *enforcing* the law are only expected to know the 'clearly established' ones. Turns out, ignorance of the law *is* an excuse—for government officials. Such blithe 'rules for thee but not for me' nonchalance is less qualified immunity than unqualified impunity.

*Id.* Appellants' repeated removal from Discovery Green, and Dubash's unconstitutional arrest and detention, further "lays bare" the problems inherent in a doctrine that excuses the obvious incursion by law enforcement into the fundamental rights of two peaceful protestors who did their utmost to protect themselves from that very result. *Id.* The doctrine reaches peak absurdity when applied to protect police who violate a clearly established bedrock constitutional principle like

27

exercising First Amendment rights in public parks. *See, e.g.*, *Glik v. Cunniffe*, 655 F.3d 78, 85 (1st Cir. 2011).

Like Appellants, NPPA's members frequently overprepare for events they may cover, even (and especially) when those events are in public spaces like parks or public streets where law enforcement may be present. For example, when covering a protest or similar event, it is standard journalistic practice for members of the press, time-permitting, to learn about the physical space they will be covering, identify entrances and exits, come equipped with protective gear, and don clothing and other physical markings which clearly identify them as a member of the press. *See, e.g.*, Brief of Appellant, *Rusanowsky v. City of Dallas*, No. 24-10455, ECF No. 28, at 13–15 (5th Cir. Sept. 4, 2024). As part of their preparation, journalists will often invest time in learning about and being instructed on the legal principles involved in being able to gather the news in public spaces. This includes learning about whether, and when, members of the press may be ordered by law enforcement or other officials to leave public property.

Recognizing the importance of this kind of education, NPPA often holds know-your-rights trainings for its members on precisely these issues, to ensure their members are well-equipped to cover events of public importance on public property, while ensuring that they don't run afoul of other legitimate laws that might restrict their conduct or movement. NPPA also provides training on these same issues to law

enforcement and other public officials around the country. *See, e.g.*, "State Patrol Troopers Undergo Media Training Following $825K Settlement," WCCO News (Apr. 21, 2022), https://www.cbsnews.com/minnesota/news/state-patrol-troopers-undergo-media-training-following-825k-settlement/.

Despite these efforts, members of the press in Texas and nationally are increasingly targeted for arrest and prosecution. *See, e.g.*, *Villarreal*, 94 F.4th at 409–23 (Ho, J., dissenting); *Pulliam v. Fort Bend Cty., Tex.*, No. 4:22-cv-04210, 2024 WL 4068767 (S.D. Tex. Sept. 5, 2024), *report and recommendation adopted*, 2024 WL 4282088 (Sept. 24, 2024); *see also Berge v. Sch. Comm. of Gloucester*, 107 F.4th 33 (1st Cir. 2024); *Irizarry v. Yehia*, 38 F.4th 1282 (10th Cir. 2022); *In re N.Y.C. Policing During Summer 2020 Demonstrations*, 548 F. Supp. 3d 383, 394 (S.D.N.Y. 2021); *Index Newspapers LLC v. City of Portland*, 480 F. Supp. 3d 1120 (D. Or. 2020).[6] And like Appellants, this is often despite their best efforts to educate themselves about the law, and to ensure they respect the applicable statutes, rules, and regulations in the places they cover.

The lower court's qualified immunity holding here again raises important questions of public accountability. When an informed citizenry does its duty to

---

[6] *See also* Freedom of the Press Foundation, U.S. Press Freedom Tracker, "Broadcast reporter charged following investigation of protest arrest," https://pressfreedomtracker.us/all-incidents/broadcast-reporter-charged-following-investigation-of-protest-arrest/ (last accessed Feb. 27, 2025).

educate itself about its rights, but public officials who infringe those rights are not held to the same standard, perverse outcomes like this case result. Appellants were intimately familiar with their rights, and the permissions afforded them on public property like Discovery Green. But the district court concluded that their arrest and ejection from Discovery Green was nonetheless justified, because the arresting officers adequately "plead[ed] (or feign[ed]) ignorance of [the] bedrock constitutional guarantees" afforded Appellants. *Villarreal*, 94 F.4th at 407 (Willett, J., dissenting). The lower court's misapplication of basic qualified immunity principles is alone grounds for reversal; but the importance of correcting that error extends beyond this case. Reversal here will help reinforce public officials' basic duty to educate themselves on the fundamental rights of the public to which they are accountable—they cannot make up their own rules to supplant obviously applicable constitutional principles, and expect that their decisions will be insulated from scrutiny. Indeed, a "police officer is not a law unto himself; he cannot give an order that has no colorable legal basis and then arrest a person who defies it." *Iacobucci v. Boulter*, 193 F.3d 14, 25 (1st Cir. 1999).

## **CONCLUSION**

For the foregoing reasons, and for the reasons stated in the Brief of Appellants, NPPA respectfully ask the Court to reverse the dismissal of Appellants' claims and remand with instructions to grant them preliminary injunctive relief.

February 28, 2025                                     Respectfully submitted,

*/s/ Thomas S. Leatherbury*                    */s/ Peter B. Steffensen*
Thomas S. Leatherbury                          Peter B. Steffensen
Thomas S. Leatherbury Law,                  SMU Dedman School of Law
PLLC                                                    First Amendment Clinic[7]
Cumberland Hill School Building         P.O. Box 750116
1901 North Akard Street                        Dallas, TX 75275-0116
Dallas, TX 75201-2305                           (214) 768-4077
(214) 213-5004                                        psteffensen@smu.edu
tom@tsleatherburylaw.com

Mickey H. Osterreicher                          Alicia Calzada
General Counsel                                      Deputy General Counsel
National Press Photographers               National Press Photographers
Association                                             Association
70 Niagara Street                                    Alicia Wagner Calzada, PLLC
Buffalo, NY 14202                                  926 Chulie Drive, Suite 16
(716) 983-7800                                       San Antonio, Texas 78216
lawyer@nppa.org                                    (210) 825-1449
                                                           Advocacy@nppa.org

---

[7] Counsel for *Amicus Curiae* thank SMU Dedman School of Law 2L student Mary Katherine Smith and 3L student Rob Williams for their substantial and valuable contributions to this brief.

31

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on February 28, 2025, I caused a true and accurate copy of the foregoing document to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit through the CM/ECF system. I certify that the participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Peter B. Steffensen*
*Counsel of Record for Amicus Curiae*
*National Press Photographers*
*Association*

## <u>CERTIFICATION UNDER ECF FILING STANDARDS</u>

Pursuant to paragraph A(6) of this Court's ECF Filing Standards, I hereby certify that (1) any required privacy redactions have been made, 5th Cir. R. 25.2.13; and (2) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.

*/s/ Peter B. Steffensen*
*Counsel of Record for Amicus Curiae*
*National Press Photographers*
*Association*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rules of Appellate Procedure 32(g), I hereby certify that:

1. This brief complies with the type-volume limitations of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 5,001 words, as determined by the word-count function of Microsoft Word, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the type-face requirements and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) and Fifth Circuit Rules 32.1 and 32.2 because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

*/s/ Peter B. Steffensen*
*Counsel of Record for Amicus Curiae*
*National Press Photographers*
*Association*