No. 24-20485

_____

# United States Court of Appeals for the Fifth Circuit

DARAIUS DUBASH; FARAZ HARSINI,
*Plaintiff-Appellants,*

v.

CITY OF HOUSTON, ET AL.,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the Southern District of Texas, Houston Division
No. 4:23-cv-3556
Hon. Andrew S. Hanen

## BRIEF OF PROTECT THE FIRST FOUNDATION AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS-APPELLANTS

GENE C. SCHAERR
JOSHUA J. PRINCE
SCHAERR | JAFFE LLP
1717 K St. NW, Suite 900
Washington, DC 20006
(202) 787-1060
gschaerr@schaerr-jaffe.com

JOSHUA C. MCDANIEL
　*Counsel of Record*
PARKER W. KNIGHT III
KATHRYN F. MAHONEY
STEVEN W. BURNETT
HARVARD LAW SCHOOL
　RELIGIOUS FREEDOM CLINIC
6 Everett Street, Suite 5110
Cambridge, MA 02138
(617) 496-4383
jmcdaniel@law.harvard.edu

*Counsel for Amicus Curiae*

# CERTIFICATE OF INTERESTED PERSONS

No. 24-20485, *Dubash v. City of Houston*;

Counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made so that the judges of this court may evaluate possible disqualification or recusal.

**Plaintiffs-Appellants and Counsel**
Daraius Dubash
Dr. Faraz Harsini

John Daniel Greil
Steven Timothy Collis
Law & Religion Clinic, University of Texas School of Law

Sarah Berinhout
JT Morris
Foundation for Individual Rights and Expression (FIRE)

**Defendants-Appellees and Counsel**
City of Houston
Officer Robert Douglas
Officer Vern Whitworth
Discovery Green Conservancy
Barry Mandel

Andrew S. Holland
Wilson, Elser, Moskowitz, Edelman & Dicker, L.L.P.

Houston Downtown Park Corporation

Laura Flores Macom
Langley & Banack, Inc.

**Amicus Curiae**
Protect the First Foundation

**Counsel for Amicus Curiae**
Gene C. Schaerr
Joshua J. Prince
Schaerr | Jaffe LLP

Joshua C. McDaniel
Parker W. Knight III
Kathryn F. Mahoney
Steven W. Burnett
Harvard Law School Religious Freedom Clinic

*/s/ Joshua C. McDaniel*
JOSHUA C. MCDANIEL
   *Counsel of Record*
PARKER W. KNIGHT III
KATHRYN F. MAHONEY
STEVEN W. BURNETT
HARVARD LAW SCHOOL
   RELIGIOUS FREEDOM CLINIC
6 Everett Street, Suite 5110
Cambridge, MA 02138
(617) 496-4383
jmcdaniel@law.harvard.edu

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ....................................................i

TABLE OF CONTENTS....................................................................... iii

TABLE OF AUTHORITIES ................................................................iv

INTRODUCTION AND INTERESTS OF AMICUS ..........................................1

ARGUMENT ...................................................................................3

    I.   The American right to preach in public is rooted in centuries of
        tradition. ...............................................................................3

        A.   The religious persecution of public proselytizers was
             commonplace in the colonies. ...........................................3

        B.   Charismatic preachers in the Great Awakenings embedded
             proselytization into America's religious landscape and
             freedoms.....................................................................7

        C.   The right to preach in public was enshrined in the First
             Amendment. ................................................................ 12

    II.  Our Nation's First Amendment jurisprudence has set the right to
        publicly proselytize into our Constitutional firmament. ...................17

        A.   Precedents won by Jehovah's Witnesses safeguard the right
             to proselytize in public places...........................................18

        B.   The Constitution protects the right to proselytize in public
             spaces..........................................................................20

        C.   The Constitution forbids standardless discretion in regulating
             religious activity............................................................23

CONCLUSION..................................................................................24

CERTIFICATE OF COMPLIANCE...........................................................26

CERTIFICATE OF SERVICE.................................................................26

# TABLE OF AUTHORITIES

## Cases

*Cantwell v. Connecticut,*
310 U.S. 296 (1940) ................................................................ 19

*City of Boerne v. Flores,*
521 U.S. 507 (1997) ............................................................... 13

*Dallas Ass'n of Cmty. Orgs. for Reform Now v. Dallas Cnty. Hosp. Dist.,*
670 F.2d 629 (5th Cir. 1982). ............................................... 22

*Denton v. City of El Paso, Texas,*
861 F. App'x 836 (5th Cir. 2021). ......................................... 22

*Evans v. Newton,*
382 U.S. 296 (1966). .............................................................. 22

*Fernandes v. Limmer,*
663 F.2d 619 (5th Cir. 1981) ................................................. 23

*Follet v. McCormick,*
321 U.S. 573 (1944) ............................................................... 19

*Fowler v. Rhode Island,*
345 U.S. 36 (1953) ........................................................... 19, 21

*Hague v. Comm. for Indus. Org.,*
307 U.S. 496 (1939). .............................................................. 21

*Int'l Soc. for Krishna Consciousness of Atlanta v. Eaves,*
601 F.2d 809 (5th Cir. 1979) ................................................. 23

*Jamison v. Texas,*
318 U.S. 413 (1943) ......................................................... 19, 20

*Jones v. Opelika*,
  319 U.S. 103 (1943) ........................................................... 19

*Kunz v. New York*,
  340 U.S. 290 (1951) ........................................................... 21

*Largent v. Texas*,
  318 U.S. 418 (1943) ........................................................... 19

*Lovell v. Griffin*,
  303 U.S. 444 (1938) ........................................................... 19

*Marsh v. Alabama*,
  326 U.S. 501 (1946) ................................................. 19, 21, 22

*Martin v. Struthers*,
  319 U.S. 141 (1943) ........................................................... 19

*Murdock v. Pennsylvania*,
  319 U.S. 105 (1943) ........................................................... 19

*Niemotko v. Maryland*,
  340 U.S. 268 (1951) ..................................................... 19, 21

*Poulos v. New Hampshire*,
  345 U.S. 395 (1953) ........................................................... 23

*Saia v. New York*,
  334 U.S. 558 (1948) ............................................. 19, 20, 21, 24

*Schneider v. New Jersey*,
  308 U.S. 147 (1939) ........................................................... 19

*Sicurella v. United States*,
  348 U.S. 385 (1955) ........................................................... 18

*Tucker v. Texas*,
  326 U.S. 517 (1946) ........................................................... 19

*W. Va. State Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943) ............................................................ 18

*Watchtower Bible & Tract Soc'y of New York, Inc. v. Vill. of Stratton*,
536 U.S. 150 (2002) ............................................................ 22

**Statutes and Constitutional Provisions**

Act for Establishing Religious Freedom, § 1 (1786), *reprinted in* 8 *The Papers of James Madison* 400 (Robert A. Rutland ed., 1973) .................................................................................. 23

Charter of Rhode Island and Providence Plantations (1663) ................ 9

Del. Const. art. I, § 1 (1792) .................................................. 21

First Charter of Carolina art. XVIII (1663) ............................... 9

Fundamental Constitutions for East New-Jersey art. XVI (1683) ......... 9

Ga. Const. art. LVI (1777) ............................................ 20, 21

Laws of West New-Jersey art. X (1681) ................................. 9

Maryland Toleration Act of 1649, *reprinted in* 1 *Archives of Maryland* 244 (W.H. Browne ed., 1883) ...................................... 9

Mass. Declaration of Rights art. II (1780) .............................. 22

Mass. Declaration of Rights art. III (1780) ............................. 22

Md. Const. art. XXXIII (1776) ........................................ 21

Md. Const., Declaration of Rights § 36 ................................. 21

N.H. Bill of Rights art. V (1783) ..................................... 21

Pa. Const. art. II (1776) ............................................. 20

S.C. Const. art. XXXVIII (1778) ............................................................. 22

Va. Declaration of Rights art. XVI (1776) .............................................. 22

**Other Authorities**

A.B. Kendig, "Early Out-Door Methodist Preaching," *in Memorial of Jesse Lee and the Old Elm* 31 (J.W. Hamilton ed., 1875) ............ 10

*Am. Civil Liberties Union, The Persecution of Jehovah's Witnesses (1941)* ................................................................................................ 19

Benjamin Brawley, *Lorenzo Dow*, 1 Journal of Negro History 265 ....... 12

Benjamin Franklin, *Autobiography of Benjamin Franklin* (Frank W. Pine ed., 2006) ................................................................................. 9

Charles Coleman Sellers, *Lorenzo Dow, the Bearer of the Word (1928)* ................................................................................................. 11

Christopher Grasso, *Connecticut's Speaking Aristocracy: Ministers, Lawyers, Pamphleteers, and Polemicists* (1999) .............. 9

Concession and Agreement of the Lords Proprietors of the Province of New Caesarea, or New-Jersey (1664) ............................. 6

Edward Burrough, *A Declaration of the Sad and Great Persecution and Martyrdom of the People of God, called Quakers, in New-England, for the Worshipping of God* (1661), https://perma.cc/3N92-YGVX ............................................................. 5

Edwin B. Bronner, *The Failure of the "Holy Experiment" in Pennsylvania, 1684-1699*, 21 Pa. Hist. 93, 94 (1954) ........................ 7

Elisha Williams, T*he Essential Rights and Liberties of Protestants*, *in Political Sermons of the American Founding Era* (Ellis Sandoz ed. 1998) ................................................................. 10

Gayle Ann Spiers Lasater, *Jehovah's Witnesses, in* 2 *The Encyclopedia of Christian Civilization* 1227–28 (George Thomas Kurian ed., 2011) ................................................... 18

James Madison, *Memorial and Remonstrance Against Religious Assessments* (1785), *reprinted in* 8 *The Papers of James Madison* 303 (Robert A. Rutland ed., 1973) ...................................... 16

James Taylor Holmes, *The American Family of Rev. Obadiah Holmes* (1915) ......................................................................... 5

*Jehovah's Witness Issue* in *The Ministry* (Oct. 1940), ........................... 18

Jennifer Jacobs Henderson, *Defending the Good News: The Jehovah's Witnesses' Plan to Expand the First Amendment* (2010) ...................................................................... 17, 19

Jerome Dean Mahaffey, *Preaching Politics: The Religious Rhetoric of George Whitefield and the Founding of a New Nation* (2007) ............................................................................... 9

John Locke, A Letter Concerning Toleration, *reprinted in John Locke: A Letter Concerning Toleration and Other Writings* 44 (Mark Goldie ed., 2010) ...................................................... 16

Leroy M. Lee, *The Life and Times of the Rev. Jesse Lee* (1860) ............. 11

Letter from Abigail Adams to Isaac Smith Jr. (1771), *reprinted in* 1 *The Adams Papers* 76–78 (Lyman H. Butterfield ed., 1963) .......... 8

Letter from Thomas Jefferson to Samuel Miller (Jan. 23, 1808), https://perma.cc/TGS2-ENSP ........................................................... 16

Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409 (1989) ............................................................... 4, 6, 16

*Norwalk Methodist*, The Norwalk Hour, Sept. 9, 1901 .......................... 11

Office of Legal Policy, *Report to the Attorney General: Religious Liberty under the Free Exercise Clause* (1986)................................... 13

Roger Williams, *The Bloudy Tenent of Persecution* (Edward B. Underhill ed., Hanserd Knollys Soc'y 1848) ...................................... 4

Samuel Barber, *Boston Common: A Diary of Notable Events, Incidents, and Occurrences* (1916)......................................................... 5

Samuel Richards Weed, *Norwalk After Two Hundred and Fifty Years* (1902) ........................................................................ 11

*The Eccentric Preacher: Or, a Sketch of the Celebrated Lorenzo Dow* (1841) ............................................................................. 11

Thomas Jefferson, *Notes on the State of Virginia* 157 (William Peden ed., Univ. of N.C. Press 2011) (1785) ............................. 4, 5, 13

Thomas Kidd & Samuel Young, "The Second Great Awakening Context" in *The Oxford Handbook of Seventh-Day Adventism* (Michael Campbell, ed. 2024) .......................................................... 12

United States House of Representatives, *History of the Chaplaincy* (Feb. 15, 2025) ............................................................. 11

## INTRODUCTION AND INTERESTS OF AMICUS

The First Amendment sets the United States apart among the world's nations. For centuries, this country has held sacrosanct the rights to speak and preach freely in public spaces, recognizing their importance to the Nation's Founding. This tradition of public religious speech overcame early colonial restrictions, blossoming into a celebrated feature of American religious discourse by the time of the Founding and continuing into the nineteenth century. Those who inherited that tradition, including Jehovah's Witnesses, drove the Supreme Court to recognize that the First Amendment includes constitutional protections for religious proselytization. The resulting First Amendment precedent especially abhors discretionary restraints on public speech.

This case is an aberration. In a 12-acre public park in downtown Houston where anyone's free to enter, Plaintiffs displayed eye-catching but harmless images of animal cruelty while preaching about industrial farming practices—for Mr. Dubash, a matter of great spiritual concern. A park official took offense and arrested Plaintiffs, and the court below dismissed their subsequent lawsuit. This treatment embodies a chilling message: policing offensiveness is a proper state function, minority views

1

or religions receive attenuated legal protections, and our hard-won constitutional guarantees are subordinate to the whims of an official's discretion in public spaces. In short, the district court's decision is contrary to this country's deeply rooted historical practice and longstanding legal protections.

Amicus Protect the First Foundation (PT1) is a 501(c)(3) organization dedicated to preserving—along with other First Amendment rights—the religious freedoms that this case implicates. In this brief, PT1 provides useful and relevant information about the history of legal protections for those like Mr. Dubash, who engage in public proselytizing. PT1 also describes the case law governing Plaintiffs' First Amendment Claims, with a focus on Mr. Dubash's free exercise claim and religiously motivated free speech claim. PT1 believes it is particularly important to defend the religious liberty of minority faiths and religious communities like those of Mr. Dubash—because the religious liberties of all rise or fall together.[1]

---

[1] No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund preparing or submitting this brief; and no person other than amicus curiae or his counsel contributed money intended to fund preparing or submitting this brief. Counsel for all parties have consented to the filing of this brief.

# ARGUMENT

## I. The American right to preach in public is rooted in centuries of tradition.

What happened here to Plaintiffs—and in particular Mr. Dubash[2]—would have shocked the Founders. Prompted by the persecution of religious minorities in the colonies, they adopted broad protections for religious rights, including the right to preach in public. And in the early Republic, many, including the itinerant preachers of the Great Awakenings, embraced that right when openly challenging the established religious hierarchies of the time. In short, America's early history situates public proselytization like Mr. Dubash's as an integral and constitutionally protected form of free expression.

### A. The religious persecution of public proselytizers was commonplace in the colonies.

This country's robust protection for religious freedom and expression in public places arose out of a backdrop of colonial experience. In differing ways, each colony grappled—sometimes successfully but often not—with

---

[2] Although only Mr. Dubash alleged a free exercise claim, Compl. at ¶¶ 239–48, many of the precedents discussed in this brief protect religious and secular individuals alike.

the prospect of speech many disfavored or found offensive. And such speech often came in the form of religious preaching by the nonconformists of the day.

By the mid-seventeenth century, the first groups of Puritan settlers had successfully settled in the New World after fleeing religious persecution in England. Before long, they were followed by diverse waves of nonconforming religious believers migrating from the Old World as well. Yet, though early settlers "had suffered long for conscience' sake . . . they soon employed that power to persecute differing consciences." Roger Williams, *The Bloudy Tenent of Persecution* (Edward B. Underhill ed., Hanserd Knollys Soc'y 1848). All too often, early settlers wielded their authority with "equal intolerance" to that of the rulers they had fled in England. Thomas Jefferson, *Notes on the State of Virginia* 157 (William Peden ed., Univ. of N.C. Press 2011) (1785).

As a result, a "near-theocracy" persecuted religious dissenters in Puritan New England, while "state domination" demanded conformity in the Anglican South. Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409, 1421 (1989). Virginia, for example, criminalized religious dissent through laws

4

that required infant baptism, prohibited minority prayer gatherings, banished and deported Quakers, and punished with death those who dared to re-enter. *See* Jefferson, *supra*, at 157.

Massachusetts Puritans also imposed harsh penalties on religious dissenters like Baptists and Quakers. *See id.* at 1423. If Quakers survived being publicly "beat[en] like unto a jelly," they faced outdoor imprisonment, having their ears cut off, or being branded with "R" for reprobate. Edward Burrough, *A Declaration of the Sad and Great Persecution and Martyrdom of the People of God, called Quakers, in New-England, for the Worshipping of God* 1, 35 (1661), https://perma.cc/3N92-YGVX; *see also* James Taylor Holmes, *The American Family of Rev. Obadiah Holmes* 22–26 (1915) (recounting the public whipping of Obadiah Holmes, a Baptist preacher). When even those methods proved ineffective, the colony began sentencing believers to death, publicly hanging three Quakers on Boston Common in the space of two years. Samuel Barber, *Boston Common: A Diary of Notable Events, Incidents, and Occurrences* 29–32 (1916).

But not all the early colonies were so brutal toward religious dissent. Some colonies like Rhode Island and Pennsylvania were deliberately

intended to serve as havens for those fleeing persecution in Puritan colonies. *McConnell*, *supra*, at 1425–26. Other colonies, like New York and New Jersey, tolerated highly diverse religious populations, despite having established churches. *Id.* at 1424. The first colonial experiments with language resembling the Free Exercise Clause appeared in this context. *Id.* at 1425.

For instance, Quaker Rhode Island and New Jersey included guarantees of "free exercise" and "liberty of conscience" in their founding documents,[3] while the governors of Maryland,[4] New York,[5] and the Carolinas[6] authored provisions to promote religious pluralism and tolerance. Most significantly, in 1681, King Charles II granted William Penn a charter to found the Province of Pennsylvania as a "holy experiment" in tolerance.

-----

[3] Charter of Rhode Island and Providence Plantations (1663); Concession and Agreement of the Lords Proprietors of the Province of New Caesarea, or New-Jersey (1664); *see also* Laws of West New-Jersey art. X (1681); Fundamental Constitutions for East New-Jersey art. XVI (1683).

[4] *See* Maryland Toleration Act of 1649, *reprinted in* 1 *Archives of Maryland* 244–47 (W.H. Browne ed., 1883).

[5] *See* An Act Declaring the Rights and Privileges . . . of New York, *reprinted in* 1 *The Colonial Laws of New York* 244 (James B. Lyon ed., 1894) (1691).

[6] *See* First Charter of Carolina art. XVIII (1663), *reprinted in NCpedia*, https://perma.cc/S76N-WHEN.

Edwin B. Bronner, *The Failure of the "Holy Experiment" in Pennsylvania, 1684-1699*, 21 Pa. Hist. 93, 94 (1954). Pennsylvania became a beacon for nonconformists, with its founding document proudly declaring that none "shall . . . be molested or prejudiced for their religious persuasion, or practice, in matters of faith and worship." William Penn, Frame of Government of Pennsylvania (1682), *reprinted in* 5 *The Federal and State Constitutions, Colonial Charters, and Other Organic Laws* 3063 (Francis Newton Thorpe ed., 1909). So, much like their forebears, who came to the New World to escape religious persecution in Europe, religious dissenters in the early colonies fled to the mid-Atlantic to escape the threat of arrest, corporal punishment, and even death to the north and south.

## B. Charismatic preachers in the Great Awakenings embedded proselytization into America's religious landscape and freedoms.

With new pilgrims came a new appreciation for free religious expression, beginning in the most tolerant colonies and spreading through what would become the early states. Public preaching in particular became a celebrated practice both leading up to the Founding and then after ratification. Itinerant preachers in the First and Second Great

Awakenings—religious revivals that bracketed the Founding—spurred a transformation of American public spaces into fora for religious expression.

Between 1740 and 1760, for example, First Great Awakening preachers—including George Whitefield, Jonathan Edwards, Gilbert Tennent, and James Davenport—addressed thousands of believers across the Eastern seaboard in outdoor marketplaces, fields, and public parks. They preached both loudly and often, making the public nature of prayer a hallmark of American religion by the end of the century. *See* Letter from Abigail Adams to Isaac Smith Jr. (1771), *reprinted in* 1 *The Adams Papers* 76–78 (Lyman H. Butterfield ed., 1963) (noting that the fervency of mass public prayer led Americans, unlike Brits, to show "the real appear[a]nce of Religion"). And their experience highlighted that the protection of open prayer was not only desirable but necessary in the budding country.

For instance, George Whitefield, perhaps the most famous of these traveling proselytizers, strategically chose public venues for his sermons. He recognized that disaffected believers "who would not come to a church to hear his message *would* go to a park." Jerome Dean Mahaffey,

*Preaching Politics: The Religious Rhetoric of George Whitefield and the Founding of a New Nation* 43 (2011) (emphasis added). By "mov[ing] his message to neutral ground," he "bypass[ed] any bias people had toward the [church] and overc[ame] people's misgivings of entering a 'sacred' place while in a 'state of sin.'" *Id.*

And his methods worked. In 1740, Whitefield drew a record-breaking crowd of 20,000 to Boston Common, where he spoke within view of the site where early Quaker preachers had been hanged. *Id.* at 99–100. Similarly, in Philadelphia, he commandeered the courthouse steps to preach to a crowd of 30,000. *See* Benjamin Franklin, *Autobiography of Benjamin Franklin* 127–132 (Frank W. Pine ed., 2006) (1791). His voice projected from the city center to the crowd's perimeter, apparently by magic, and worked a "wonderful . . . change" in his listeners, his preaching seeming to make "all the world . . . grow[] religious." *Id.* at 127.

Whitefield and his fellow preachers also influenced the law. For example, in response to pressure from Great Awakening preachers, Connecticut abandoned its law prohibiting public preaching. Christopher Grasso, *Connecticut's Speaking Aristocracy: Ministers, Lawyers, Pamphleteers, and Polemicists* 61, 67 (1999). In a lengthy diatribe against the

law, Reverend Elisha Williams asserted that congregations' ability to fix the time and place of their Sunday worship was "a right" that all "worshipping assemblies claim." Elisha Williams, *The Essential Rights and Liberties of Protestants, reprinted in* 1 *Political Sermons of the American Founding Era, 1730–1805*, at 70 (Ellis Sandoz ed., 1998). He framed this "right" as an integral component of free exercise, noting that the assemblies must be "left free in an uninterrupted enjoyment of this right" precisely "because conscience is immediately concerned therein." *Id.*

Change continued in the years after the ratification of the federal Constitution and Bill of Rights. During that time, a new generation of itinerant preachers—first Methodists, then many others—sparked the Second Great Awakening. These preachers spoke on public land out of necessity. Because they were outside the mainstream, "houses of worship, halls and school buildings were closed against them" leaving only "the street corner, the public parks, or gardens, the fields, or woods." Rev. A.B. Kendig, *Early Out-Door Methodist Preaching, in Memorial of Jesse Lee and the Old Elm* 30–31 (J.W. Hamilton ed., 1875).

Take Jesse Lee. The same month Madison proposed the First Amendment to Congress, Lee arrived in the town of Norwalk, Connecticut, to

preach his first sermon in the state. Samuel Richards Weed, *Norwalk After Two Hundred and Fifty Years* 296 (1902). Though he tried, Lee could find no house to welcome him, so was forced to speak under an apple tree beside the public street, with only twenty people around to hear him. *Historical Sermons*, The Norwalk Hour, Sept. 9, 1901. That humble address would later mark the official beginning of Methodism in New England, and Lee himself grew quite a following. At one point he "[stood] on a table" to "sing[] . . . sweet songs" to a crowd of thousands on Boston Common—and eventually, he served as the chaplain of the House and then the Senate. Leroy M. Lee, *The Life and Times of the Rev. Jesse Lee* 244–45 (1860); *see History of the Chaplaincy*, Office of the Chaplain, U.S. House of Representatives, https://perma.cc/JP8H-XGKA.

Similarly, Lorenzo Dow—nicknamed "Crazy Dow" for his outlandish stunts and ragged appearance—spoke "in the fields or woods, finding it difficult to gain admittance to a house of worship." Charles Coleman Sellers, *Lorenzo Dow, the Bearer of the Word* 66–68, 242 (1928); *The Eccentric Preacher: Or, a Sketch of the Life of the Celebrated Lorenzo Dow* 1 (1841). That use of public land, at first a mark of ostracism, eventually turned "Crazy Dow" into "the foremost itinerant preacher of his time,"

allowing him to preach against slavery all over the antebellum South. Benjamin Brawley, *Lorenzo Dow*, 1 J. Negro Hist. 265, 265, 272–73 (1916).

Over time, these itinerants gave birth to numerous denominations that are fixtures of America's modern religious landscape. Thomas S. Kidd & Samuel L. Young, *The Second Great Awakening Context*, *in The Oxford Handbook of Seventh-Day Adventism* 9–12 (Michael W. Campbell ed., 2024).

## C. The right to preach in public was enshrined in the First Amendment.

Largely as a result of these Great Awakening preachers, along with the horrors that preceded them in early northern and southern colonies, the Founding generation deeply appreciated the importance of public religious expression. And they brought that appreciation to bear when they crafted both early state constitutions and the First Amendment.

For instance, the Virginia Constitutional Convention in 1776 repealed all laws that criminalized religious belief or practice, including those preventing "any [particular] mode of worship." Jefferson, *supra*, at 158. As Jefferson explained, the Founders "wiped away" these

"[s]tatutory oppressions in religion" to enshrine the "natural right[] that the exercise of religion should be free." *Id.*

Fifteen years later, in 1791, the Founders codified their understanding of this "natural right" in the Free Exercise Clause. *Id.* The Clause sparked little debate, reflecting "an unstated consensus" that the text incorporated "the meaning of [the states'] own guarantees of religious freedom." Office of Legal Policy, *Report to the Attorney General: Religious Liberty under the Free Exercise Clause* 4 (1986). As a result, state constitutional provisions and associated commentary "shed light" on the Clause's original understanding. *City of Boerne v. Flores*, 521 U.S. 507, 550 (1997) (O'Connor, J., dissenting). State constitutions confirm that the right to public proselytization was central to the understanding of free exercise.

Indeed, of the fourteen states that ratified the First Amendment, ten protected "free exercise" in their constitutions and bills of rights, with many including blanket protections for free religious expression. *See, e.g.*, Pa. Const. art. II (1776) ("[N]o authority can . . . interfere with, or in any manner controul, the right of conscience in the free exercise of religious worship."); Ga. Const. art. LVI (1777) ("All persons whatever shall have

13

the free exercise of their religion."). And the wording of several states' constitutional protections incorporated public worship. The New Hampshire Bill of Rights guaranteed residents the "right to worship God . . . in the manner and season most agreeable to the dictates of his own conscience," while Maryland protected religious "profession" and "practice." N.H. Bill of Rights art. V (1783); Md. Const. art. XXXIII (1776). Those states carved out exceptions to this protection only for disturbances to "the good order, peace or safety of the State" or to others engaged in worship—exceptions that make sense only if religious exercise was happening in public spaces. Md. Const. art. XXXIII (1776); *see* N.H. Bill of Rights art. V (1783); Ga. Const. art. LVI (1777).

Another group of states went further and actively endorsed public religious expression. In its guarantee or religious free exercise Delaware's constitution noted that it was "the duty of all persons frequently to assemble together for the public worship of Almighty God." Del. Const. art. I, § 1 (1792). Massachusetts' bill of rights protected the "right" and "duty" "publicly . . . to worship the Supreme Being." Mass. Declaration of Rights art. II (1780). To encourage the "institution of the public Worship of God," *id.* at art. III), it guaranteed that "no Subject shall be hurt, molested, or

restrained" because of his "religious profession or sentiments." *Id.* at art. II. And South Carolina had perhaps the simplest approach: protecting "religious societies who acknowledge" that "God is publicly to be worshipped." S.C. Const. art. XXXVIII (1778).

These connections the state constitutions drew between free exercise and public preaching were no accident. Virginia is a case in point. Virginia's Bill of Rights—a close textual predecessor of the federal Bill of Rights—provided a blanket guarantee that "all men are equally entitled to the free exercise of religion, according to the dictates of conscience." Va. Declaration of Rights art. XVI (1776). Building on that broad protection, the Virginia legislature ratified an act declaring attempts to "restrain the profession or propagation of principles" a "dangerous fallacy, which at once destroys all religious liberty." Act for Establishing Religious Freedom, § 1 (1786), *reprinted in* 8 *The Papers of James Madison* 400 (Robert A. Rutland ed., 1973).

What's more, the Founders' writings further clarify their view that protections for public expression were essential to safeguarding free exercise. James Madison argued that restrictions on public religious

expression are "adverse to the diffusion of the light of Christianity."[7] James Madison, *Memorial and Remonstrance Against Religious Assessments* (1785), *reprinted in* 8 *The Papers of James Madison* 303 (Robert A. Rutland ed., 1973). Drawing on Enlightenment thinking, he identified proselytization—or as he put it, "impart[ing]" the "precious gift" of faith to "to the whole race of mankind"—as "[t]he first wish" of the faithful. *Id.*; *see also* John Locke, A Letter Concerning Toleration, *reprinted in John Locke: A Letter Concerning Toleration and Other Writings* 44 (Mark Goldie ed., 2010) ("The Magistrate ought not forbid the Preaching or Professing of any Speculative Opinions."). Similarly, Jefferson observed that it was a "right" of religious groups "to determine for [themselves] the times for [religious] exercises," a "right [that] can never be safer than in their own hands, where the [C]onstitution has deposited it.'" Letter from Thomas Jefferson to Samuel Miller (Jan. 23, 1808), https://perma.cc/TGS2-ENSP.

---

[7] *See also McConnell*, *supra*, at 1452–53 (recounting Madison's horror at seeing Baptist priests persecuted "for publishing religious sentiments" (quoting Letter from James Madison to William Bradford (Jan. 24, 1774))).

In short, proselytization on public land—whether in the wilderness or in public streets, parks, or commons—formed a foundation of American religiosity from the time of George Whitefield through the 1800s. The public license to preach was especially important to those whose unpopular views closed the doors of church or hall: those who—like Mr. Dubash—had no congregation of their own. Luckily, they found allies in the Founders, who recognized their fight to proclaim their dissenting beliefs, and protected them with the First Amendment.

## II. Our Nation's First Amendment jurisprudence has set the right to publicly proselytize into our Constitutional firmament.

Once the Great Awakenings and the Free Exercise Clause laid the foundation for America's protection of public preaching, religious minorities took to the courts and gradually built up a legal edifice of protections that still stands today. In particular, Jehovah's Witnesses carried on the tradition of proselytization through to the twentieth century. *See generally* Jennifer Jacobs Henderson, *Defending the Good News: The Jehovah's Witnesses' Plan to Expand the First Amendment* (2010) [hereinafter *Witnesses' Plan*]. And the Supreme Court has time and again come down on their side, embracing the protection of public preaching envisioned at the

Founding and expanding it as the First Amendment was incorporated against the states.

## A. Precedents won by Jehovah's Witnesses safeguard the right to proselytize in public places.

The Jehovah's Witness movement began at the end of the nineteenth century as a reverberation of the Second Great Awakening. *See* Gayle Ann Spiers Lasater, *Jehovah's Witnesses*, *in* 2 *The Encyclopedia of Christian Civilization* 1227–28 (George Thomas Kurian ed., 2011). Echoing the tradition they drew from, the Witnesses went "out on the highways and byways" to reach as many as possible with their message. *Jehovah's Witness Issue*, *The Ministry*, Oct. 1940, at 9, https://perma.cc/VPZ8-QFXF. But they almost immediately met with pushback, both culturally and legally. Their unique belief system, which strives to maintain separation from the world, led them to reject many cultural norms like supporting American war efforts and pledging allegiance to the flag. *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 629–30 (1943); *Sicurella v. United States*, 348 U.S. 385, 386–87 (1955); *In the World but No Part of It*, Watchtower Online Library (1997), https://perma.cc/A3YM-J2FD. As a result, they became frequent targets of state-backed religious

discrimination. *Am. Civil Liberties Union, The Persecution of Jehovah's Witnesses* 3 (1941), https://perma.cc/FB96-VSM8.

Their troubles came to a head around World War II, when many localities tried to limit Witness proselytization. Some towns passed or revived ordinances that empowered government officials to use discretion to deny preachers the right to proselytize in public—discretion used almost exclusively against the unpopular Witnesses. *Witnesses' Plan* at 63–65. But the Witnesses responded swiftly and powerfully. They filed lawsuits challenging the ordinances, litigating roughly 190 appeals between 1938 and 1950 alone. *Witnesses' Plan* at 88–89. Of those, nineteen cases went to the Supreme Court.

Overwhelmingly, the Witnesses' right to preach publicly won the day. The Supreme Court sided with them in fourteen of their nineteen cases,[8]

---

[8] *Lovell v. City of Griffin*, 303 U.S. 444 (1938), *Schneider v. New Jersey*, 308 U.S. 147 (1939), *Cantwell v. Connecticut*, 310 U.S. 296 (1940), *Jamison v. Texas*, 318 U.S. 413 (1943), *Largent v. Texas*, 318 U.S. 418 (1943), *Jones v. Opelika*, 319 U.S. 103 (1943), *Murdock v. Pennsylvania*, 319 U.S. 105 (1943), *Martin v. City of Struthers*, 319 U.S. 141 (1943), *Follet v. Town of McCormick*, 321 U.S. 573 (1944), *Marsh v. Alabama*, 326 U.S. 501 (1946), *Tucker v. Texas*, 326 U.S. 517 (1946), *Saia v. New York*,

and in doing so, it confirmed two key principles that vindicate proselytizers' rights. First, the right of proselytization extends to parks and other spaces open to the public. Second, public officials may not impose restraints on proselytizers—even time, place, and manner restrictions—by a system of standardless discretion.

## B. The Constitution protects the right to proselytize in public spaces.

The first principle confirms a broadly applicable right to preach in public places—and that means all public places. To start, the Supreme Court ensured access to public streets. In *Jamison v. Texas*, 318 U.S. 413 (1943), a case about a proselytizing Witness who ran afoul of a Dallas ordinance prohibiting distribution of advertisements on city streets, the Court rejected the city's claim that it could limit constitutional rights in public. *Id.* at 415–16. Instead, it affirmed that so long as a preacher is "rightfully on a street . . . left open to the public," he "carries with him" his right to express his beliefs. *Id.* at 416.

---

334 U.S. 558 (1948), *Niemotko v. Maryland*, 340 U.S. 268 (1951), *Fowler v. Rhode Island*, 345 U.S. 67 (1953).

Then, the Court took on public parks. In *Saia v. New York*, for example, it overturned the conviction of a Jehovah's Witness who used an amplifier to proselytize in a public park without police permission. 334 U.S. 558, 559–60 (1948). The Court looked to centuries of Anglo-American practice and tradition to say that both "streets and parks" bear special significance as being "immemorially . . . held in trust for the use of the public." *Id.* at 561 n.2 (quoting *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939)). And the Court repeatedly reaffirmed that commitment. *See, e.g.*, *Fowler v. Rhode Island*, 345 U.S. 67 (1953) (overturning a Witness's conviction for violating an ordinance that prohibited "religious meeting[s] in any public park"); *Niemotko v. Maryland*, 340 U.S. 268, 271–72 (1951) (overturning a Witness's conviction for proselytizing without a permit); *Kunz v. New York*, 340 U.S. 290, 294–95 (1951) (overturning a Baptist minister's conviction for holding religious meetings in a public park without a license). Through all these cases runs a basic proposition: individuals enjoy a fundamental legal right to proselytize in public spaces—including public parks.

What's more, these cases show that governments can't evade their obligations by delegating public spaces to private management. In *Marsh*

*v. Alabama*, the Court straightforwardly applied the constitutional protections it had previously established in public places to Witnesses proselytizing in a privately-owned company town. 326 U.S. 501, 506 (1946). Far from letting the town's private status dictate the outcome, the Court explained that any facilities built and operated "primarily to benefit the public" are treated as public spaces protected by the First Amendment. *Id.*

Since *Marsh*, both the Supreme Court and this Circuit have reaffirmed that labeling an otherwise public space as private doesn't allow the government to punish proselytization there. *See Evans v. Newton*, 382 U.S. 296, 299 (1966) (stating that "[a] town may be privately owned and managed, but that does not necessarily allow the company to treat it as if it were wholly in the private sector"); *Watchtower Bible & Tract Soc'y of New York, Inc. v. Village of Stratton*, 536 U.S. 150, 169 (2002) (holding that door-to-door canvassing is protected despite the private nature of front doors); *Denton v. City of El Paso, Texas*, 861 F. App'x 836, 840 (5th Cir. 2021) (unpublished) (holding that a municipal ban on "religious proselytizing" in a farmers market likely violated the First Amendment).

Indeed, this Court has held that First Amendment rights extend even to fora with limited public access, like a publicly owned hospital, *Dallas Ass'n of Cmty. Orgs. for Reform Now v. Dallas Cnty. Hosp. Dist.*, 670 F.2d 629, 630–31 (5th Cir. 1982), and the inside of an airport, *Int'l Soc. for Krishna Consciousness of Atlanta v. Eaves*, 601 F.2d 809, 832–33 (5th Cir. 1979); *see also Fernandes v. Limmer*, 663 F.2d 619, 633 (5th Cir. 1981) (holding a blanket ban on solicitation in airport unconstitutional because the commercial nature of airport terminals makes them a public forum). Discovery Green, by contrast, is a public park—as traditional a public forum as they come. The Witnesses' cases thus squarely preclude any attempt to limit Mr. Dubash's proselytizing.

Put simply, case law has clearly and consistently vindicated the rights of public preachers to speak freely in places like streets and parks. And governments can't circumvent those protections by simply labeling those places private or delegating management to private entities. That's precisely what Houston tried to do here.

## C. The Constitution forbids standardless discretion in regulating religious activity.

To be sure, state and local governments can reasonably regulate the time, place, and manner of the exercise of First Amendment rights in the

public square. But they cannot do so by giving public officials unbridled discretion over what speech is and is not allowed in the public square. In *Poulos v. New Hampshire*, for instance, the Supreme Court explained that a government can't place "complete discretion to refuse" public access in the hands of officials. 345 U.S. 395, 407 (1953); *see also Eaves*, 601 F.2d at 823 (collecting cases "striking down statutes that allow officials excessively wide discretion").

The removals and arrest of Plaintiffs from the Discovery Green involved precisely the kind of standardless discretion the Court forbade in *Poulos*. Defendants weren't applying any restriction on time, place, or manner. The police removed them simply because officials found the content of their speech "offensive." *Dubash v. City of Houston*, No. 4:23-CV-3556, 2024 WL 4351351, at *6 (S.D. Tex. Aug. 26, 2024). Such broad discretion over who is allowed to speak or proselytize runs directly counter to longstanding precedents.

## CONCLUSION

Mr. Dubash exercised his First Amendment rights when he engaged in proselytizing efforts in a public park, a space that has "immemorially been held in trust for the use of the public" for those very purposes. *Saia*,

334 U.S. at 561 n.2 (internal citation omitted). The panel should reverse the district court's order dismissing the case.

Respectfully submitted,

/s/ *Joshua C. McDaniel*
JOSHUA C. MCDANIEL
   *Counsel of Record*
PARKER W. KNIGHT III
KATHRYN F. MAHONEY
STEVEN W. BURNETT
HARVARD LAW SCHOOL
  RELIGIOUS FREEDOM CLINIC
6 Everett Street, Suite 5110
Cambridge, MA 02138
(617) 496-4383
jmcdaniel@law.harvard.edu

GENE C. SCHAERR
JOSHUA J. PRINCE
SCHAERR | JAFFE LLP
1717 K St. NW, Suite 900
Washington, DC 20006
(202) 787-1060
gschaerr@schaerr-jaffe.com

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with Fed. R. App. P. 32(a)(7)(B) because it contains 4,805 words, excluding the parts exempted by Fed. R. App. P. 32(f).

This brief also complies with the typeface and type-style requirements of Fed. R. App. P. 32(a) because it has been prepared in a proportionally spaced, 14-point Century Schoolbook font.

Dated: February 28, 2025

/s/ *Joshua C. McDaniel*
Joshua C. McDaniel

## CERTIFICATE OF SERVICE

I certify that on February 28, 2025, I served this document on all parties or their counsel of record via CM/ECF.

Dated: February 28, 2025

/s/ *Joshua C. McDaniel*
Joshua C. McDaniel