No. 24-20485

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

DARAIUS DUBASH AND DR. FARAZ HARSINI,

PLAINTIFFS-APPELLANTS,

v.

CITY OF HOUSTON, TEXAS; HOUSTON DOWNTOWN PARK CORPORATION; OFFICER ROBERT DOUGLAS (# 7942), IN HIS INDIVIDUAL CAPACITY; OFFICER VERN WHITWORTH (# 7595) IN HIS INDIVIDUAL CAPACITY; DISCOVERY GREEN CONSERVANCY F/K/A HOUSTON DOWNTOWN PARK CONSERVANCY; AND BARRY MANDEL, IN HIS INDIVIDUAL CAPACITY

DEFENDANTS–APPELLEES.

On Appeal from the United States District Court
for the Southern District of Texas Houston Division
Case No. 4:23-cv-03556

## MOTION FOR LEAVE TO FILE *AMICUS CURIAE* BRIEF OF AMERICAN CIVIL LIBERTIES UNION OF TEXAS IN SUPPORT OF PLAINTIFF–APPELLANTS

Thomas Buser-Clancy
Savannah Kumar
Sarah F. Corning
ACLU FOUNDATION OF TEXAS, INC.
P.O. BOX 8306
HOUSTON, TX 77288
(713) 942-8146
tbuser-clancy@aclutx.org
skumar@aclutx.org
scorning@aclutx.org

*Counsel for Amicus Curiae*

Pursuant to <u>Federal Rules of Appellate Procedure 27</u> and 29(a)(3), *amicus curiae* the American Civil Liberties Union Foundation of Texas ("ACLU of Texas") respectfully move for leave to file an *Amicus Curiae* Brief in Support of Plaintiff-Appellants.

## MOVANTS' INTERESTS

The ACLU Foundation of Texas, Inc. ("ACLU of Texas") is a leading civil rights organization in the Lone Star State. From Amarillo to Brownsville and Beaumont to El Paso, we believe in a Texas that works for all of us — a Texas where each person has an equal say in the decisions that shape our future and everyone can build a good life. The ACLU of Texas works with communities, at the State Capitol, and in the courts to protect and advance civil rights and civil liberties for every Texan, no exceptions. As a statewide civil rights organization headquartered in Houston, the ACLU of Texas has a particular interest in ensuring that governments cannot ignore their duty to respect the First Amendment rights of protesters in public parks, such as Discovery Green in Houston, by delegating the management of these spaces to private parties.

## REASONS FOR AND RELEVANCE OF THIS *AMICUS* BRIEF

This case raises important questions regarding people's First Amendment rights to protest in public parks. The proposed *amicus* brief will aid the Court in determining that: (i) Discovery Green is a public park that has hosted a myriad of

protests throughout its existence, (ii) the Conservancy is a state actor when it is operating Discovery Green, and (iii) Officers Douglas and Whitworth are not entitled to qualified immunity. The District Court's holding that the Plaintiffs have no recourse in response to discrimination based on the content of their speech in a traditional public forum threatens the core meaning of the First Amendment.

## CONCLUSION

For the foregoing reasons, *Amicus* respectfully request that the Court grant leave to file an *amicus curiae* brief in support of Plaintiff-Appellant.

Respectfully submitted,

*/s/ Thomas Buser-Clancy*

Thomas Buser-Clancy
Savannah Kumar
Sarah F. Corning
ACLU FOUNDATION OF TEXAS, INC.
P.O. BOX 8306
HOUSTON, TX 77288
(713) 942-8146
tbuser-clancy@aclutx.org
skumar@aclutx.org
scorning@aclutx.org
*Counsel for Amicus Curiae*

## CERTIFICATE OF CONFERENCE

Pursuant to 5th Cir. R. 27.4, *Amicus* conferred with counsel for the parties regarding the relief requested in this motion. On February 27, 2025, counsel for Plaintiff-Appellants consented to the filing of this brief and on February 25, 2025, counsel for Defendants-Appellees stated that they are not opposed.

*/s/ Thomas Buser-Clancy*
Thomas Buser-Clancy

## CERTIFICATE OF SERVICE

I hereby certify that on the 28th day of February 2025, a true and correct copy of the foregoing was filed electronically using the CM/ECF system, which served counsel for the parties.

*/s/ Thomas Buser-Clancy*
Thomas Buser-Clancy

No. 24-20485

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

DARAIUS DUBASH AND DR. FARAZ HARSINI,

PLAINTIFFS-APPELLANTS,

v.

CITY OF HOUSTON, TEXAS; HOUSTON DOWNTOWN PARK CORPORATION; OFFICER ROBERT DOUGLAS (# 7942), IN HIS INDIVIDUAL CAPACITY; OFFICER VERN WHITWORTH (# 7595) IN HIS INDIVIDUAL CAPACITY; DISCOVERY GREEN CONSERVANCY F/K/A HOUSTON DOWNTOWN PARK CONSERVANCY; AND BARRY MANDEL, IN HIS INDIVIDUAL CAPACITY,

DEFENDANTS–APPELLEES.

On Appeal from the United States District Court
for the Southern District of Texas Houston Division
Case No. 4:23-cv-03556

**BRIEF OF AMICUS CURIAE AMERICAN CIVIL LIBERTIES UNION OF TEXAS IN SUPPORT OF PLAINTIFF–APPELLANTS**

Thomas Buser-Clancy
Savannah Kumar
Sarah F. Corning
ACLU Foundation of Texas, Inc.
P.O. Box 8306
Houston, TX 77288
(713) 942-8146
tbuser-clancy@aclutx.org
skumar@aclutx.org
scorning@aclutx.org

*Counsel for Amici Curiae*

## CERTIFICATION OF INTERESTED PARTIES AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, amicus curiae the American Civil Liberties Union of Texas states that it does not have a parent corporation and that no publicly held corporation owns 10 percent or more of their stock.

Pursuant to Rule 29.2, the undersigned counsel of record certifies that the following listed persons and entities have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| Person or Entity | Connection to Case |
|---|---|
| ACLU Foundation of Texas, Inc. | Amicus curiae |
| Thomas Buser-Clancy | Counsel to amici |
| Savannah Kumar | Counsel to amici |
| Sarah F. Corning | Counsel to amici |

Dated: 2/28/2025         By: */s/ Thomas Buser-Clancy*
                                 Thomas Buser-Clancy

# TABLE OF CONTENTS

STATEMENT OF INTEREST .................................................................1

INTRODUCTION .............................................................................2

ARGUMENT ..................................................................................3

  I.    Discovery Green Is Houston's Village Green ...............................3

  II.   The Conservancy is a State Actor When it is Operating a Public Park.........8

    a.  The Conservancy and the City and Park Corporation act jointly in the operation of Discovery Green.......................................................9

     i. The City and Park Corporation have delegated the public function of operating a public park to the Conservancy. ..............................9

     ii. The City and Park Corporation are entwined in the Conservancy's management of Discovery Green. ..........................................12

     iii. The district court relied on inapposite cases. ………………………… 16

    b.  The Conservancy is a state actor because it operates a public park, which is a traditional and exclusive public function. ...........................................17

  III.  Qualified Immunity Does Not Shield Officers From Liability Where There Was No Probable Cause for Arrests. ..........................................20

CONCLUSION ..............................................................................26

CERTIFICATE OF COMPLIANCE........................................................28

CERTIFICATE OF SERVICE .............................................................29

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Adelman v. Branch,*
  784 Fed.Appx. 261 (5th Cir. 2019) ...................................................................24

*Bailey v. Iles,*
  87 F.4th 275 (5th Cir. 2023) ......................................................................20, 22

*Bigford v. Taylor,*
  834 F.2d 1213 (5ᵗʰ Cir. 1988)....................................................................24

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n,*
  531 U.S. 288 (2001)................................................................................9, 12

*Burton v. Wilmington Parking Authority,*
  365 U.S. 715 (1961) ..................................................................................14

*Cornish v. Corr. Servs. Corp.,*
  402 F.3d 545 (5th Cir. 2005) ..................................................................16, 17

*Edmonson v. Leesville Concrete Co.,*
  500 U.S. 614 (1991) ..................................................................................11

*Evans v. Newton,*
  382 U.S. 296 (1966).............................................................................*passim*

*Flagg Bros., Inc. v. Brooks,*
  436 U.S. 149 (1978).....................................................................................18

*Hague v. Comm. for Indus. Org.,*
  307 U.S. 496 (1939).....................................................................................2

*Herrera v. Acevedo,*
  2022 WL 17547449 (5th Cir. 2022) .....................................................20, 25, 26

*Kaupp v. Texas,*
  538 U.S. 626 (2003)....................................................................................21

*Kinney v. Weaver,*
  367 F.3d 337 (5th Cir. 2004) (en banc) .......................................................20

iv

*Lee v. Katz*,
276 F.3d 550 (9th Cir. 2002) ...............................................................19

*Mangieri v. Clifton*,
29 F.3d 1012 (5th Cir. 1994) ...............................................................23

*Manhattan Community Access Corporation v. Halleck*,
587 U.S. 802 (2019)........................................................................8, 17

*Marsh v. State of Ala.*,
326 U.S. 501 (1946)...................................................................8, 18, 19

*Nieves v. Bartlett*,
139 S. Ct. 1715 (2019)...........................................................................21

*Packingham v. North Carolina*,
582 U.S. 98 (2017)..................................................................................22

*Paz v. Weir*,
137 F. Supp. 2d 782 (S.D. Tex. 2001).................................................12

*Public Utilities Commission of District of Columbia v. Pollak*,
343 U.S. 451 (1952)................................................................................13

*Reitz v. Woods*,
85 F.4th 780 (5th Cir. 2023) ................................................................23

*Rendell-Baker v. Kohn*,
457 U.S. 830 (1982)........................................................................16, 17

*Rosborough v. Management & Training Corporation*,
350 F.3d 459 (5th Cir. 2003) ........................................................11, 12

*Rundus v. City of Dallas, Tex.*,
634 F.3d 309 (5th Cir. 2011) ...............................................................15

*Siders v. City of Brandon, Mississippi*,
123 F.4th 293 (5th Cir. 2024) ................................................................2

*Texas v. Johnson*,
491 U.S. 397 (1989)................................................................................22

*United Church of Christ v. Gateway Econ. Dev. Corp. of Greater Cleveland*,
383 F.3d 449 (6th Cir. 2004) ............................................................19

*West v. Atkins*,
487 U.S. 42 (1988) ............................................................................11

*Wickersham v. City of Columbia*,
481 F.3d 591 (8th Cir. 2007) ...........................................................15

**Other Authorities**

A.J. Mistretta, *Her Mark on the Park: A Conversation with Discovery Green's Susanne Theis*, Houstonfirst (Feb. 20, 2024) *https://www.houstonfirst.com/news/her-mark-on-the-park-a-conversation-with-discovery-greens-susanne-theis*............................................4

City of New Orleans, *NORD Commission: About Us*,
https://nordc.org/about/ (last visited Feb. 21, 2025)..........................18

Discovery Green, *About*, https://www.discoverygreen.com/about/ (last visited Feb. 21, 2025) ..........................................................................4

Discovery Green, *George Floyd Protests: A Powerful and Thought-Provoking Week at Discovery Green* (June 5, 2020), https://www.discoverygreen.com/spotlight/george-floyd-protests-at-discovery-green/ ..................................................................................6

Discovery Green, *Lunar New Year*,
https://www.discoverygreen.com/event/lunar-new-year-2/ (last visited Feb. 21, 2025) ...........................................................................5

Discovery Green, *Make a Donation*,
https://www.discoverygreen.com/donate/ (last visited Feb. 21, 2025). ....................................................................................................15

Discovery Green, *Our history*,
https://www.discoverygreen.com/history/ (last visited Feb. 21, 2024) .............................................................................................4, 14

Discovery Green Conservancy, *Park Rules: Discovery Green* § 1.2.2(p) (July 17, 2014) https://www.discoverygreen.com/wp-content/uploads/2023/06/Park-Rules.pdf ..........................................3

Federal Rule of Appellate Procedure 29(a)(4)(E)......................................................1

Gilbert Bernal, *Black Lives Matter at Discovery Green*, HoustonPress
(July 9, 2016, 6:31 AM),
https://www.houstonpress.com/slideshow/black-lives-matter-at-
discovery-green-8551432 ......................................................................7

Gillian E. Metzger, *Privatization As Delegation*, 103 Colum. L. Rev.
1367, 1371 (2003)................................................................................16

Houston, *HISD students, parents, AFT reps rally in downtown
Houston against TEA's takeover of district* (July 24, 2024),
https://www.youtube.com/watch?v=OZfAXXED1Mc#:~:text=HIS
D%20students%2C%20parents%2C%20AFT%20reps,to%20be%2
0dozens%20in%20attendance; ..............................................................7

Houston Parks and Recreation Department, *Department History*, City
of Houston, Texas, https://www.houstontx.gov/parks/history.html
(last visited Feb. 21, 2025)..................................................................18

*Jackson Square*, The Historic New Orleans Collection (Aug. 5, 2021),
https://hnoc.org/publishing/first-draft/brief-history-jackson-square-
soldiers-stomping-ground-tourist-attraction;.......................................18

*Jazzy Sundays in the Parks*,
https://www.discoverygreen.com/signature-experiences/jazzy-
sundays-in-the-parks/ (last visited Feb. 21, 2025)................................5

KHOU 11 News, *Houston Tea Party Society to rally at Discovery
Green* (Oct. 26, 2009),
https://www.khou.com/article/news/local/houston-tea-party-
society-to-rally-at-discovery-green/285-342839885 ............................5

KRPC 2 Staff, *Demonstrators gather outside NRA convention in
downtown Houston Saturday* (Mar. 28, 2022),
https://www.click2houston.com/news/local/2022/05/28/videos-
photos-demonstrators-gather-outside-nra-convention-in-
downtown-houston-saturday/.................................................................6

Maria Jimenez Moya, et al., *Weekend of Abortion Protests Brings Out Supporters*, NYTimes (May 7, 2025), https://www.nytimes.com/2022/05/07/us/abortion-rights-rally.html; ...................................................................................... 7

Margaret Walls, *Parks and Recreation in the United States,* Resources for the Future, June 2009, at 1, https://media.rff.org/documents/RFF-BCK-ORRG_Local20Parks.pdf ........................................................... 17

Natalie Hee, *Houston pro-choice advocates spend Fourth of July protesting Roe v. Wade decision*Fox 26 Houston (July 4, 2025, 7:18 PM), https://www.fox26houston.com/news/pro-choice-protesting-supreme-court-case; ............................................... 7

Peter Harnik & Abby Martin, *Public Spaces/Private Money: The Triumphs and Pitfalls of Urban Park Conservancies*, The Trust for Public Land, Feb. 2015 https://www.communityforthecommons.org/uploads/1/2/9/9/129938953/public-spaces-private-money-feb-2015.pdf ......................... 15, 26

Raj Mankad, *[Where's the] Revolution: The Changing Landscape of Free Speech in Houston*, Cite Magazine, Fall 2009, at 34, https://repository.rice.edu/server/api/core/bitstreams/1f58eeb2-8b43-4287-8a12-7d136e993888/content ........................................ 10

Rebekah F. Ward, *Fossil fuel protesters rally outside Houston's CERAWEEK energy conference*, Houston Chronicle (Mar. 19, 2024) ................................................................................. 6, 7

Robert Kline, *Freedom of Speech on the Electronic Village Green: Applying the First Amendment Lessons of Cable Television to the Internet*, 6 Cornell J.L. & Pub. Pol'y 23, 58 (1996) .............................. 4

Stacie Sherman & Mark Niquette, *NRA Converges on Houston as Nation Mourns Slain Schoolkids*, Bloomberg News (May 27, 2022, 10:49 AM), https://www.yahoo.com/news/nra-converges-houston-nation-mourns-134215498.html. ................................................ 7

The Trust for Public Land, *The Oldest City Parks*, Dec. 2010, at 1, .http://cloud.tpl.org/pubs/ccpe-largest-oldest-most-visited-parks-4-2011-update.pdf ............................................................... 17

*Valentine's Day*, https://www.discoverygreen.com/event/valentines-
day/ (last visited Feb. 21, 2025)..............................................................5

## STATEMENT OF INTEREST[1]

The ACLU Foundation of Texas, Inc. ("ACLU of Texas") is a leading civil rights organization in the Lone Star State. From Amarillo to Brownsville and Beaumont to El Paso, we believe in a Texas that works for all of us—a Texas where each person has an equal say in the decisions that shape our future and everyone can build a good life. The ACLU of Texas works with communities, at the State Capitol, and in the courts to protect and advance civil rights and civil liberties for every Texan, no exceptions. As a statewide civil rights organization headquartered in Houston, the ACLU of Texas has a particular interest in ensuring that governments cannot ignore their duty to respect the First Amendment rights of protesters in public parks, such as Discovery Green in Houston, by delegating the management of these spaces to private parties.

---

[1] Pursuant to <u>Federal Rule of Appellate Procedure 29(a)(4)(E)</u>, amicus certifies that no person or entity, other than amicus, its members, or its counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or in part.

# INTRODUCTION

> Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens.

*Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939).

Accordingly, this Circuit has recognized that public parks are "traditional public fora that time out of mind have facilitated the general demand for public assembly and discourse." *Siders v. City of Brandon, Mississippi*, 123 F.4th 293, 303 (5th Cir. 2024) (citation omitted).

As a public park in downtown Houston, Discovery Green is a traditional public forum, where individuals may gather to exercise their First Amendment protected rights without interference from the government. This is true even though Discovery Green is managed by the Discovery Green Conservancy (the "Conservancy")—a nonprofit, private organization.

Generally, Discovery Green has fulfilled its goal and obligation to serve as a public forum—providing a space for Houstonians and visitors from all walks of life to gather as a community: to celebrate, mourn, protest, discuss, disagree, and persuade. However, in this case, the Conservancy isolated particular speech it found offensive and, acting in concert with public police officers, quashed that speech.

2

It is bedrock law that the government cannot silence speech that it finds offensive, and this is true even where the government uses private actors to do the silencing. Instead of upholding these foundational First Amendment principles, the district court allowed the fact that the Conversancy is a private organization to obfuscate its analysis and permit the Conservancy, the police officers, and other defendants to avoid liability for clear First Amendment violations.

The ACLU of Texas submits this amicus brief, respectfully requesting that this Court reverse the district court and make clear that governmental entities cannot avoid their obligation to uphold the United States Constitution by contracting out violations thereof.

## ARGUMENT

### I.   Discovery Green Is Houston's Village Green

Discovery Green was founded to be Houston's pre-eminent town square, and its status as a public forum is well known and documented.

The park's own rules recognize that, despite its private management, Discovery Green is a "dedicated public park."[2]

---

[2] Discovery Green Conservancy, *Park Rules: Discovery Green* § 1.2.2(p) (July 17, 2014),
https://www.discoverygreen.com/wp-content/uploads/2023/06/Park-Rules.pdf.

The park's self-stated mission is to "provide an uncommonly beautiful, urban green space in the heart of Houston that serves as a **village green** for our city."[3] As one scholar has explained, "[t]he village green was traditionally a central meeting place of universal access, like a town square or park, where different views might be aired by any speaker." Robert Kline, *Freedom of Speech on the Electronic Village Green: Applying the First Amendment Lessons of Cable Television to the Internet*, 6 Cornell J.L. & Pub. Pol'y 23, 58 (1996).

Discovery Green's public-facing website trumpets that it is a "beautiful, vibrant 12-acre park in the heart of downtown Houston that opened to the public in April 2008."[4] It specifies that "[w]hen the Houston City Council approved the contracts to provide funding and support to the park, it also mandated that the 'public at large' be engaged in the design and development of the park."[5]

Discovery Green serves as a meeting point for members of the community. The park is open to the public and free of charge. It has large green spaces, picnic tables, and a playground. It hosts numerous events for the community to gather such

---

[3] Discovery Green, *About*, https://www.discoverygreen.com/about/ (last visited Feb. 21, 2025); *see also* A.J. Mistretta, *Her Mark on the Park: A Conversation with Discovery Green's Susanne Theis*, Houstonfirst (Feb. 20, 2024) https://www.houstonfirst.com/news/her-mark-on-the-park-a-conversation-with-discovery-greens-susanne-theis ("The vision from the beginning was that this would be a village green, where Houstonians meet one another—a shared third space.").
[4] Discovery Green, *Our history*, https://www.discoverygreen.com/history/ (last visited Feb. 21, 2024).
[5] *Id.*

as a Lunar New Year Celebration, Valentine's Day activities, and even has a free Sunday Jazz series. [6]

And, from its opening, Discovery Green has served as an epicenter of public discourse. In 2009, Tea Party activists gathered in Discovery Green to promote their vision of a smaller, more restrained government.[7]

Discovery Green is also located across from Houston's primary convention center, the George R. Brown Convention Center. Due to this proximity, people often assemble at Discovery Green to comment on and, at times, protest the subject matter of the conference. For instance, in 2022, the NRA held their convention at the George R. Brown convention center. The NRA convention attracted both protests in favor of gun regulation and protests in favor of gun rights—all of which occurred on

---

[6] Discovery Green, *Lunar New Year*, https://www.discoverygreen.com/event/lunar-new-year-2/ (last visited Feb. 21, 2025); *id.* at *Valentine's Day*, https://www.discoverygreen.com/event/valentines-day/ (last visited Feb. 21, 2025); *id.* at *Jazzy Sundays in the Parks*, https://www.discoverygreen.com/signature-experiences/jazzy-sundays-in-the-parks/ (last visited Feb. 21, 2025).
[7] KHOU 11 News, *Houston Tea Party Society to rally at Discovery Green* (Oct. 26, 2009), https://www.khou.com/article/news/local/houston-tea-party-society-to-rally-at-discovery-green/285-342839885.

Discovery Green.[8] That same year, a convention concerning energy, CERAweek, attracted a festival aimed at discussing concerns regarding the energy industry.[9]

Discovery Green prides itself on being the center of such community interactions. Its website heralds its role in serving as the gathering point for citizens after the murder of George Floyd. At the website page titled, "George Floyd Protests: A Powerful and Thought-Provoking Week at Discovery Green," a video features Barry Mandel, then President of Discovery Green Conservancy and defendant here, who comments "on what coming together as a community means for Houston"—highlighting in particular the 25,000-person gathering at Discovery Green to celebrate the life of George Floyd and "express their desire for change."[10]

---

[8] KRPC 2 Staff, *Demonstrators gather outside NRA convention in downtown Houston Saturday*, Click2Houston.com (Mar. 28, 2022), https://www.click2houston.com/news/local/2022/05/28/videos-photos-demonstrators-gather-outside-nra-convention-in-downtown-houston-saturday/.

[9] Rebekah F. Ward, *Fossil fuel protesters rally outside Houston's CERAWEEK energy conference*, Houston Chronicle (Mar. 19, 2024), https://www.houstonchronicle.com/business/energy/article/ceraweek-energy-oil-protest-climate-19173601.php

[10] Discovery Green, *George Floyd Protests: A Powerful and Thought-Provoking Week at Discovery Green* (June 5, 2020), https://www.discoverygreen.com/spotlight/george-floyd-protests-at-discovery-green/.

Gatherings and protests at Discovery Green are both well-known and well publicized. Local newspapers and local television stations often broadcast stories about them.[11] Even national outlets have covered these gatherings.[12]

In other words, Discovery Green—as a general matter—fulfills its mission to serve as a village green. It cannot, however, hide behind the Conservancy when it fails to uphold its constitutional obligations as a public park.

---

[11] Ward, *supra*; Natalie Hee, *Houston pro-choice advocates spend Fourth of July protesting Roe v. Wade decision*, Fox 26 Houston (July 4, 2025, 7:18 PM), https://www.fox26houston.com/news/pro-choice-protesting-supreme-court-case; Gilbert Bernal, *Black Lives Matter at Discovery Green*, HoustonPress (July 9, 2016, 6:31 AM), https://www.houstonpress.com/slideshow/black-lives-matter-at-discovery-green-8551432; KPRC2 Click2 Houston, *HISD students, parents, AFT reps rally in downtown Houston against TEA's takeover of district* (July 24, 2024), https://www.youtube.com/watch?v=OZfAXXED1Mc#:~:text=HISD%20students%2C%20parents%2C%20AFT%20reps,to%20be%20dozens%20in%20attendance; ABC 13 Eyewitness News, *Protestors gather at Discovery Green, airport Sunday against Trump immigration order* (Jan. 30, 2017), https://abc13.com/politics/protests-continue-in-houston-against-immigration-order/1726672/

[12] Maria Jimenez Moya, et al., *Weekend of Abortion Protests Brings Out Supporters*, NYTimes (May 7, 2025), https://www.nytimes.com/2022/05/07/us/abortion-rights-rally.html; Stacie Sherman & Mark Niquette, *NRA Converges on Houston as Nation Mourns Slain Schoolkids*, Bloomberg News (May 27, 2022, 10:49 AM), https://www.yahoo.com/news/nra-converges-houston-nation-mourns-134215498.html.

## II.   The Conservancy is a State Actor When it is Operating a Public Park.

The district court dismissed plaintiffs' Section 1983 claims against the conservancy because it determined that plaintiffs failed to show that the Conservancy was acting under the color of state law. ROA.1227. This was error.

Public-private partnerships, such as the one between the Conservancy and the City and Park Corporation, cannot serve as an end run around the First Amendment. A state is not justified in "permitting a corporation to govern a community of citizens so as to restrict their fundamental liberties." *Marsh v. State of Ala.*, 326 U.S. 501, 509 (1946).

To prevent states from using private actors as an end-run around the constitution, the Supreme Court has identified three circumstances where a private entity qualifies as a state actor: "(i) when the private entity performs a traditional, exclusive public function; (ii) when the government compels the private entity to take a particular action; or (iii) when the government acts jointly with the private entity." *Manhattan Community Access Corporation v. Halleck*, 587 U.S. 802, 809 (2019) (citations omitted).

Any of these circumstances is sufficient to establish state action, and two are present here. The Conservancy qualifies as a state actor because (i) it acts jointly with the City and Park Corporation, and (ii) it performs the traditional and exclusive public function of operating a public park.

8

### a. The Conservancy and the City and Park Corporation act jointly in the operation of Discovery Green.

A private entity is deemed a state actor "when the government acts jointly with the private entity." *Id*. This prong can be met either through (a) the State delegating a public function to a private entity, *see, e.g., Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001); *Evans v. Newton*, 382 U.S. 296, 299 (1966); or (b) the State entwining itself in the conduct of the private entity, *see, e.g., Brentwood*, 531 U.S. 296; *Evans*, 382 U.S. at 301. Both exist here.

### i. The City and Park Corporation have delegated the public function of operating a public park to the Conservancy.

The Supreme Court and this Court have held that when the State delegates a public function to a private entity, the parties are acting jointly, and therefore, the private entity is a state actor. *See Brentwood*, 531 U.S. at 296 ("We have treated a nominally private entity as a state actor when it . . . has been delegated a public function by the state.").

Here, the Park Corporation, incorporated to act on behalf of the City, entered into an agreement with the Conservancy and delegated operation of the public park. ROA.24 [¶ 59-62]. The Operating Agreement states that the "Conservancy shall operate, manage, maintain and preserve the Park in a manner that *discharges the [Park] Corporation's obligations . . . .*" ROA.811 [¶ 4.1] (emphasis added). In order to discharge the Park Corporation's obligation, the Park Rules "shall comply with

all Applicable Laws . . . and shall be non-discriminatory to the full extent required by Applicable Laws." ROA.811 [¶ 4.3]. Thus, the agreement recognizes that the Conservancy was delegated both the operation of the park and the responsibility to comply with the law. It should go without saying that "the law" includes the First Amendment of the United States Constitution.

Former Conservancy president, Guy Hagstette, confirmed as much in 2008 when he stated that "first and foremost [Discovery Green] is a public park,' and that 'we have to abide by any law that governs how parks are managed,' including the First Amendment."[13]   And Production Coordinator Floyd Willis agreed with Mr. Dubash when Mr. Dubash stated that the Conservancy "still ha[s] to abide by the First Amendment because [the park] is publicly owned." ROA.30 [¶ 112-114].

Clearly established case law supports the idea that when the State delegates a public function to a private entity, the private entity becomes a state actor for the purposes of that public function. In *Evans v. Newton*, the Supreme Court held that private trustees of a public park were state actors because the State itself delegated the ownership and operation of a public park—government functions—to the private trustees. *Evans*, 382 U.S. at 299. ("[W]hen private . . . groups are endowed by the

---

[13] Raj Mankad, *[Where's the] Revolution: The Changing Landscape of Free Speech in Houston*, Cite Magazine, Fall 2009, at 34, https://repository.rice.edu/server/api/core/bitstreams/1f58eeb2-8b43-4287-8a12-7d136e993888/content.

State with powers or functions governmental in nature, they become agencies or instrumentalities of the State and subject to its constitutional limitations.").

Similarly, in *West v. Atkins,* the Court held that a private physician who was under part-time contract with the State to provide medical services to incarcerated people was a state actor. 487 U.S. 42, 55 (1988). The State and the physician acted jointly when the State contracted with a private entity to fulfill the State's constitutional obligations, and the physician voluntarily assumed the obligation. *See Id*. at 54-56. Just as in *West* where the State had an obligation to provide medical care to incarcerated people without violating the Eighth Amendment, *Id*. at 56, here, the City and the Park Corporation were obligated to provide a public park that is free of censorship. "Contracting out" the operation of a public park "does not relieve the State of its constitutional duty to" refrain from censorship and it "does not deprive [people] of the means to vindicate their" First Amendment rights. *Id.; see also Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 626 (1991) (concluding that when the government delegates some portion of this power to private entities, that entity, "in whatever disguise, takes on those attributes of government which draw the Constitution's safeguards in play.").

This Court has similarly decided that the delegation of public functions to private entities triggers state action. In *Rosborough v. Management & Training Corporation*, this Court held that private prison corporations and their employees

qualify as state actors in their operation of the private prison. 350 F.3d 459, 461 (5th Cir. 2003); *see also Paz v. Weir*, 137 F. Supp. 2d 782, 805 (S.D. Tex. 2001) (concluding that a private corporation was a state actor when the County delegated to the corporation its duty under state law to provide religious services to incarcerated people.) "Clearly, confinement of wrongdoers—though sometimes delegated to private entities—is a fundamentally governmental function." *Rosborough*, 350 F.3d at 461. Therefore, the corporations and their employees are "subject to limitations imposed by the Eighth Amendment" and liable to incarcerated people who have suffered a constitutional injury. *Id*. This Court's reasoning in *Rosborough* should guide its reasoning here. The City has delegated the government function of operating a public park to the Conservancy and Plaintiffs allege a constitutional injury from the Conservancy's operation of the park; therefore, the Conservancy is a state actor subject to Mr. Dubash and Dr. Harsini's § 1983 challenge.

### ii. The City and Park Corporation are entwined in the Conservancy's management of Discovery Green.

The Supreme Court has also held that state action exists where the government remains "entwined in the management or control" of the function carried out by a private entity. *Evans*, 382 U.S. at 301; *see also Brentwood*, 531 U.S. at 296.

Here, in addition to the City and Park Corporation's delegation, the City remains "entwined" in the management and control of the public park through (1)

12

the Operating Agreement's terms; (2) the jointly beneficial interdependency between the Conservancy and the City and Park Corporation; (3) and the Houston police's enforcement of speech restrictions.

**First,** in *Evans*, the Court concluded that because the government remained entwined with the operation of the park after its transfer to private trustees, the park remained in the public sector. *Evans*, 382 U.S. at 301. The Court relied on *Public Utilities Commission of District of Columbia v. Pollak*, where the Supreme Court decided that a private utility provider was subject to the First and Fifth Amendments because the provider operated its service under the supervision of the government. 343 U.S. 451, 462 (1952).

Similarly here, municipal entwinement is present because the City continues to exercise supervision over the Conservancy. The board of directors for the Park Corporation must be members of the Conservancy's board. ROA.24 [¶ 60]; ROA.60–61 [art. VI]. And per the Operating Agreement: the City's mayor must approve any changes to the Park Rules that the Conservancy undertakes; the Conservancy reports its operating plan, budget, and year-end report with audited financials every year to the City; and the City has the right to audit and obtain copies of the books and records of the Conservancy. ROA.811 [¶ 4.3], 815-16 [¶ 8].

**Second,** government entwinement can also be found where the government and the private entity are engaged in a joint venture that is mutually beneficial. In

*Burton v. Wilmington Parking Authority*, the Supreme Court concluded that the refusal of a restaurant located in a public parking garage to serve Black people constituted state action. 365 U.S. 715, 725-26 (1961). The private restaurant was operated in a government owned building, the building was created with mostly public funds, and the building was "dedicated to public uses in performance of the [Parking] Authority's essential governmental functions." *Id*. at 723 (internal quotation marks omitted). Both the restaurant and the government benefited from the arrangement because the restaurant paid rent to the State and received convenient and well-maintained parking for its customers. *Id*. at 723-24.

Here, Discovery Green is similarly owned by the State, was created "with mostly public funds," and is a "dedicated public" space. ROA.15 [¶ 16]. Both the Conservancy and the City and Park Corporation benefit from the public-private partnership. The Conservancy exists for the sole purpose of operating the park,[14] and the Conservancy receives public funding every year, both directly and through its agreement with the Park Corporation. ROA.24 [¶ 59]; ROA.25 [¶ 65]. In fact, in 2020, "more than a third of [the] Conservancy's annual revenue came from

---

[14] Discovery Green, *Our history*, https://www.discoverygreen.com/history/ (last visited Feb. 21, 2025).

government grants." ROA.24 [¶ 52]. And the City reaps the significant benefits of the Conservancy's fundraising which funds park revitalization and management.[15]

**Third**, the Houston police officers' conduct entwines the government in the management and control of the park. Courts have found entwined conduct where public police officers enforce the private entity's rules rather than neutral state or local law. *Compare Wickersham v. City of Columbia,* 481 F.3d 591, 598-99 (8th Cir. 2007) (finding state action where the police enforced the entity's own limitations on expressive activity rather than city ordinances) *with Rundus v. City of Dallas, Tex.*, 634 F.3d 309, 314 (5th Cir. 2011) (finding no state action where Dallas police officers enforced only criminal statutes and ordinances without involving themselves in enforcing speech restrictions). In arresting Mr. Dubash, the Houston police officers did not provide only "the neutral assistance that would normally be offered to private citizens in enforcing the law of trespass." *Wickersham*, 481 F.3d at 598. Instead, the Houston police officers "played an active role in enforcing the particular speech restrictions" sought by the Conservancy. *Id*. at 599. Prior to Mr. Dubash's arrest, Production Coordinator Floyd Willis told Mr. Dubash and Dr. Harsini that he thought their speech was not "appropriate." ROA.30 [¶ 114]. Later

---

[15] *See* Peter Harnik & Abby Martin, *Public Spaces/Private Money: The Triumphs and Pitfalls of Urban Park Conservancies*, The Trust for Public Land, Feb. 2015, at 6, https://www.communityforthecommons.org/uploads/1/2/9/9/129938953/public-spaces-private-money-feb-2015.pdf; *see also* Discovery Green, *Make a Donation*, https://www.discoverygreen.com/donate/ (last visited Feb. 21, 2025).

that day, Houston Police Officer Douglas told Mr. Dubash that "if you are showing offensive material he [i.e., Floyd Willis] does not like, you can't be here" and that images of violence to animals "seems offensive." ROA.31-32 [¶¶ 124, 126]. During Mr. Dubash's arrest, Dr. Harsini asked Officer Whitworth if he and Mr. Dubash had First Amendment rights and Officer Whitworth replied, "It's up to the management." *Id*. at ¶ 141. Officers Douglas and Whitworth directly enforced the Conservancy's unwritten rule that offensive speech may be restricted instead of providing neutral assistance, thereby entwining the State with the Conservancy's operation of the public park.

### iii. The district court relied on inapposite cases.

There is a difference between cases in which private entities are "wielding government power" and cases in which the government is "simply purchasing private services." Gillian E. Metzger, *Privatization As Delegation*, 103 Colum. L. Rev. 1367, 1371 (2003). This case is the former. In the cases relied on by the district court, *Rendell-Baker v. Kohn* and *Cornish v. Correctional Services Corporation*, the Supreme Court held that private entities were not state actors with respect to their internal personnel decisions. *Rendell-Baker v. Kohn*, 457 U.S. 830, 841 (1982); *Cornish v. Corr. Servs. Corp.*, 402 F.3d 545, 550-51 (5th Cir. 2005). In both cases, the issue was whether the private entity acted under the color of state law in terminating the employees, *not* whether they were a state actor in performing their

16

public function. *Rendell-Baker*, <u>457 U.S. at 838</u>; *Cornish*, <u>402 F.3d at 550</u>. While a private entity may not be serving as a state actor when it makes internal decisions about who to fire or hire, it is a state actor when it is making decisions about whether to recognize the constitutional rights of the public it serves.

### b. The Conservancy is a state actor because it operates a public park, which is a traditional and exclusive public function.

Even if the State had not delegated operation of Discovery Green to the Conservancy or entwined itself in the management and control of the park, the Conservancy would be a state actor because it is performing a "traditional and exclusive public function." *Halleck*, <u>587 U.S. at 809</u>; *see also Evans*, <u>382 U.S. at 301-02</u>.

Operating public parks is a traditional function of local governments. City-run public parks are as old as this country. "The Boston Common, designated as a public open space in 1634, is considered the nation's first city park."[16] An additional fifteen public parks were created by American cities before 1800.[17] The parks were operated by cities through city council committees, which were precursors to parks and recreation departments. For example, after the Louisiana Purchase, Jackson Square

---

[16] Margaret Walls, *Parks and Recreation in the United States,* Resources for the Future, June 2009, at 1, <u>https://media.rff.org/documents/RFF-BCK-ORRG_Local20Parks.pdf</u>.

[17] The Trust for Public Land, *The Oldest City Parks*, Dec. 2010, at 1, .<u>http://cloud.tpl.org/pubs/ccpe-largest-oldest-most-visited-parks-4-2011-update.pdf</u>.

in New Orleans, created in 1718, was operated by the city council, which is now the New Orleans Recreation Department.[18] The city of Houston was founded in 1837 and by 1899 the first Park Committee was appointed by the Mayor.[19] The Park Committee oversaw the creation and management of city parks and later evolved into the Houston Parks & Recreation Department we recognize today. *Id*.

The question is then whether operating public parks is an *exclusive* public function. It is. The Court in *Evans* held that owning and operating a public park is a traditional *and* exclusive municipal function. *Evans*, 382 U.S. at 302.[20] The "public character of th[e] park requires that it be treated as a public institution subject to the command of the Fourteenth Amendment." *Id*. The Court explained that operating a public park is analogous to operating of "streets of a company town in *Marsh v. State of Alabama*, the elective process in *Terry v. Adams*, and the transit system of *Public*

---

[18] *See* Jason Wiese, *From Soldiers' Stomping Ground to Tourist Attraction: A Brief History of Jackson Square*, The Historic New Orleans Collection (Aug. 5, 2021), https://hnoc.org/publishing/first-draft/brief-history-jackson-square-soldiers-stomping-ground-tourist-attraction; *see also* City of New Orleans, *NORD Commission: About Us*, https://nordc.org/about/ (last visited Feb. 21, 2025).

[19] Houston Parks and Recreation Department, *Department History*, City of Houston, Texas, https://www.houstontx.gov/parks/history.html (last visited Feb. 21, 2025).

[20] In footnoted dictum, the Supreme Court in *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149 n.8 (1978), explained that it did not think that *Evans* establishes that the operation of a park for recreational purposes is an exclusively public function, citing the American entrepreneurs who have built their wealth from operating amusement parks. We do not disagree. Running a private park, like an amusement park, is not a traditional and exclusive public function and *Evans* did not hold so. However, *Evans* did hold that the operation of a *public* park is an exclusively public function.

*Utilities Commission of District of Columbia v. Pollak . . . ,*" which are all traditional and exclusive public functions. *Id*. (citations omitted). In *Marsh*, the Court concluded that a private entity cannot provide the town's municipal services— streets, sidewalks, public spaces—and then claim to be unaffected by the First Amendment. *See* 326 U.S. 501, 505-06 (1946). The operation of a public park, which is a municipal service, similarly cannot be provided by a private entity and therefore be immune to the First Amendment's mandates.

Other Courts of Appeal have followed *Evans* and *Marsh* and found state action in similar circumstances to those here. The Ninth Circuit in *Lee v. Katz* considered whether a private organization was a state actor when it restricted speech in its operation of a large, open-air plaza. 276 F.3d 550, 551–52 (9th Cir. 2002). The court concluded that the organization was a state actor because its regulation of "free speech within the Commons, a public forum, is a traditional and exclusive function of the State." *Id*. at 556; *see also United Church of Christ v. Gateway Econ. Dev. Corp. of Greater Cleveland*, 383 F.3d 449, 455 (6th Cir. 2004) (holding that a private entity was a public actor when performing the public function of regulating the public's access to the Gateway Sidewalk.).

Discovery Green "does not function differently from any other" public park. *Marsh,* 326 U.S. at 508. It calls itself a public park and is "freely accessible and open to the people" of Houston. *Id*. The people who visit Discovery Green are owed the

same freedoms as people who visit any other public park and have "an identical interest in the functioning of the community in such a manner that the channels of communication remain free." *Id*. at 507. A public park that forbids offensive speech is unconstitutional "state activity indicating a preference on a matter as to which the State must be neutral." *Id*.

## III. Qualified Immunity Does Not Shield Officers From Liability Where There Was No Probable Cause for Arrests.

The district court erred in its finding that Officers Douglas and Whitworth were entitled to qualified immunity for arresting Mr. Dubash and threatening to arrest Dr. Harsini. The two prong inquiry to determine whether qualified immunity applies asks "first whether 'the facts alleged show the officer's conduct violated a constitutional right' and second, 'whether the right was clearly established' at the time of the alleged violation." *Herrera v. Acevedo*, 2022 WL 17547449, at * 2 (5th Cir. 2022) (per curium) (*citing Byrd v. Cornellius*, 52 F.4th 265, 271 (5th Cir. 2022)).

In the context of arrests for free speech activity, this court has recently reiterated that "[i]t is well established that under the Fourth Amendment a warrantless arrest must be based on probable cause." *Bailey v. Iles*, 87 F.4th 275, 285 (5th Cir. 2023). This well-established principle provides the "fair warning" that is the "central concept" of the "clearly established" standard for qualified immunity. *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (en banc).

Here, there was no actual probable cause for arresting and threatening to arrest Mr. Dubash and Dr. Harsini, and the officers were objectively unreasonable in believing there was probable cause to arrest them.[21] Officers Douglas and Whitworth arrested Mr. Dubash for trespassing and threatened Dr. Harsini with arrest for free speech activity in a public park. As established above, Discovery Green is a public park with a longstanding history of use for protests, pickets, and other expressive activities.[22] Mr. Dubash and Dr. Harsini's demonstration was peaceful, non-disruptive, and constitutionally protected.

There is nothing in the record to suggest that Mr. Dubash's arrest was triggered by disobeying park rules or causing any disturbance. Instead, the stated justification for their arrest was that the content of their demonstration was "offensive." ROA.31 [¶ 124]. But "offensive" speech does not justify arrest. There is a "clearly established

---

[21] Further, this is precisely the type of situation in which officers "typically exercise their discretion not to [make arrests]" even if they believe they have probable cause to do so. *Nieves v. Bartlett*, 139 S. Ct. 1715, 1727 (2019). For example, no Houston police officer or other city official arrested or interfered with protesters in Discovery Green during the protests of the National Rifle Association's annual convention form May 27-29, 2022, or during the LGBTQ celebration called "Rainbow on the Rink." ROA.24-26.

[22] The Recommendation from the District Court indicates that Officers Douglas and Whitworth are entitled to qualified immunity because they "only detained" but did not technically "arrest" Dubash despite handcuffing him and leading him to an office where he remained handcuffed to a chair for hours. ROA.34 [¶¶ 140, 142], Ex. G-3 at 13:00–15:00; ROA.1270 [fn.7]. This constitutes an arrest, but probable cause is needed regardless of whether something is a detention or an arrest. *See Kaupp v. Texas*, 538 U.S. 626, 629-30 (2003).

First Amendment right to engage in speech even when some listeners consider the speech offensive, immature, in poor taste, or even dangerous." *Bailey*, 87 F.4th at 289 (finding that the district court erred in granting qualified immunity for an arrest based on offensive speech). "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

Officers do not have probable cause for arresting protesters or threatening their arrest for peaceful expressive activity where their free speech rights are at their strongest in traditional public fora. It is clearly established that parks are public fora where free speech activity, even if offensive, is permitted. The Supreme Court has repeatedly recognized that it is a "basic rule . . . that a street or park is a quintessential forum for the exercise of First Amendment rights." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017). Parks are "essential venues for public gatherings to celebrate some views, to protest others, or simply to learn and inquire." *Id.* Accordingly, officers had appropriate "fair warning" of the unconstitutionality of making arrests for protected free speech activity in a public space.

The district court's recommendation to the contrary credits the officers' "belief" that Discovery Green is a private park in affording them qualified immunity. But this mistaken belief is irrelevant to establishing probable cause, which requires

objective facts and circumstances rather than subjective beliefs. *Mangieri v. Clifton*, 29 F.3d 1012, 1017 (5th Cir. 1994) ("The subjective beliefs of [officers] as to what facts they relied upon in forming the probable cause to arrest Mangieri are irrelevant to the objective reasonableness of their actions."); *see also Reitz v. Woods*, 85 F.4th 780, 792 (5th Cir. 2023) (rejecting officer's offered subjective justification for probable cause where the factors cited were "wholly unrelated to the charge").

In this case, the objective and obvious fact is that Discovery Green is a public park where Appellants' First Amendment rights were in full force. The Officers' purported subjective belief that Discovery Green was a private park is directly contradicted by the park's own rules, the park's mission statement, numerous public statements from the Park's founders and management, the park's public website, public signs, and the chartering deed. *See supra* Section I, *see also* ROA.24-27. The routine and well-publicized use of Discovery Green for protest activity also made it clear that it is public. *See supra* Section I. As if that were not enough, Mr. Dubash directly showed the officers information confirming the public nature of the park before they arrested him. ROA.31 [¶ 121]. No reasonable officer could claim a lack of knowledge about the public nature of the park after receiving such thorough and

targeted notice about its public nature.[23] The officers' unreasonable mistaken belief to the contrary does not entitle them to qualified immunity.

*Adelman v. Branch* is instructive. There, this Court affirmed a district court's denial of summary judgment on qualified immunity grounds where an officer carried out a trespass arrest of a photographer for taking photos in a public space in accordance with relevant policies. 784 Fed.Appx. 261, 267 (5th Cir. 2019) (per curium). Like here, the officer in that case mistakenly believed the public property was private at the time of the arrest and repeated her belief to the photographer but later conceded that it was public. *Id.* at 263 n.1. The officer's qualified immunity defense hinged on her mistaken belief that she had authority to order the plaintiff to leave because she was operating under an outdated understanding of the department's public photography policy and had been on sick leave when the department updated that policy. *Id.* at 263. This Court held that "no reasonable officer . . . would conclude she had authority to eject a person complying with [] policies from public property—and then arrest that person for criminal trespass when he failed to depart." *Id.* at 267. This Court did not credit the officer's mistaken understanding of the photography policy. Simply "fail[ing] to learn about . . . [an]

---

[23] At the very least, officers would have had a duty to investigate the information Mr. Dubash provided about Discovery Green being a public park before arresting him without verification of this basic fact. *See, e.g.*, *Bigford v. Taylor*, 834 F.2d 1213, 1218 (5th Cir. 1988) (explaining that instructing officers "may not disregard facts tending to dissipate probable cause").

updated policy" does not entitle an officer to qualified immunity as "an officer can gain no Fourth Amendment advantage through a sloppy study of the laws [s]he is duty-bound to enforce." *Id.* at 266 n.3 (citing *Heien v. North Carolina*, <u>574 U.S. 5, 539-40</u> (2014)).

Here too, the officers' sloppy understanding, whether about the public nature of Discovery Green or the basic protections of the First Amendment, does not entitle them to qualified immunity. If officers can claim, as Douglas and Whitworth did, a lack of knowledge about the public nature of a space that is clearly operating as a public park even after a demonstrator provides them with information proving it is public, then any officer would be able to claim reasonable uncertainty about the nature of a space and arrest people for activity that would have been protected by the First Amendment in such public spaces.

The district court's decision is even more troubling considering that it occurred at the motion to dismiss stage, where the court was required to credit the complaint's well-pleaded allegations. Even if it was unclear from the record whether officers had probable cause to arrest or threaten arrest, Mr. Dubash and Dr. Harsini still pled enough to state a claim for relief that survives the motion to dismiss stage by indicating objective facts that established Discovery Green as a public park, and that the Officers had notice and reason to believe that Discovery Green is a public park where peaceful demonstrations like theirs are allowed. *See Herrera*, <u>2022 WL</u>

17547449, at *3 (finding a protestor's claims survived the motion to dismiss stage even when it was unclear from the record whether officers had probable cause to arrest him for the offense of obstructing a passageway, since the record leaves open the question of whether he actually rendered the sidewalk he was on "impassable" or "unreasonably inconvenient or hazardous" as the statute requires).

**CONCLUSION**

There is no doubt that a government cannot censor speech occurring in a public forum simply because it finds that speech offensive. For the reasons expressed above and those in Appellants' brief, it is equally true that a government cannot contract with a private party to censor that same speech. Left untouched, the district court's decision provides a roadmap for eroding clearly established First Amendment protections.

The court's decision is particularly concerning for free speech in the traditional public forum of public parks because of the common practice of operating public parks through private conservancies. Discovery Green is far from the only public park operated by a conservancy. The iconic National Mall in Washington, D.C. is operated by a conservancy.[24] So is Central Park in New York City, Piedmont

---

[24] Peter Harnik & Abby Martin, *Public Spaces/Private Money: The Triumphs and Pitfalls of Urban Park Conservancies*, The Trust for Public Land, Feb. 2015, at 4, https://www.communityforthecommons.org/uploads/1/2/9/9/129938953/public-spaces-private-money-feb-2015.pdf.

Park in Atlanta, Brackenridge Park in San Antonio, Hermann Park in Houston, Memorial Park in Houston, Buffalo Bayou in Houston, and many more across the country. *Id*.

To maintain that people are not entitled to their First Amendment rights in these public parks is to carve a hole in the Constitution. The original purpose behind park conservancies was to help fund public parks because city park and recreation departments were struggling to adequately fund them, not to justify censorship. *Id*. at 6. This Court should preserve traditional public fora instead of allowing the State to hand them over—along with people's constitutional rights—to private parties disinterested in the Constitution.

Dated: 2/28/2025                        Respectfully submitted,

                                        */s/   Thomas Buser-Clancy*
                                        Thomas Buser-Clancy
                                        Savannah Kumar
                                        Sarah F. Corning
                                        ACLU Foundation of Texas, Inc.
                                        P.O. Box 8306
                                        Houston, TX 77288
                                        (713) 942-8146
                                        tbuser-clancy@aclutx.org
                                        skumar@aclutx.org
                                        scorning@aclutx.org

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I certify that this Brief of Amicus Curiae in Support of Plaintiff–Appellant complies with the type-volume limitation, typeface requirements, and type style requirements of Federal Rule of Appellate Procedure 32 because it contains 6,259 words and has been prepared in a proportionally spaced typeface, 14-point Times New Roman, using the word-processing system Microsoft Word 2016.

Dated: 2/28/2025                    By: */s/ Thomas Buser-Clancy*
                                        Thomas Buser-Clancy

                                        *Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2025, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to all counsel of record.

Dated: <u>2/28/2025</u>                                        By: <u>*/s/ Thomas Buser-Clancy*</u>
                                                                    Thomas Buser-Clancy

                                                                    *Counsel for Amicus Curiae*